No. 24-10462-DD

In the
United States Court of Appeals
for the Eleventh Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

EMMANUEL AYALA,
*Defendant-Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 8:22-CR-369-KKM-AAS-1

## PRINCIPAL BRIEF OF THE UNITED STATES

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

SEAN SIEKKINEN
Assistant United States Attorney
Appellate Division
USA No. 192
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

June 28, 2024

*United States v. Emmanuel Ayala*
No. 24-10462-DD

## Certificate of Interested Persons
## and Corporate Disclosure Statement

The following persons have an interest in the outcome of this case:

1.    Ayala, Emmanuel, defendant-appellee;

2.    Consuegra, Stephen, Federal Public Defender's Office;

3.    Corrigan, Hon. Timothy, United States District Judge;

4.    Cunningham, Scott, USPS Special Agent, victim;

5.    Daines, Laura J., Federal Public Defender's Office;

6.    Downing, Paul A., former Assistant Federal Public Defender;

7.    Hall, A. Fitzgerald, Federal Public Defender;

8.    Handberg, Roger B., United States Attorney;

9.    King, Abigail K., Assistant United States Attorney;

10.    Mizelle, Hon. Kathryn Kimball, United States District Judge;

11.    Muench, James A., Assistant United States Attorney;

12.    Rhodes, David P., Assistant United States Attorney,
       Chief, Appellate Division;

13.    Roberts, Ross, Assistant United States Attorney;

14.    Sansone, Hon. Amanda Arnold, United States Magistrate Judge;

15.    Siekkinen, Sean, Assistant United States Attorney;

16.    Tuite, Hon. Christopher P., United States Magistrate Judge; and

*United States v. Emmanuel Ayala*
No. 24-10462-DD

17.    Younce, Jill, USPS Special Agent, victim.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## Statement Regarding Oral Argument

The United States requests oral argument. This case presents an important issue of Second Amendment law, and the district court's order of dismissal, if not corrected, will have grave implications for longstanding firearm restrictions in post offices and other government buildings.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement .........C-1

Statement Regarding Oral Argument .............................................................i

Table of Contents...........................................................................................ii

Table of Citations .........................................................................................iv

Statement of Jurisdiction ..............................................................................ix

Statement of the Issue ................................................................................... 1

Statement of the Case.................................................................................... 1

    *Course of Proceedings* ............................................................................... 2

    *Statement of the Facts*................................................................................ 9

    *Standard of Review* ................................................................................... 9

Summary of the Argument ............................................................................ 9

Argument and Citations of Authority.......................................................... 11

    The district court wrongly held that the Second Amendment
    prevents the government from prohibiting postal employees from
    bringing firearms into post offices where they work ........................... 11

    A.   *Heller*, *McDonald*, and *Bruen* expressly vindicate firearm
        restrictions in government buildings, which include post
        offices..............................................................................................12

    B.   Even if the Supreme Court's assurances in *Heller*, *McDonald*,
        and *Bruen* are construed as dicta, the analogies that the
        Court drew demonstrate a historical understanding of the
        government's authority to restrict firearms in other
        government buildings ............................................................. 25

C.    Even if the government could not restrict firearms in post offices as a general matter, Ayala's as-applied constitutional challenge would still fail, because the government may prohibit its own employees from bringing guns to work ............. 37

Conclusion ............................................................................................... 42

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

# Table of Citations

## Cases

*Bd. of Comm'rs, Wabaunsee Cty. v. Umbehr*,
  518 U.S. 668 (1996) ................................................................. 40

*Bishop v. Wood*,
  426 U.S. 341 (1976) ................................................................. 41

*Bonidy v. U.S. Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015)...................................24, 29, 33, 38

*Carey v. Musladin*,
  549 U.S. 70 (2006) .................................................................. 23

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ............................ 7, 10, 12–13, 15–25, 26, 39, 38, 40–41

*Engquist v. Oregon Dep't of Agriculture*,
  553 U.S. 591 (2008) ................................................................ 39

*Frey v. Nigrelli*,
  661 F.Supp.3d 176 (S.D.N.Y. 2023) ........................................... 19

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ..............................................................31, 39

*GeorgiaCarry.Org, Inc. v. Georgia*,
  687 F.3d 1244 (11th Cir. 2012)................................................... 29

*Koon v. Platkin*,
  673 F.Supp.3d 515 (D. N.J. 2023) ............................................. 20

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988) ................................................................ 39

*McDonald v. City of Chicago*,
  561 U.S. 742, 786 (2010)..........................7, 10, 12, 15–18, 20–22, 25, 38, 40

*Nekrilov v. City of Jersey City*,
  45 F.4th 662 (3d Cir. 2022) ...................................................... 31

*New York State Rifle and Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022)...................... 3–8, 10, 12, 13–25, 27–30, 32–36, 38, 40–41

*O'Connor v. Ortega*,
   480 U.S. 709 (1987) ................................................................ 39

*Peterson v. BMI Refractories*,
   124 F.3d 1386 (11th Cir. 1997) .............................................. 26

*Postal Service v. Council of Greenburgh Civic Ass'ns*,
   453 U.S. 114 (1981) ................................................................ 39

*Range v. Attorney General*,
   69 F.4th 96 (3d Cir. 2023), *petition for cert. filed*,
   No. 23-374 (U.S. Oct. 10, 2023) ............................................ 18

*Robbins v. United States*,
   284 F. 39 (8th Cir. 1922) ....................................................... 29

*Schultz v. Alabama*,
   42 F.4th 1298 (11th Cir. 2022)............................................38–39

*Schwab v. Crosby*,
   451 F.3d 1308 (11th Cir. 2006)...........................................24, 26

*Seminole Tribe of Fla. v. Fla.*,
   517 U.S. 44 (1996)................................................................. 23

*U.S. Civil Service Commission v. Letter Carriers*,
   413 U.S. 548 (1973) ............................................................... 40

*United States v. Brown*,
   552 F.2d 817 (8th Cir. 1977) .................................................. 29

*United States v. City & Cnty. of San Francisco*,
   310 U.S. 16 (1940)................................................................. 29

*United States v. Class*,
   930 F.3d 460 (D.C. Cir. 2019) ............................................... 30

*United States v. Dorosan*,
   350 F. App'x 874 (5th Cir. 2009) ................................ 13, 29, 38

*United States v. Dubois*,
  94 F.4th 1284 (11th Cir. 2024)................................................18–19, 23–24

*United States v. Jackson*,
  69 F.4th 495 (8th Cir. 2023) ...................................................................... 25

*United States v. Jimenez-Shilon*,
  34 F.4th 1042 (11th Cir. 2022)..................................................................... 9

*United States v. Kokinda*,
  497 U.S. 720 (1990) .................................................................................. 32

*United States v. Marique*,
  No. CR 22-00467-PJM, 2023 WL 5338069 (D. Md. Aug. 18, 2023)........... 19

*United States v. Matherson*,
  367 F. Supp. 779 (E.D.N.Y. 1973) ............................................................ 29

*United States v. Rahimi*,
  __ S. Ct. __, 2024 WL 3074728
  (June 21, 2024) ................................................1, 4, 10, 15, 25, 28, 34, 36, 41

*United States v. Rozier*,
  598 F.3d 768 (11th Cir. 2010)............................................................... 18, 23

*Waters v. Churchill*,
  511 U.S. 661 (1994) .................................................................................. 39

*Worth v. Harrington*,
  666 F.Supp.3d 902 (D. Minn. 2023) .......................................................... 19

**Statutes**

18 U.S.C. § 111................................................................................................ 2

18 U.S.C. § 930......................................................................................2, 11, 17

18 U.S.C. § 930(a).............................................................1, 5, 6, 9, 34, 42

18 U.S.C. § 930(d)(2) ...................................................................................... 3

18 U.S.C. § 930(d)(3) ................................................................................... 3–4

18 U.S.C. § 930(g)......................................................................................... 20

18 U.S.C. § 930(g)(1) ............................................................3, 9, 11

18 U.S.C. § 3231 ...............................................................................ix

18 U.S.C. § 3731 ...............................................................................ix

**Rules**

Fed. R. App. P. 4(b)(1)(B)(i) ...........................................................ix

**Other Authorities**

2 Edw. 3 c. 3 (1328). ...................................................................... 27

7 Edw. 2, 170 (1313). ...................................................................... 27

39 C.F.R. § 232.1(l) ...................................................................13, 33

1647 Md. Laws 216........................................................................... 27

1650 Md. Laws 273........................................................................... 27

1786 Va. Acts 33, ch.21 ................................................................... 27

Act of Jan. 26, 1787 N.Y. Laws 345................................................. 27

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205 (2018) ............................................. 32

Del. Const. Art. 28........................................................................... 27

*Going Postal*, Wikipedia, https://en.wikipedia.org/wiki/Going_postal ......... 28

James Bruns, *Great American Post Offices,* at xii & 3 (1998)............................. 35

Post Office Department, 7 Collections of the Massachusetts Historical Society 3, 48 (1838) ................................................................... 35

Postal Service Administrative Support Manual, Section 276.22, *available at* https://www.nalc.org/workplace-issues/resources/body/ Administrative-Support-Manual-Issue-13-July-1999-Updated-Through-January-2021.pdf. ...................................37–38

Pub. L. No. 100-690 § 6215 (Nov. 18, 1988)................................ 17

Randy Kozel, *The Scope of Precedent*,
  113 Mich. L. Rev. 179 (2014) ................................................................. 23

Ruth Lapham Butler, *Doctor Franklin, Postmaster General* (1928) ................... 34

The Charter and Ordinances of the City of Providence, with the Acts of
  the General Assembly Relating to the City (1835) ............................... 27–28

U.S. Const. art. IV, § 3, cl. 2. ................................................................. 28–29

U.S. Postal Service, *Publication 119: Sources of Historical Information on
  Posts Offices, Postal Employees, Mail Routes, and Mail Contractors*, at 10
  (Nov. 2022) .............................................................................................. 35

William Michael Treanor, *The Original Understanding of the Takings Clause
  and the Political Process*, 95 Colum. L. Rev. 782 (1995) ............................. 30

## Statement of Jurisdiction

The United States appeals the dismissal of one count of a two-count indictment. *See* Doc. 57. The district court has jurisdiction over this criminal case. *See* 18 U.S.C. § 3231. On January 12, 2024, the court granted in part defendant Ayala's motion to dismiss the indictment, Doc. 57, dismissing the first count with prejudice, Doc. 58. The United States timely appealed on February 12, 2024. *See* Doc. 62; Fed. R. App. P. 4(b)(1)(B)(i). This Court has jurisdiction over this interlocutory appeal, which is "from a decision, judgment, or order of a district court dismissing an indictment ... as to one or more counts, or any part thereof ... ." 18 U.S.C. § 3731.

## Statement of the Issue

Did the district court err in ruling that 18 U.S.C. § 930(a)—which prohibits the possession of "a firearm or other dangerous weapon in a Federal facility"—is unconstitutional under the Second Amendment as applied to a Postal Service employee who carried a firearm into his Postal Service workplace.

## Statement of the Case

Just last week, in *United States v. Rahimi*, the Supreme Court acknowledged that "some courts have misunderstood the methodology of our recent Second Amendment cases." That is what happened here. The district court dismissed a count charging defendant Ayala with having illegally possessed a firearm at his Postal Service workplace, ruling that the Second Amendment bars the government from prohibiting firearms in post offices because firearms were not prohibited in post offices at the time of the Founding. The lack of post-office-specific regulations is no surprise, however, because dedicated postal buildings did not exist at that time. In any event, the Supreme Court has assured us three times that the government may restrict firearms in government buildings, without any evident exception. And in *Rahimi*, the Court emphatically reminded us that the law at issue need only be "consistent with" our historical principles and "relevantly similar" to our

1

Founding-era laws. Because the district court strayed from these principles, the United States has appealed.

## Course of Proceedings

A grand jury charged Emmanuel Ayala with having knowingly possessed a firearm in a federal facility, in violation of 18 U.S.C. § 930, and with having forcibly resisted, opposed, impeded, and interfered with an officer and employee of the United States performing official duties, in violation of 18 U.S.C. § 111. *See* Doc. 1.

Ayala moved to dismiss the indictment. *See* Doc. 23. In his motion, Ayala explained that he is a truck driver for the United States Postal Service, *id.* at 3; that, on the date alleged in the indictment, he had carried a concealed firearm into the post office where he works, *id.* at 3–4; and that he had fled when plainclothes Postal Service agents tried to arrest him in the parking lot, after he had left the building itself, *id.* at 4–6. He also asserted that he "is legally entitled to possess firearms," that he "has a concealed weapons permit and a class 'G' security license under Florida law," and that he "carries his gun primarily for self-defense while he's on the job and driving on the roadways." *Id.* at 3–4.

The facts asserted in Ayala's motion are not alleged in the indictment. *See* Doc. 1. As to the firearm offense, the indictment says simply that Ayala

"did knowingly possess and cause to be present a firearm, that is, a Smith & Wesson 9MM firearm, in a federal facility," on the alleged date. *Id.* at 1. (The statute defines "Federal facility" as "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g)(1).) The United States agrees, however, that Ayala worked for the Postal Service, that he carried a concealed firearm into his post office on the date alleged in the indictment, and that he subsequently resisted arrest, leading to these charges.

Ayala argued in his motion to dismiss that the statute prohibiting the possession of firearms in federal facilities is unconstitutional as applied to him, under *New York State Rifle and Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), *see* Doc. 23 at 7–12, and unconstitutionally vague regardless, *id.* at 12–17. His vagueness challenge was directed at two statutory exceptions that permit (1) "the possession of a firearm [in a federal facility] ... by a Federal official ... if such possession is authorized by law," 18 U.S.C. § 930(d)(2), and (2) the "lawful carrying of firearms ... in a federal facility incident to hunting or other lawful purposes," § 930(d)(3). *See* Doc. 23 at 13–18. Ayala argued that he may have been allowed to carry a firearm to work under either exception. *Id.* And, further, that he had therefore been entitled to resist "an unlawful arrest." *Id.* at 18–20.

3

The United States opposed Ayala's motion, relying in part on the Supreme Court's repeated pronouncements in *Bruen*, and in cases cited favorably by *Bruen*, that the Second Amendment permits firearm restrictions in government buildings. *See* Doc. 25 at 4–5. But the district court concluded that the Supreme Court's statements about such presumptively lawful restrictions do not resolve the matter. *See* Doc. 26 at 1–3. Instead, the court directed the United States to submit supplemental briefing "that examines the historical evidence of regulation of firearms at post offices, with a particular view to the time of the Founding," including "firearm regulations at post offices and of their workers." *Id*. at 4 (citing *Bruen*). The court also ordered supplemental briefing on "whether Ayala falls within the [statutory] exception that permits possessing a firearm in a federal facility [incident to hunting or other lawful purposes]." *Id.* at 5 (citing § 930(d)(3)).

The United States submitted a supplemental brief addressing both issues, while reiterating that the Supreme Court had decided in *Bruen* and earlier cases that firearm restrictions in government buildings are consistent with the Second Amendment's text and historical understanding, and that *Bruen* should not be taken to require in each case historical examples of firearm restrictions in precisely the type of government building at issue. *See* Doc. 32. (The Supreme Court's most recent Second Amendment case, *United States v. Rahimi*,

4

__ S. Ct. __, 2024 WL 3074728 (June 21, 2024), which confirms this, did not yet exist during the district-court litigation.)

The district court disagreed and granted Ayala's motion in part, "dismiss[ing] the § 930(a) charge because it violates Ayala's Second Amendment right to bear arms," declining to address his vagueness challenge, and rejecting his challenge to the resisting-arrest count. Doc. 57 at 1–4. The court began by announcing that *Bruen* requires the United States in this case to present a historical record of regulations that address "safety problems by regulating firearms in post offices." Doc. 57 at 4. The court also conducted its own historical inquiry and uncovered no firearms regulations that it considered relevantly similar. *Id.* at 4, 8–26. The court next concluded that "nothing in Supreme Court dicta establishes that the United States may ban firearms in all government buildings." *Id.* at 4, 26–33. And the court ruled that the scope of the Second Amendment right is a legal question, not a factual one, so the court need not hold an evidentiary hearing to resolve the issue. *Id.* at 4, 34–35. "Instead, the government bears the burden to identify historical evidence supporting its challenged regulation." *Id.* at 4. The court rejected the idea that the United States as property owner had the authority to restrict firearms on its premises. *Id.* at 35–38. And finally, the court passed on addressing the significance of Ayala's status as a postal employee because the court did not

5

deem that point to have been adequately presented. *Id.* at 39–40.

The district court explained that it was addressing only "[section] 930(a)'s constitutionality as applied to Ayala." Doc. 57 at 7 n.3. Because, according to the court, "[p]ossessing a firearm in a Federal facility is an activity that falls within the plain text of the Second Amendment," the court required a showing "that a ban on firearms in ordinary post offices is consistent with our nation's founding-era tradition of firearms regulation." *Id.* at 8. The court observed that post offices have existed since before the founding, yet there was no colonial history of restricting firearms to protect postal-employee safety or to ensure the efficacy of mail delivery. *Id.* at 11–12. The court acknowledged the existence of colonial-era anti-intimidation laws banning firearms during specific times and at specific places, but deemed them unhelpful because "there is no evidence that Congress ever sought to address intimidation at post offices with firearms bans." *Id.* at 12.

The district court said that "the government attempts to address age-old problems through a new and near-complete firearms ban" but does not "identify any relevantly similar analogue." Doc. 57 at 13. Therefore, "the United States fails to carry its burden under *Bruen* to identify a historical tradition from the founding that supports the application of §930(a) to an ordinary post office." *Id.* The court rejected the idea that laws prohibiting arms

6

in "legislatures, polling places, and courthouses" are analogous—despite the Supreme Court's observation in *Bruen*—and added that there were "relatively few" of those anyway. *Id*. at 14.

The district court discussed at length the English Statute of Northampton and state "copycat[]" laws, Doc. 57 at 16–23, concluding that those laws would apply, at most, to senior officials, not to "[o]rdinary postal employees at an ordinary post office," *id*. at 22. The court then addressed prohibitions in legislatures and polling places, *id*. at 23–26, but deemed those "sparse" examples applicable only to places where "important and legally definitive governmental decisions are regularly made," *id*. at 23–24.

The district court then discussed the many statements in *Heller*, *McDonald*, and *Bruen* approving of firearm prohibitions in "government buildings," "schools," and other "sensitive spaces." Doc. 57 at 26–33. The court characterized *Heller*'s endorsement of firearm prohibitions in "schools and government buildings" as "not necessary to the reasoning of [the] case" and "pure dicta." *Id*. at 27. The court then went further, declaring that "[n]o sound argument exists that either *Heller* or *McDonald* or both logically entail a rule that 'all manners of government buildings' are sensitive places," that *Bruen* similarly does not necessarily characterize government buildings as "settled" sensitive places, and that such a view "would render the analogical reasoning

required by *Bruen* pointless." *Id*. at 33. In dismissing the Supreme Court's repeated prior assurances, the district court took a narrow view of those opinions' holdings—only the legal rule as applied to the actual facts of that case. *Id*. at 28–30. And the court concluded: "Because there is neither a holding nor reasoned dicta from the Supreme Court answering whether all government buildings are sensitive places, *Bruen* requires the above historical analysis." *Id*. at 33. That analysis, the court concluded, shows that "there is no historical practice of a near-total prohibition on firearms in ordinary post offices and there is no relevantly similar historical analogue supporting such a prohibition." *Id*.

Next, the district court rejected Ayala's contention that the United States had to present evidence from "an expert historian" establishing that the post office where he worked was a historically 'sensitive place.'" Doc. 54 at 34. The court concluded that no evidentiary hearing was warranted because "whether a firearms regulation is consistent with our nation's historical tradition is a legal question, not a factual one." *Id*. (cleaned up).

Then, the district court rejected the idea that the government, as proprietor, could ban the possession of guns on its property. Doc. 57 at 35–39. The court ultimately reasoned: "At some point, when twenty-eight percent of land in the United States is owned by the federal government and many

8

ordinary activities require frequenting a 'Federal facility,' the government's theory would amount to a nullification of the Second Amendment right altogether." *Id.* at 38. (The court may have overlooked that the United States' argument in this as-applied challenge was limited to government *buildings*, see Doc. 32 at 2–18—which are "Federal facilit[ies]" covered by the statute, *see* 18 U.S.C. § 930(g)(1). Resolution of this appeal does not implicate the vast swathes of federal land, largely in the West and Alaska, that concerned the district court.)

In the end, the court granted Ayala's motion to dismiss count one with prejudice. Doc. 57 at 42. This appeal by the United States followed.

### Statement of the Facts

The relevant facts are set forth above.

### Standard of Review

This Court should review *de novo* the constitutionality of the challenged statute. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1043 (11th Cir. 2022).

## Summary of the Argument

The district court erred in ruling that 18 U.S.C. § 930(a)—which prohibits the possession of "a firearm or other dangerous weapon in a Federal facility"—is unconstitutional under the Second Amendment as applied to Ayala, a Postal Service employee who carried a firearm into his Postal Service

9

workplace.

In striking down laws that had broadly prohibited firearms at home or in public, the Supreme Court has cautioned that other laws prohibiting the possession of firearms in schools or government buildings are settled and beyond doubt (*Heller* and *McDonald*). Bruen affirmed and reiterated *Heller* and *McDonald*, while explaining that firearm prohibitions in schools and government buildings are consistent with our nation's tradition and the historical understanding of the Second Amendment.

The district court, though, made three mistakes in applying *Bruen*. First, it improperly dismissed as non-binding dicta the Supreme Court's repeated assurances about the government's settled authority to regulate firearms in government buildings. Then, in undertaking from scratch its own assessment of the historical evidence (which it did not need to do in light of the Supreme Court's clear statements), the court improperly insisted on an unnecessary and impossible degree of similarity between historical analogues and the challenged firearm restriction. Just last week, the Supreme Court acknowledged that lower courts have been misreading its precedent and making this mistake (*Rahimi*). Finally, in deeming the prohibition against possessing firearms in federal facilities unconstitutional as applied to Ayala—a postal employee who carried a gun into a post office—the court understated

the United States' authority as a property owner and overstated Ayala's rights as an employee.

This Court should hold, consistent with the historical evidence and the Supreme Court's instructions, that the Second Amendment's text and historical understanding support firearm restrictions in government buildings, including post offices. The district court's dismissal of count one should be reversed.

## Argument and Citations of Authority

### The district court wrongly held that the Second Amendment prevents the government from prohibiting postal employees from bringing firearms into post offices where they work.

Ayala was charged with having knowingly possessed a firearm in a federal facility, in violation of 18 U.S.C. § 930. *See* Doc. 1. "'Federal facility' means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." § 930(g)(1). Ayala admits that he carried a gun into a post office, which is a federal facility and a government building. *See* Doc. 23 at 3–12. The district court erred in dismissing this count. The court improperly renounced the Supreme Court's repeated promises that regulation of firearms in sensitives places like government buildings (and schools) remains permissible; conducted the historical analysis at an inappropriately granular

11

level that very few modern firearm regulations could satisfy; and purported to

conduct an as-applied analysis but did so without appropriately considering

Ayala's circumstances.

**A.    *Heller*, *McDonald*, and *Bruen* expressly vindicate firearm restrictions in government buildings, which include post offices.**

The most glaring problem with the district court's decision is its rejection

of the Supreme Court's repeated assurances, starting with *District of Columbia v.*

*Heller,* 554 U.S. 570 (2008), that the constitutionality of laws forbidding the

carrying of firearms in government buildings is settled. *Heller* began with the

observation that, "[f]rom Blackstone through the 19th-century cases,

commentators and courts routinely explained that the right [to bear arms] was

not a right to keep and carry any weapon whatsoever in any manner

whatsoever and for whatever purpose." *Id*. at 626. With that principle in mind,

*Heller* explained that its decision to strike down a local ordinance that had

prohibited the keeping of handguns in homes "should [not] be taken to cast

doubt on … laws forbidding the carrying of firearms in sensitive places such as

schools and government buildings." *Id*. The Court identified such sensitive-

place restrictions as but one example in a non-exhaustive list of "presumptively

lawful regulatory measures" that do not clash with the Second Amendment;

the Court also singled out "longstanding prohibitions on the possession of

12

firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27 & n.26. In making those assurances, the *Heller* Court explained that it would "expound upon the historical justifications for the exceptions [it had] mentioned if and when those exceptions come before [it]." *Id.* at 635.[1]

Then, in *McDonald v. City of Chicago*, the Supreme Court "repeat[ed] those assurances," reiterating that it had "made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as … 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings,' [etc.]." 561 U.S. 742, 786 (2010) (quoting *Heller*).

Finally, in *Bruen*, the Court reaffirmed those exceptions yet again, *see* 597 U.S. at 30–31, even as it invalidated New York's proper-cause licensing regime.

The *Bruen* Court then addressed the general test. It explained that "when

---

[1]Shortly after *Heller*, the Fifth Circuit relied on those assurances to uphold a conviction "for bringing a handgun onto property belonging to the United States Postal Service" in violation of 39 C.F.R. § 232.1(l). *United States v. Dorosan*, 350 F. App'x 874 (5th Cir. 2009) (unpublished). The Court held that, because the Postal Service used its parking lot for loading mail and staging its mail trucks, that is, "as a place of regular government business," the lot falls under *Heller*'s "sensitive places" exception. *Id.* (quoting *Heller*, 554 U.S. at 626).

the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," placing on the government the burden to demonstrate that a firearms regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. The Court explained that it was employing a "test rooted in the Second Amendment's text, as informed by history," and it rejected in the process the balancing test that had become prevalent in many circuits. *Id.* at 19. The historical inquiry, it said, "will often involve reasoning by analogy," in which courts examine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 28–29. The Court explained that "analogical reasoning" should be "neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 30. A court should not uphold modern laws simply because they remotely resemble historical outliers. *Id.* But a court need not search in vain for a "historical *twin*"; "a well-established and representative historical *analogue*" will suffice. *Id.* (emphases the Court's). Thus, the Court explained, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

The Supreme Court reiterated just last week that *Bruen*'s analogical reasoning does not require a historical "twin"—merely an "analogue." *See*

14

*United States v. Rahimi*, __ S. Ct. __, 2024 WL 3074728, at *10 (June 21, 2024). *Rahimi* recognized, apropos of this case, that "some courts have misunderstood the methodology of our recent Second Amendment cases." *Id.* at *6. "These precedents"—*Bruen*, *McDonald*, and *Heller*—"were not meant to suggest a law trapped in amber." *Id.* Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* (citing *Bruen*, 597 U.S. at 26–31). So a court "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29 & n.7).

To that end, *Rahimi* held that our historical tradition of surety laws and going-armed laws, which could lead to jail for individuals who threatened the physical safety of others, suffices to justify a modern law that disarms subjects of domestic-violence restraining orders, even though historically there were no such specific restrictions. *Id.* at *11. In reversing the Fifth Circuit, the Court recognized the adequacy of an appropriately analogous, "relevantly similar" restriction, and it squarely rejected the notion that a match was required.

So too, here. *Bruen* specifically identifies firearm prohibitions in government buildings as an example of lawful modern regulations. *See* 597

15

U.S. at 30–31. Taking *Heller*'s discussion of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" as a starting point, the Court explained that, "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions." *Id*. at 30. "We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id*. And, based on that, "courts can use analogies ... to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id*. So *Bruen*, *McDonald*, and *Heller* make clear that government buildings—including ones analogous to those where restrictions had historically applied—fall on the constitutionally-regulable side of that line.

Whether *Bruen* means to say that schools and government buildings are themselves *historically* sensitive places (of the same vintage as, say, legislative assemblies, polling places, and courthouses) or are *new* and *modern* analogues to the enumerated examples, is debatable but irrelevant. The point, regardless, is that this part of *Bruen* explains why it is "constitutionally permissible" to prohibit the carrying of firearms in schools and government buildings (as *Heller*

16

and *McDonald* also say): either because the lawfulness of such prohibitions may be presumed "settled" given the lack of any historical dispute or because schools and government buildings—of whatever type—are "analogous enough to pass constitutional muster" when compared to other presumptively settled sensitive places. *Bruen*, 597 U.S. at 30. And nothing in *Bruen* purports to narrow or restrict the categories of sensitive places that *Heller* and *McDonald* specifically identified. Here, the district court should not have second-guessed the Supreme Court's "repeat[ed] … assurances" that its recent precedents cast no doubt on firearm restrictions in such places. *See McDonald*, 561 U.S. at 786.

For more than 35 years, 18 U.S.C. § 930 has restricted the possession of firearms in any "building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." *See* Pub. L. No. 100-690 § 6215 (Nov. 18, 1988). *McDonald* reiterated *Heller*'s "assurances" that the Second Amendment casts no doubt on longstanding "laws forbidding the carrying of firearms in … government buildings" (or other sensitive places). *McDonald*, 561 U.S. at 786. *Bruen* again reiterated *Heller* (and *McDonald*). The district court's view of *Bruen*, however—as an invitation to scrutinize firearm restrictions for particular types of government buildings, of which there are, of course, myriad types—would cast significant doubt on firearm restrictions in those buildings, contrary to the

17

Supreme Court's assurances in *Heller* and *McDonald*, which *Bruen* affirms and reiterates. This district court is the only court we know of to interpret *Bruen* so selectively.

We will briefly address what some other courts have said. A few courts, we acknowledge, have found that some of the Supreme Court's assurances about other presumptively lawful firearm restrictions are not binding assurances at all. *See, e.g.*, *Range v. Attorney General*, 69 F.4th 96, 101 (3d Cir. 2023) (majority en-banc opinion concluding that the Second Amendment protects a non-violent felon's right to possess firearms), *petition for cert. filed*, No. 23-374 (U.S. Oct. 10, 2023). Those decisions, though, conflict with this Court's decision in *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010), which recognized that the Supreme Court's assurances in *Heller* are "not dicta" and would be entitled to "considerable weight" even if they are. *Id.* at 771 n.6; *see also United States v. Dubois*, 94 F.4th 1284, 1292 (11th Cir. 2024) (re-acknowledging "that this language from *Heller* was 'not dicta' because it limited the Second Amendment right to '*law-abiding* and *qualified* individuals'") (quoting *Rozier*, 598 F.3d at 771; emphasis this Court's). In any event, no court as far as we know (other than the district court here) has held that the government may not restrict firearms in a government building. To the contrary, other district courts seem to have recognized—consistent with *Rozier*

and *Dubois*—that *Bruen* affirms "settled" firearm regulations in all manner of government buildings (and, by the same reasoning, in schools). *See, e.g., United States v. Marique*, No. CR 22-00467-PJM, 2023 WL 5338069, at *5 (D. Md. Aug. 18, 2023) ("In *Bruen* and in *Heller*, the Supreme Court made no distinction between the types of government buildings that are sensitive places. The Court declared only that government buildings are sensitive places where firearms regulations are presumptively permissible and consistent with the Nation's history of firearms regulations."), appeal pending, No. 23-4576 (4th Cir.); *Worth v. Harrington*, 666 F.Supp.3d 902, 912 n.12 (D. Minn. 2023) (observing that, "[a]lthough the *Bruen* Court identified few other founding-era sensitive places with outright prohibitions on weapons, the lack of evidence of 'disputes regarding the lawfulness of such prohibitions' suggested that 'arms carrying could be prohibited [in schools and government buildings] consistent with the Second Amendment'") (quoting *Bruen*; brackets in original), appeal pending, No. 23-2248 (8th Cir.); *Frey v. Nigrelli*, 661 F.Supp.3d 176, 206 (S.D.N.Y. 2023) (reading *Bruen* to have "'assumed it settled that' schools full of children were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment'") (quoting *Bruen*), appeal pending, No. 23-365 (2d Cir.).[2]

---

[2]A district court in New Jersey found that plaintiffs were likely to

*Bruen* does not change the import of *Heller* or *McDonald*. It neither expanded the scope of the Second Amendment beyond what *Heller* and *McDonald* established nor narrowed the categories of sensitive places where firearms may be restricted. *Bruen*'s embrace of text, history, and tradition is explicitly founded on *Heller* itself. The majority explained that its holding was "consistent with *Heller* and *McDonald*," *Bruen*, 597 U.S. at 10, and "[i]n keeping with *Heller*," *id*. at 17. And when *Bruen* accepted as an example the "sensitive places" limitation of *Heller*, it did not suggest that it was eliminating or tempering it in any way. Indeed, the concurring opinions emphasized that *Bruen* does not "disturb[] anything that we said in *Heller* or *McDonald* ... about restrictions that may be imposed on the possession or carrying of guns," *id*. at 72 (Alito, J., concurring), and—more specifically—that *Bruen* casts no "doubt on longstanding prohibitions on the ... carrying of firearms in sensitive places

———————————

succeed—and therefore granted plaintiffs a preliminary injunction—in a lawsuit challenging a state law prohibiting firearms in "public libraries and museums" (among other places). *Koon v. Platkin*, 673 F.Supp.3d 515, 643 (D.N.J. 2023). But it's not clear if those places would count as "government buildings" within the meaning of either 18 U.S.C. § 930(g) ("where Federal employees are regularly present for the purpose of performing their official duties") or the Supreme Court's precedent. *See Koon*, 673 F.Supp.3d at 643 (noting that the State's attempt to "equate" those libraries and museums to "sensitive places such as schools and government buildings stretches the sensitive places doctrine too far"—apparently either because those libraries and museums were not "government buildings" to begin with, or because "the State cannot stretch every government building into a sensitive place").

such as schools and government buildings" (or other longstanding prohibitions), as the Court said in *Heller* and *McDonald*, *id.* at 81 (Kavanaugh, J., concurring). That the Supreme Court chose not to recognize any break from its past Second Amendment decisions makes it difficult to treat its repeated statements about lawful firearm restrictions in government buildings as anything less than binding. (Recall that the *Heller* Court did not offer up these examples detached from the historical context; it explained that it would someday "expound upon the historical justifications for the exceptions [it had] mentioned if and when those exceptions come before [it]." *Heller,* 554 U.S. at 635.) If text, history, and tradition have always formed the test, then lower-court judges should treat the statements in *Heller* and *McDonald* as consistent with that test.

The district court here, though, worried that the Supreme Court's assurances about the constitutionality of firearm restrictions in sensitive places "would render the analogical reasoning required by *Bruen* pointless." Doc. 57 at 33. Not so. *Bruen* demonstrates perfectly well the relevance of analogical reasoning as to sensitive places. On one hand, says *Bruen*, firearm prohibitions in government buildings are justified by historical analogues drawn from relevantly similar sensitive places (polling places, courthouses, and legislative assemblies). *Bruen*, 597 U.S. at 30. On the other hand, calling all of Manhattan

a "sensitive place"—as had been urged in *Bruen*—has no support because a sprawling and densely populated urban area is fundamentally dissimilar from the discrete public buildings that have historically been recognized as sensitive places. *See id.* at 30–31. The district court's concern that the Supreme Court's assurances would nullify *Bruen* is thus misplaced. Quite to the contrary, *Bruen* shows that analogical reasoning will be necessary to assess firearm prohibitions in *other* potentially "sensitive" places; those falling between the lawful and unlawful ones that the Court identified (schools and government buildings vs. newly devised ones, such as entire cities). *Id.* at 31.

*Heller*, *McDonald*, and *Bruen* should foreclose this constitutional challenge. The Court has said many times in many ways that the Second Amendment does not call into question settled firearm prohibitions in government buildings. *See Bruen*, 597 U.S. at 30; *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786. The district court's carve-out of a post-office exception conflicts with each of those opinions.

Nevertheless, the district court dismissed the Supreme Court's statements as "not necessary to the reasoning of [the] case" and "pure dicta." Doc. 57 at 27. That was a mistake. "Virtually every one of the [Supreme] Court's opinions announcing a new application of a constitutional principle contains some explanatory language that is intended to provide guidance to

22

lawyers and judges in future cases." *Carey v. Musladin*, 549 U.S. 70, 79 (2006) (Stevens, J., concurring). "By their very nature, doctrinal frameworks sweep far beyond the facts at hand to address other situations not concurrently before the court." Randy J. Kozel, *The Scope of Precedent*, 113 Mich. L. Rev. 179, 193 (2014). Given the relatively small number of cases the Supreme Court decides, applying conventional "what is a holding" principles to those decisions would hamstring the Court, trivialize its most important pronouncements, and beget circuit conflicts. "It is quite wrong to invite [lower-court] judges to discount the importance of such guidance on the ground that it may not have been strictly necessary as an explanation of the Court's specific holding in the case." *Musladin*, 549 U.S. at 79. The Supreme Court itself recognizes that a "well-established rationale upon which the Court based the results of its earlier decisions" is entitled to as much deference as the results themselves. *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 66–67 (1996). "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Id*. Indeed, as noted above, this Court has already held that the Supreme Court's assurances in *Heller* about the scope of its holding are not dicta. *See Rozier*, 598 F.3d at 771 n.6; *Dubois*, 94 F.4th at 1292.

But beyond that, *Heller* identified classes of presumptively lawful

regulations—including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"—as part of its historical analysis of the Second Amendment's meaning. And *Heller* said that the Court would expound on the historical justifications for those permissible regulations when a case raising them comes before it. *See* 554 U.S. at 635; *cf. Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) ("This is not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta."). It did not say that it would later decide whether those regulations it deemed permissible actually are permissible. Rather, the Court described these classes as "presumptively lawful regulatory measures," *Heller*, 554 U.S. at 635 n.26, which, this Court has explained, "made [it] clear" that these specified categories are subject to firearm restrictions. *See, e.g., Dubois*, 94 F.4th at 1292.[3] It doesn't mean a rebuttable presumption, to be addressed from scratch in each case, as the district court might presume. *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1136 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part). Rather, as the Eighth Circuit concluded, it is "more likely that the Court presumed that the regulations are constitutional because they are constitutional, but termed the conclusion presumptive because the specific

---

[3]The Supreme Court also made clear that its list of presumptively lawful regulatory measures "does not purport to be exhaustive." *Heller*, 554 U.S. at 627 n.26.

24

regulations were not at issue in *Heller*." *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023).

The Supreme Court announced that "nothing in [its] opinion should be taken to cast doubt" on those types of regulations. *Heller*, 554 U.S. at 626. Yet the district court not only cast doubt on them; it cast them aside.

**B.    Even if the Supreme Court's assurances in *Heller*, *McDonald*, and *Bruen* are construed as dicta, the analogies that the Court drew demonstrate a historical understanding of the government's authority to restrict firearms in other government buildings.**

The district court disagreed that legislative assemblies, polling places, and courthouses were relevantly similar to post offices, finding the comparison "unreasoned." Doc. 57 at 13–15. This Court need not address the sufficiency of those analogies if it takes the Supreme Court's assurances as assurances. But even if this Court concludes that the Supreme Court left the door open for lower courts to reevaluate the Court's analogical reasoning anew with respect to virtually every type of government building, the analogies that the Supreme Court drew fit comfortably within the *Bruen* framework, especially as explained in *Rahimi*. There is no reason not to follow them.

Faced with the Supreme Court's repeated assertions that the government may regulate firearms in government buildings, the district court said— accurately—that "the Eleventh Circuit has clearly reminded district courts not to follow dicta blindly." Doc. 57 at 27. But this Court (like other circuits) treats

Supreme Court dicta very differently. *See Schwab*, 451 F.3d at 1325 (11th Cir. 2006) ("[T]here is dicta, and then there is Supreme Court dicta."). "[D]icta from the Supreme Court is not something to be lightly cast aside." *Id.* (quoting *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997)). And this Court abides by that principle. It explained why in *Schwab*, where it disagreed—"a lot"—with the Second Circuit's decision to dismiss as dicta certain Supreme Court pronouncements:

> We will start with the most fundamental reason. We have always believed that when the Founders penned Article III's reference to the    judicial power being vested 'in one supreme Court and in such inferior Courts' as Congress may establish, they used 'supreme' and 'inferior' as contrasting adjectives, with us being on the short end of the contrast.

*Id.* (citation omitted). And then, this Court said, with admirable humility, "It would never occur to us to tell the Supreme Court that we would decide our cases based on our analysis of its decisions, not its own analysis of them if that analysis had been announced in a case where it was not essential to the result." *Id.* The district court here erred in its treatment of the Supreme Court's clear pronouncements, "dicta" or not.

The Supreme Court's statements about firearm restrictions in government buildings are entitled to—at a minimum—substantial deference. But even an independent look confirms that legislative assemblies, polling

26

places, and courthouses are sufficient analogues, in this context, for other types of government buildings, such as post offices. There are numerous examples of such historical regulations. For example, in England, in 1313, a law was passed providing that, for those who appear in Parliament, "every Man shall come without all Force and Armour." 7 Edw. 2, 170 (1313). This was followed in 1328 by the Statute of Northampton, which prohibited the carrying of arms "before the King's justices" and "other of the King's ministers doing their office." *Bruen*, 597 U.S. at 40 (citing 2 Edw. 3 c. 3 (1328)). This general proposition remained in place for centuries and laid the groundwork for similar laws in the colonies. For example, in 1647, Maryland outlawed firearms in the House of Assembly during session. *See* 1647 Md. Laws 216; *see also* 1650 Md. Laws 273. In 1786, Virginia's legislature enacted a prohibition similar to the Statute of Northampton that forbade most people from "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms." 1786 Va. Acts 33, ch.21. In 1776 and 1778, Delaware and New York enacted laws that prohibited individuals from bringing arms to a polling place during an election. *See* Del. Const. Art. 28; Act of Jan. 26, 1787 N.Y. Laws 345. Similarly, in 1835, Providence, Rhode Island, decreed that "No person shall fire any gun, pistol, rifle or other fire-arm ... on any public lands within said city." The Charter and Ordinances of the City of Providence,

27

with the Acts of the General Assembly Relating to the City Page 60, Image 61 (1835). In sum, there are numerous examples from the Founding Era in which jurisdictions adopted laws against bringing arms to government property where government business was being conducted, as the Supreme Court noted in *Bruen*, 597 U.S. at 30, 40.

And the reach between firearm restrictions in legislative assemblies, polling places, and courthouses, and other government buildings, like the post office here, is no greater than that between the specific and general restrictions that *Rahimi* squarely embraced. Prohibiting firearms in legislative assemblies, polling places, and courthouses served to protect government officials and citizens alike in buildings where government business was conducted. So, too, in modern government buildings. Congress has the authority to restrict firearm possession in post offices, and particularly—as applied here—by Postal employees, even though the term "going postal" did not enter the lexicon until long after Benjamin Franklin's tenure as Postmaster General. *See Going Postal*, Wikipedia, https://en.wikipedia.org/wiki/Going_postal.

Furthermore, such restrictions are consistent with Congress's "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. "The power over the public land thus entrusted to Congress is

without limitations." *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940). The Property Clause has long been recognized to authorize the enactment and enforcement of regulations designed to maintain safety and order on government property. *See United States v. Brown*, 552 F.2d 817 (8th Cir. 1977); *Robbins v. United States*, 284 F. 39 (8th Cir. 1922); *United States v. Matherson*, 367 F. Supp. 779 (E.D.N.Y. 1973). The government has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office or other government building) than when it is acting as a sovereign (such as when it regulates private activity unconnected to a government service). *Bonidy*, 790 F.3d at 1126. In *Dorosan*, discussed above, the Fifth Circuit (alternatively) upheld a conviction "for bringing a handgun onto property belonging to the United States Postal Service," because the Postal Service's "restrictions on guns stemmed from its constitutional authority as the property owner." *Dorosan*, 350 F. App'x at 875 (citing U.S. Const. art. IV, § 3, cl. 2. Along similar lines, this Court has recognized that the Second Amendment, "understood in its proper historical context, … codified a pre-existing right that was circumscribed by the common law rights of an owner under property law[.]" *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1265 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. 1. "*Heller*'s expounding of the pre-existing right enshrined in the Second Amendment does

nothing to change this." *Id.* This Court therefore rejected a challenge to a church's prohibition on firearms: "An individual's right to bear arms as enshrined in the Second Amendment, whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land." *Id.*

Since the framing of the Constitution, the Property Clause has conferred analogous power upon the federal government to regulate its own buildings. *Cf. United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (holding, pre-*Bruen*, that prohibiting guns on grounds of the U.S. Capitol "does not impinge upon a right protected by the Second Amendment," and affirming the prohibition partly because "as the owner of the Maryland Avenue lot [which was part of the Capitol grounds], the government—like private property owners—has the power to regulate conduct on its property"). Our Founders understood that property owners had the right to exclude others from their property and, along with it, the lesser power to restrict the actions or conduct of visitors as a condition of admittance. *See* William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 826–27 (1995) ("The individual's right of property 'consists in the free use, enjoyment, and disposal of all acquisitions, without any control of diminution, save only by the laws of the land.'") (quoting Blackstone's

Commentaries); *see also Nekrilov v. City of Jersey City*, 45 F.4th 662, 683–84 (3d Cir. 2022) (Bibas, J., concurring) (similarly describing the Founders' "broad conception" of property rights) (also citing Blackstone's Commentaries). Taken together with the settled historical examples that the Supreme Court identified—firearm prohibitions in legislative assemblies, polling places, and courthouses—the Property Clause demonstrates a historical understanding of the government's authority to restrict firearms in its own buildings, without exception, and a tradition of doing so.[4]

Here, the district court observed that, even when the government acts as proprietor, it remains subject to some constitutional constraints. *See* Doc. 57 at 36–37. That is of course true. The relevant constraints, however, usually involve the unconstitutional-conditions doctrine: The government may restrict access to its property in a manner that is reasonably related to the management of the property, but it may not leverage its control over its property to impose unrelated restrictions on constitutionally protected activity. *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to

---

[4]As mentioned above at 9, this is not a case about the propriety of restrictions on federal lands generally.

affect the entity's operations."). For example, the government may forbid solicitation in post offices, *see United States v. Kokinda*, 497 U.S. 720, 722–723 (1990) (plurality opinion), even though it could not forbid solicitation elsewhere as a condition of using a post office. So too here, the government may forbid the possession of firearms in federal facilities, even though it could not, say, require a person to stop keeping a gun at home as a condition of entering a federal facility.

We recognize that some scholars have found scarce historical examples of firearm restrictions in government buildings. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235–44 (2018). We provide several examples above but, regardless, the Supreme Court has said that the examples need not be numerous. In *Bruen,* to be sure, the Court concluded that a few examples could not establish a historical tradition of prohibiting the carrying of firearms *in public*, but that was because extensive countervailing authority showed that the right had been overwhelmingly protected. *See Bruen,* 597 U.S. at 44–46, 50–55. But *Bruen* explains that, in the "sensitive places" context, "[w]e … can assume it settled that … arms carrying could be prohibited consistent with the Second Amendment"—even though "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons

were altogether prohibited." *Id*. at 30. Put differently, *Bruen* shows that even a handful of examples can establish a historical tradition where, as here, the historical laws' constitutionality was not in dispute. "And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (emphasis the Court's).

To be more specific, the Postal Service has broad discretion to govern its business operations according to the rules it deems appropriate, and a regulation banning firearms on postal property is consistent with the Postal Service's objectives, which include providing a safe environment for its patrons and employees. *Bonidy,* 790 F.3d at 1126–27. To this end, the Code of Federal Regulations states that "[n]o person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property, except for official purposes." 39 C.F.R. 232.1(l). In *Bonidy*, the Tenth Circuit held that a postal customer's Second Amendment right did not extend to a Postal Service parking lot because the Second Amendment right to carry firearms does not apply to that federal property. *Bonidy*, 790 F.3d *at* 1121. In post offices—as in legislative assemblies, polling places, and courthouses—firearm restrictions reflect Congress's reasoned judgment that the restriction will help to protect

government officials and citizens carrying out or participating in government business within the confines of a government building. From a constitutional perspective, no greater need is necessary to justify firearm prohibitions in post offices or any other government building.

Ultimately, the district court here found section 930(a) unconstitutional as applied to Ayala because firearm restrictions in government buildings had not yet expanded to post offices by the time of the founding. But whether a firearm regulation is "part of" the historical tradition, *Bruen* explains, depends on whether it is "consistent with"—*i.e.*, not inconsistent with—that tradition. 597 U.S. at 19, 24. And *Rahimi* emphasizes and relies on that distinction. *See* 2024 WL 3074728, at *5. The lack of founding-era post-office-specific firearm restrictions is neither dispositive nor surprising, because dedicated postal buildings were rare or non-existent at that time.

The British Government furnished no postal buildings in the North American colonies, and the lack of dedicated accommodations continued long after the early American period. *See* Ruth Lapham Butler, *Doctor Franklin, Postmaster General* (1928), *attached hereto as* Ex. A. Letters were left at public gathering spots such as taverns or inns, and local postmasters "exercised their office" from private residences. *Id.* at 48. Rather than existing in "government buildings," early post offices "moved with any change of the Postmasters in

34

charge." *Id.* The first known colonial post office was a private tavern and residence designated by the General Court of Massachusetts in 1639. *See* Post Office Department, 7 Collections of the Massachusetts Historical Society 3, 48 (1838), *attached hereto as* Ex. B. New York City's first post office, opened in 1642, was housed in a succession of coffee houses until 1804. *See* James Bruns, *Great American Post Offices,* at xii & 3 (1998), *attached hereto as* Ex. C. There are no federal records on the buildings occupied by most early post offices. *See* U.S. Postal Service, *Publication 119: Sources of Historical Information on Posts Offices, Postal Employees, Mail Routes, and Mail Contractors*, at 10 (Nov. 2022), attached hereto as Ex. D. Until the early 1900s, most post office quarters were provided by the postmaster at no charge to the Post Office Department (often in the postmaster's home or other place of business, such as a general store). *Id.* Accordingly, the lack of firearm prohibitions in "post offices" at the time of the founding is not inconsistent with a contemporaneous understanding that firearms could nevertheless be restricted in "government buildings," which post offices would only later become. And firearms were indeed restricted in several types of government buildings at the time of the founding, as explained above. *See, e.g., Bruen*, 597 U.S. at 30.

The fundamental problem with the district court's historical analysis, and related to its insistence that each type of government building separately

satisfy it, is its laser focus on post offices, largely to the exclusion of all other government premises. The court's focus conflicts with *Bruen*'s directives, discussed above, and it renders firearm regulation almost impossible in most arenas, given the changes that have taken place over the past 250 years—including, especially, with respect to the federal government.

The Supreme Court's most recent Second Amendment decision confirms the district court's error. As discussed above, *Rahimi* cautions that the Court's Second Amendment cases were "not meant to suggest a law trapped in amber." *Rahimi*, 2024 WL 3074728, at *6. *Rahimi* explains that *Bruen* requires courts to "consider[] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition," not necessarily with identical historical regulations: "The Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Id.* (emphasis added). That was the very mistake the Fifth Circuit court made in *Rahimi*, by insisting on historical domestic-violence restrictions (of which there were none) before allowing a modern analogue. Here, this Court should reject the district court's over-exacting demand for historical post-office restrictions and hold, for the reasons above, that the text and historical understanding of the Second Amendment are consistent with firearm

36

restrictions in government buildings, including post offices.

**C.   Even if the government could not restrict firearms in post offices as a general matter, Ayala's as-applied constitutional challenge would still fail, because the government may prohibit its own employees from bringing guns to work.**

Yet even if this Court concludes that the historical regulations cited above are not enough to establish an understanding and tradition of prohibiting firearms in any government building, or at least in post offices, and that the Supreme Court's prior assurances are not binding or even persuasive, the district court still erred. Ayala's as-applied challenge implicates his rights as an employee and the Postal Service's rights as his employer. *See* Doc. 23 at 3–4 (Ayala conceding that he was acting as a Postal Service truck driver). The district court seemingly viewed his status more as an administrative issue, implicating whether Ayala could constitutionally be disciplined for bringing a gun to work, including whether he had in fact been disciplined. Doc. 57 at 39. The Postal Service administrative-support manual does, indeed, state, "Except for Postal Service employees who are authorized by the chief postal inspector or by the inspector general, Postal Service employees are prohibited from possessing firearms in the following instances: a. While on official duty, either on or off Postal Service property. b. While on or within Postal Service property at any time." Postal Service Administrative Support Manual, Section 276.22,

*available at* https://www.nalc.org/workplace-issues/resources/body/
Administrative-Support-Manual-Issue-13-July-1999-Updated-Through-
January-2021.pdf.

But that's not the issue in this criminal case. The point, here, is that
constitutional rights of federal employees are limited while they are at work.
As we pointed out in our supplemental brief in the district court, *Dorosan* and
*Bonidy* upheld criminal prosecutions against Postal Service employees. Doc. 32
at 16–17. Specific pre-existing firearm prohibitions on postal property or for
postal employees at the time of the Founding are not necessary to justify the
longstanding, presumptively lawful firearm prohibitions in government
buildings (including post offices), as *Bruen*, *Heller*, and *McDonald* recognize.
Yet, even if those cases left any doubt about firearm prohibitions in post offices
or other government buildings as a general matter—which they don't—Ayala
certainly cannot show that the Second Amendment prevents the government
from prohibiting its own employees from bringing guns to work, in this *as-
applied* challenge.

That's because an as-applied challenge "asserts that a statute cannot be
constitutionally applied in particular circumstances"; that is, it addresses
"whether [the] statute is unconstitutional on the facts of a particular case or to
a particular party." *Schultz v. Alabama*, 42 F.4th 1298, 1319 (11th Cir. 2022)

38

(internal quotation marks and citations omitted). And here, "[w]hen a citizen enters government service"—like Ayala—he "by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 416 (2006). The government, when acting as an employer, must be able to exercise a degree of control over its employees. *Id.* "[T]he government as employer indeed has far broader powers than does the government as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion). Pursuant to this axiom, the Supreme Court has noted that government employees have diminished constitutional protections. *Garcetti*, 547 U.S. at 426 (stating that First Amendment did not give government employee unfettered right to speak and disseminate information); *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 605 (2008) (noting that certain Equal Protection Clause causes of action are not available to public-sector employees); *O'Connor v. Ortega*, 480 U.S. 709, 722–23 (1987) (plurality opinion) (recognizing the diminished expectations of privacy a government employee has over her work premises under the Fourth Amendment); *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448–449 (1988) (Free Exercise Clause); *Postal Service v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129-130 (1981) (Free Speech Clause); *Bishop v. Wood*, 426 U.S. 341, 350 (1976) (due process). Indeed, even government contractors are subject to similar limitations. *See Bd. of Comm'rs, Wabaunsee Cty.*

*v. Umbehr*, 518 U.S. 668, 684 (1996). And the government's latitude to restrict otherwise constitutionally protected conduct by its own employees is not limited to workplace discipline. *See, e.g., U.S. Civil Service Commission v. Letter Carriers*, 413 U.S. 548 (1973) (upholding the Hatch Act's restrictions on partisan political conduct by federal employees, even though the restrictions are enforceable through administrative proceedings and civil penalties, not merely through ad hoc workplace discipline).

Ayala, as a government employee on government property during his official duties, cannot claim the full panoply of Second Amendment rights recognized by *Bruen,* any more than he could claim any other constitutional right unfettered at work. To be a government employee or contractor means to voluntarily cede some constitutional rights. Like other core constitutional rights, public-sector employees and contractors have diminished Second Amendment rights. The Supreme Court has made clear that the Second Amendment is subject to the same general constitutional principles as other provisions of the Bill of Rights. *See Bruen*, 597 U.S. at 70 ("The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees."); *McDonald*, 561 U.S. at 784 (rejecting "a special incorporation test applicable only to the Second Amendment"); *Heller*, 554 U.S. at 634 ("We know of no

40

other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach."). "'Like most rights, … the right secured by the Second Amendment is not unlimited'"; it was "never thought to sweep indiscriminately." *Rahimi*, 2024 WL 3074728, at *5 (quoting *Heller*).

Notwithstanding *Bruen*, the federal government—as an employer—may constitutionally determine whether and when its employees—such as Ayala—may possess firearms while on duty in postal buildings, even if, for the sake of argument, the government could not prohibit others from bringing firearms into the same buildings. In this sense, a federal employee's Second Amendment rights are simply no more or less absolute than any other constitutional rights, as the Supreme Court said in *Bruen* ("This Second Amendment standard accords with how we protect other constitutional rights."). 597 U.S. at 24; *see also Rahimi*, 2024 WL 3074728, at *5. To demand historical examples of the government prohibiting its own employees from bringing guns into the buildings where they work would run headlong into decades of Supreme Court precedent cited above, recognizing the government's authority to burden most any constitutional rights consistent with the mission, scope, and purpose of an employee's job.

41

# Conclusion

This Court should reverse the district court's ruling that 18 U.S.C. § 930(a) is unconstitutional as applied to Ayala, vacate the order dismissing that count, and remand for further proceedings.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

By:    _s/ Sean Siekkinen_
SEAN SIEKKINEN
Assistant United States Attorney
Appellate Division
USA No. 192
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000
sean.siekkinen@usdoj.gov

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 9437 countable words under 11th Cir. R. 32-4, complies with Fed. R. App. P. 32(a)(7)(B).

## Certificate of Service

I certify that a copy of this brief and the notice of electronic filing was sent by CM/ECF on June 28, 2024, to:

LAURA J. DAINES, ESQ.
Federal Public Defender's Office

*Counsel for Emmanuel Ayala*

s/ Sean Siekkinen
SEAN SIEKKINEN
Assistant United States Attorney

Gkpr/yes/6-24-24

b_Ayala Emmanuel_US principal brief final.docx