No. 24-10462-DD

In the
# United States Court of Appeals
# for the Eleventh Circuit

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

EMMANUEL AYALA,
*Defendant-Appellee*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 8:22-CR-369-KKM-AAS-1

---

## APPENDIX

---

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

SEAN SIEKKINEN
Assistant United States Attorney
Appellate Division
USA No. 192
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
July 1, 2024                                      (813) 274-6000

# Index of Appendix

District Court Docket Sheet....................................................................Docket

Indictment ......................................................................................Doc. 1

Defendant's Motion to Dismiss Indictment.........................................Doc. 23

United States' Response to Defendant's
Motion to Dismiss Indictment ...........................................................Doc. 25

United States' Supplemental Brief to
Defendant's Motion to Dismiss Indictment.........................................Doc. 32

Order Granting in Part Defendant's Motion to Dismiss Indictment ......Doc. 57

Certificate of Service

# DOCKET

# *8:22cr369, USA v. Ayala*

US District Court Criminal Docket

United States District Court, Florida Middle

(Tampa)

**This case was retrieved on 06/30/2024**

## Header

---

**Date Filed:** 10/26/2022                                    **Class Code:** Open
**Other Docket:** None                                            **Closed:**

## Participants

---

### Defendant

---

| Name | Attorneys |
|------|-----------|
| Emmanuel Ayala<br>Appeals court case number: 24-10462-B Eleventh Circuit | Stephen Consuegra<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Federal Defender Middle District of Florida<br>400 N. Tampa Street Suite 2700<br>Tampa, FL 33602<br>USA<br>stephen_consuegra@fd.org<br>813-228-2715<br><br>Laura Jessica Daines<br>ATTORNEY TO BE NOTICED<br>Federal Defender's Office Middle District of Florida<br>400 N. Tampa Street., Suite 2700<br>Tampa, FL 33602-5148<br>USA<br>laura_daines@fd.org<br>813-228-2715<br>Fax: 813-228-2562<br><br>Paul Andrew Downing<br>ATTORNEY TO BE NOTICED<br>11/18/2022<br>Federal Public Defender's Office<br>400 N Tampa St Ste 2700<br>Tampa, FL 33602-4726<br>USA<br>Paul_Downing@fd.org<br>813-228-2715   Designation: Public Defender or Community Defender Appointment |

## Charges                                                      Disposition

---

**Complaints:** none

**Pending:** ASSAULTING/RESISTING/IMPEDING
OFFICERS/EMPLOYEES(2)

**Offense Level (Opening):** Felony

**Terminated:** POSSESS W/INTENT/USE IN CRIME          Dismissed with prejudice on January 12, 2024.
(FEDERAL FACILITY)(1)

**Offense Level (Terminated):** Felony

**Case Assigned To:** Judge Kathryn Kimball Mizelle

**Case Referred To:** Magistrate Judge Amanda Arnold
Sansone

# U.S. Attorneys

Abigail King

ATTORNEY TO BE NOTICED

DOJ-USAO

Tampa Division 400 North Tampa Street Ste 3200

Tampa, FL 33602

USA

abigail.king@usdoj.gov

813-274-6000
Designation: Retained

James A. Muench

ATTORNEY TO BE NOTICED

US Attorney's Office - FLM

Suite 3200 400 N Tampa St

Tampa, FL 33602-4798

USA

james.muench2@usdoj.gov

813/274-6000

Ross Roberts

ATTORNEY TO BE NOTICED

05/02/2024

DOJ-USAO

400 North Tampa Street Ste 3200

Tampa, FL 33602

USA

ross.roberts@usdoj.gov

813-274-6000

# Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 10/26/2022 | INDICTMENT returned in open court as to Emmanuel Ayala (1) count(s) 1, 2. (Attachments: # 1 Restricted Unredacted Indictment) (KME) (Entered: 10/27/2022) | |
| 4 | 10/27/2022 | ORDER as to Emmanuel Ayala: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Judge Timothy J. Corrigan on 12/01/2020. (KME) (Entered: 10/27/2022) | |
| 5 | 10/27/2022 | STANDING ORDER directing the United States to file a notice of all corporate victims or other corporate interested parties. Signed by Judge Kathryn Kimball Mizelle on 10/27/2022. (GSO) (Entered: 10/27/2022) | |
| 6 | 11/15/2022 | NOTICE OF ATTORNEY APPEARANCE James A. Muench appearing for USA. (Muench, James) (Entered: 11/15/2022) | |
| | 11/16/2022 | Arrest of Emmanuel Ayala on 11/16/2022 (MEJ) (Entered: 11/16/2022) | |
| 7 | 11/16/2022 | ***CJA 23 Financial Affidavit by Emmanuel Ayala. (MEJ) (Entered: 11/16/2022) | |
| 8 | 11/16/2022 | ORAL MOTION to Appoint Counsel by Emmanuel Ayala. (MEJ) Motions referred to Magistrate Judge Amanda Arnold Sansone. (Entered: 11/16/2022) | |
| 9 | 11/16/2022 | ORAL ORDER granting 8 Oral Motion to Appoint Counsel. Paul Andrew Downing, AFPD appointed as to Emmanuel Ayala (1). Signed by Magistrate Judge Christopher P. Tuite on 11/16/2022. (MEJ) (Entered: 11/16/2022) | |
| 10 | 11/16/2022 | ORAL MOTION for Discovery, ORAL MOTION for Release from Custody by Emmanuel Ayala. (MEJ) Motions referred to Magistrate Judge Amanda Arnold Sansone. (Entered: 11/16/2022) | |
| 11 | 11/16/2022 | ORAL MOTION for Release from Custody, ORAL MOTION for Reciprocal Discovery by USA as to Emmanuel Ayala. (MEJ) Motions referred to Magistrate Judge Amanda Arnold Sansone. (Entered: 11/16/2022) | |
| 12 | 11/16/2022 | ORAL ORDER as to Emmanuel Ayala: Pursuant to the Due Process Protections Act, the Court confirms the United States' obligation to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny and orders the United States to do so. Failing to do so in a timely manner may result in consequences, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, and sanctions. Signed by Magistrate Judge Christopher P. Tuite on 11/16/2022. (MEJ) (Entered: 11/16/2022) | |
| 13 | 11/16/2022 | Minute Entry for In Person proceedings held before Magistrate Judge Christopher P. Tuite: ORAL ORDER granting 10 Motion for Discovery as to Emmanuel Ayala (1); granting 10 Motion for Release from Custody as to Emmanuel Ayala (1); granting 11 Motion for Release from Custody as to Emmanuel Ayala (1); granting 11 Motion for Reciprocal Discovery as to Emmanuel Ayala (1); ARRAIGNMENT as to Emmanuel Ayala (1) Count 1, 2, held on 11/16/2022 Defendant(s) pled not guilty; Initial Appearance as to Emmanuel Ayala held on 11/16/2022. (DIGITAL) (MEJ) (MEJ). (Entered: 11/16/2022) | |
| 15 | 11/17/2022 | PRETRIAL discovery order and notice as to Emmanuel Ayala | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Jury Trial set for trial term commencing 1/3/2023 at 09:00 AM in Tampa Courtroom 13 B before Judge Kathryn Kimball Mizelle. Status Conference set for 12/13/2022 at 09:00 AM in Tampa Courtroom 13 B before Judge Kathryn Kimball Mizelle Signed by Magistrate Judge Amanda Arnold Sansone on 11/17/2022. (CDM) (Entered: 11/17/2022) | |
| 16 | 11/17/2022 | Arrest Warrant Returned Executed on 11/16/2022 as to Emmanuel Ayala. (AMS) (Entered: 11/17/2022) | |
| 17 | 11/17/2022 | ORDER Setting Conditions of Release Signed by Magistrate Judge Christopher P. Tuite on 11/16/2022. (AMS)  (Entered: 11/17/2022) | |
| 18 | 11/18/2022 | NOTICE OF ATTORNEY APPEARANCE: Stephen Consuegra appearing for Emmanuel Ayala and Substitution of Counsel (Consuegra, Stephen)  (Entered: 11/18/2022) | |
| 20 | 12/13/2022 | MINUTE ENTRY for 12/13/2022 in-person Status Conference as to Emmanuel Ayala before Judge Kathryn Kimball Mizelle. Court Reporter: Bill Jones (GSO) (Entered: 12/13/2022) | |
| 21 | 12/13/2022 | ORAL MOTION to Continue Trial by Emmanuel Ayala. (GSO) (Entered: 12/13/2022) | |
| 22 | 12/13/2022 | ORAL ORDER granting 21 Oral Motion to Continue Trial as to Emmanuel Ayala. The trial is removed from the January 2023 trial calendar and rescheduled for a status conference on March 14, 2023, at 9:00 a.m. in Courtroom 13B. The trial is continued to the April 2023 trial calendar. The time from today through April 30, 2023, is excluded under 18 U.S.C. 3161(h). Signed by Judge Kathryn Kimball Mizelle on 12/13/2022. (GSO)  (Entered: 12/13/2022) | |
| 23 | 01/05/2023 | MOTION to Dismiss Indictment by Emmanuel Ayala. (Consuegra, Stephen) (Entered: 01/05/2023) | |
| 24 | 01/05/2023 | ENDORSED ORDER directing the United States to respond no later than January 19, 2023, to 23 Defendant's Motion to Dismiss the Indictment. Signed by Judge Kathryn Kimball Mizelle on 1/5/2023. (GSO)  (Entered: 01/05/2023) | |
| 25 | 01/19/2023 | RESPONSE in Opposition by USA as to Emmanuel Ayala re 23 MOTION to Dismiss Indictment  (King, Abigail) (Entered: 01/19/2023) | |
| 26 | 03/13/2023 | ORDER directing supplemental briefing regarding 23 Defendant's motion to dismiss the indictment. Signed by Judge Kathryn Kimball Mizelle on 3/13/2023. (MEV)  (Entered: 03/13/2023) | |
| 27 | 03/14/2023 | MINUTE ENTRY for 3/14/2023 in-person Status Conference as to Emmanuel Ayala before Judge Kathryn Kimball Mizelle. Court Reporter: Bill Jones (GSO) (Entered: 03/17/2023) | |
| 28 | 03/14/2023 | ORAL MOTION to Continue Trial and to Extend Pretrial Motions Deadline by Emmanuel Ayala. (GSO) (Entered: 03/17/2023) | |
| 29 | 03/14/2023 | ORAL ORDER granting 28 Oral Motion to Continue Trial and to Extend Pretrial Motions Deadline as to Emmanuel Ayala. The trial is removed from the April 2023 trial calendar and rescheduled for a status conference on June 13, 2023, at 9:00 a.m. in Courtroom 13B. The trial is continued to the July 2023 trial calendar. The time from today through August 6, 2023, is excluded under 18 U.S.C. 3161(h). The pretrial motions deadline is extended an additional ninety days. Signed by Judge Kathryn Kimball Mizelle on 3/14/2023. (GSO)  (Entered: 03/17/2023) | |
| 30 | 04/13/2023 | MOTION to Extend Time to File a Supplemental Brief  by USA as to Emmanuel Ayala. (King, Abigail) Modified text on 4/14/2023 (SET). (Entered: 04/13/2023) | |
| 31 | 04/13/2023 | ENDORSED ORDER: The United States's motion for extension 30 is granted. Supplemental briefing is due April 28, 2023. | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Defendant's response is due May 19, 2023. Signed by Judge Kathryn Kimball Mizelle on 4/13/2023. (MEV)  (Entered: 04/13/2023) | |
| 32 | 04/28/2023 | SUPPLEMENT re 26 Order directing response to motion Government's Supplemental Brief to Defendant's Motion to Dismiss Indictment by USA as to Emmanuel Ayala (King, Abigail) (Entered: 04/28/2023) | |
| 33 | 05/16/2023 | MOTION to Extend Time to for Supplemental Briefing  by Emmanuel Ayala. (Consuegra, Stephen) (Entered: 05/16/2023) | |
| 34 | 05/17/2023 | ENDORSED ORDER granting 33 Motion to Extend Time as to Emmanuel Ayala. Ayala's supplemental briefing is due June 20, 2023. Signed by Judge Kathryn Kimball Mizelle on 5/17/2023. (MEV)  (Entered: 05/17/2023) | |
| 36 | 06/13/2023 | MINUTE ENTRY for 6/13/2023 in-person Status Conference as to Emmanuel Ayala before Judge Kathryn Kimball Mizelle. Court Reporter: Bill Jones (GSO) (GSO). (Entered: 06/16/2023) | |
| 37 | 06/13/2023 | ORAL MOTION to Continue Trial by Emmanuel Ayala. (GSO) (Entered: 06/16/2023) | |
| 38 | 06/13/2023 | ORAL ORDER granting 37 Oral Motion to Continue Trial as to Emmanuel Ayala. The trial is removed from the July 2023 trial calendar and rescheduled for a status conference on August 8, 2023, at 9:00 a.m. in Courtroom 13B. The trial is continued to the September 2023 trial calendar. The time from today through October 1, 2023, is excluded under 18 U.S.C. 3161(h). The pretrial motions deadline is extended to July 28, 2023. Signed by Judge Kathryn Kimball Mizelle on 6/13/2023. (GSO)  (Entered: 06/16/2023) | |
| 35 | 06/16/2023 | NOTICE OF ATTORNEY APPEARANCE: Laura Jessica Daines appearing for Emmanuel Ayala as Co-Counsel (Daines, Laura) (Entered: 06/16/2023) | |
| 39 | 06/20/2023 | MEMORANDUM in opposition by Emmanuel Ayala re 32 Supplement Briefing (Consuegra, Stephen) (Entered: 06/20/2023) | |
| 40 | 06/27/2023 | MOTION for Evidentiary Hearing re 23 Motion to Dismiss Indictment by Emmanuel Ayala. (Consuegra, Stephen) (Modified on 6/28/2023, to edit text) (BGR). (Entered: 06/27/2023) | |
| 41 | 06/28/2023 | ENDORSED ORDER: On review of Defendant's motion 40, by July 7, 2023, Defendant is directed to explain, in a brief not to exceed five pages, what findings of fact the Court may need to make in order to rule on the motion to dismiss and why an evidentiary hearing is necessary. The government must respond with its position as to whether a hearing is necessary by July 14, 2023. Signed by Judge Kathryn Kimball Mizelle on 6/28/2023. (MEV)  (Entered: 06/28/2023) | |
| 42 | 07/03/2023 | BRIEF on Necessary Findings of Fact and the Need for an Evidentiary Hearing re 41 Order by Emmanuel Ayala. (Consuegra, Stephen) Modified on 7/3/2023 to edit docket text (KNC). (Entered: 07/03/2023) | |
| 43 | 07/14/2023 | RESPONSE 41 Order by USA as to Emmanuel Ayala Government's Position in Opposition to an Evidentiary Hearing (King, Abigail) (Entered: 07/14/2023) | |
| 44 | 07/28/2023 | MOTION to Suppress  by Emmanuel Ayala. (Consuegra, Stephen) (Entered: 07/28/2023) | |
| 45 | 07/31/2023 | ENDORSED ORDER directing the United States to respond no later than August 11, 2023, to 44 Defendant's Motion to Suppress. Signed by Judge Kathryn Kimball Mizelle on 7/31/2023. (MEV) (Entered: 07/31/2023) | |
| 49 | 08/08/2023 | MINUTE ENTRY for 8/8/2023 in-person Status Conference as to Emmanuel Ayala held before Judge Kathryn Kimball Mizelle. | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Court Reporter: Bill Jones (GSO) (Entered: 08/11/2023) | |
| 50 | 08/08/2023 | ORAL ORDER: The trial is removed from the September 2023 trial calendar and rescheduled for a status conference on November 14, 2023, at 9:00 a.m. in Courtroom 13B. The trial is continued to the December 2023 trial calendar. The time from today through January 1, 2024, is excluded under 18 U.S.C. 3161(h). Signed by Judge Kathryn Kimball Mizelle on 8/8/2023. (GSO) (Entered: 08/11/2023) | |
| 46 | 08/11/2023 | Unopposed MOTION for Miscellaneous Relief, specifically to Exceed the Page Limit by USA as to Emmanuel Ayala. (King, Abigail) (Entered: 08/11/2023) | |
| 47 | 08/11/2023 | ENDORSED ORDER granting 46 Motion for excess pages. The government may file a 25 page response. Signed by Judge Kathryn Kimball Mizelle on 8/11/2023. (MEV) (Entered: 08/11/2023) | |
| 48 | 08/11/2023 | RESPONSE to Motion re 44 MOTION to Suppress by USA as to Emmanuel Ayala (King, Abigail) (Entered: 08/11/2023) | |
| 51 | 08/17/2023 | NOTICE of filing supplemental authority by Emmanuel Ayala re: (Consuegra, Stephen) (Entered: 08/17/2023) | |
| 52 | 09/25/2023 | NOTICE OF ATTORNEY APPEARANCE Ross Roberts appearing for USA. (Roberts, Ross) (Entered: 09/25/2023) | |
| 53 | 10/13/2023 | NOTICE of Filing Supplemental Authority by USA as to Emmanuel Ayala re 25 Response in Opposition, 32 Supplement. (King, Abigail) (Entered: 10/13/2023) | |
| 54 | 11/09/2023 | ORDER TO CONTINUE: The trial is removed from the December 2023 trial calendar and rescheduled for a status conference on December 12, 2023, at 9:00 a.m. in Courtroom 13B. The trial is continued to the January 2024 trial calendar. The time from today through February 4, 2024, is excluded under 18 U.S.C. 3161(h). Signed by Judge Kathryn Kimball Mizelle on 11/9/2023. (ZG) (Entered: 11/09/2023) | |
| 55 | 12/11/2023 | ORDER TO CONTINUE: The trial is removed from the January 2024 trial calendar and rescheduled for a status conference on January 9, 2024, at 9:00 a.m. in Courtroom 13B. The trial is continued to the February 2024 trial calendar. The time from today through March 3, 2024, is excluded under 18 U.S.C. 3161(h). Signed by Judge Kathryn Kimball Mizelle on 12/11/2023. (ZG) (Entered: 12/11/2023) | |
| 56 | 01/08/2024 | NOTICE OF RESCHEDULING HEARING: The Status Conference hearing previously scheduled for January 9, 2024, is rescheduled as to Emmanuel Ayala. New hearing date and time: Status Conference rescheduled for January 12, 2024, at 10:00 AM in Tampa Courtroom 13B before Judge Kathryn Kimball Mizelle. (GSO) (Entered: 01/08/2024) | |
| 57 | 01/12/2024 | ORDER. Defendant's 23 Motion to Dismiss is GRANTED IN PART. Count I of the 1 Indictment is DISMISSED WITH PREJUDICE. Defendant's 40 Motion for Evidentiary Hearing is DENIED. Signed by Judge Kathryn Kimball Mizelle on 1/12/2024. (ALE) (Entered: 01/12/2024) | |
| 58 | 01/12/2024 | DISMISSAL OF COUNT One on Motion of Emmanuel Ayala. (GSO) (Entered: 01/12/2024) | |
| 59 | 01/12/2024 | MINUTE ENTRY for 1/12/2024 in-person Status Conference as to Emmanuel Ayala before Judge Kathryn Kimball Mizelle. Court Reporter: Bill Jones (GSO) (Entered: 01/12/2024) | |
| 60 | 01/12/2024 | ORAL ORDER as to Emmanuel Ayala: The trial is removed from the February 2024 trial calendar and rescheduled for a status conference on February 12, 2024, at 9:00 a.m. in Courtroom 13B. The trial is continued to the March 2024 trial calendar. The time | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | from today through March 31, 2024, is excluded under 18 U.S.C. 3161(h). Signed by Judge Kathryn Kimball Mizelle on 1/12/2024. (GSO)  (Entered: 01/12/2024) | |
| 61 | 01/19/2024 | NOTICE regarding the pending Motion to Suppress by USA as to Emmanuel Ayala (Roberts, Ross)  (Entered: 01/19/2024) | |
| 62 | 02/12/2024 | NOTICE OF APPEAL (Interlocutory) by USA as to Emmanuel Ayala re 57 Order on Motion for Hearing, Order on Motion to Dismiss. Filing fee not paid. (Roberts, Ross) Modified text on 2/14/2024 (LNR). (Entered: 02/12/2024) | |
| 65 | 02/12/2024 | MINUTE ENTRY for 2/12/2024 in-person Status Conference as to Emmanuel Ayala before Judge Kathryn Kimball Mizelle. Court Reporter: Bill Jones (GSO) (Entered: 02/14/2024) | |
| 63 | 02/13/2024 | ENDORSED ORDER: Given the United States' 62 Notice of Interlocutory Appeal, the Clerk is directed to STAY and ADMINISTRATIVELY CLOSE this case pending resolution of the interlocutory appeal. The period of "delay resulting from any interlocutory appeal" is excludable time. See 18 U.S.C. 3161(h)(1)(C). Signed by Judge Kathryn Kimball Mizelle on 2/13/2024. (ZG)  (Entered: 02/13/2024) | |
| 64 | 02/14/2024 | TRANSMITTAL of initial appeal package as to Emmanuel Ayala to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 62 Notice of Appeal - Interlocutory. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (LNR) (LNR). (Entered: 02/14/2024) | |
| | 02/16/2024 | USCA Case Number as to Emmanuel Ayala. USCA Number: 24-10462-B for 62 Notice of Appeal - Interlocutory filed by USA. (KE) (Entered: 02/22/2024) | |
| 66 | 02/27/2024 | TRANSCRIPT information form filed by USA as to Emmanuel Ayala for proceedings held on 06/13/23, 08/08/23, 01/12/24 before Judge Mizelle re 62 Notice of Appeal - Interlocutory. USCA number: 24-10462. Electronic notification sent to Court Reporter Bill Jones (Roberts, Ross) (Entered: 02/27/2024) | |
| 67 | 02/29/2024 | COURT REPORTER ACKNOWLEDGMENT by Bill Jones re 62 Notice of Appeal - Interlocutory as to Emmanuel Ayala. Estimated transcript filing date: 03-27-24. USCA number: 24-10462. (HWJ) (Entered: 02/29/2024) | |
| 68 | 04/05/2024 | TRANSCRIPT of Status Conference for dates of 06-13-23 held before Judge Kathryn Kimball Mizelle, re: 62 Notice of Appeal - Interlocutory as to Emmanuel Ayala. Court Reporter/Transcriber: Bill Jones. Email address: bill_jones@flmd.uscourts.gov. Telephone number: 8133016158. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/26/2024. Redacted Transcript Deadline set for 5/6/2024. Release of Transcript Restriction set for 7/5/2024. (HWJ) (Entered: 04/05/2024) | |
| 69 | 04/05/2024 | TRANSCRIPT of Status Conference for dates of 08-08-23 held before Judge Kathryn Kimball Mizelle, re: 62 Notice of Appeal - Interlocutory as to Emmanuel Ayala. Court Reporter/Transcriber: Bill Jones. Email address: bill_jones@flmd.uscourts.gov. Telephone number: 8133016158. NOTICE TO THE PARTIES - | |

8:22cr369, USA v. Ayala

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/26/2024. Redacted Transcript Deadline set for 5/6/2024. Release of Transcript Restriction set for 7/5/2024. (HWJ) (Entered: 04/05/2024) | |
| 70 | 04/05/2024 | TRANSCRIPT of Status Conference for dates of 01-12-24 held before Judge Kathryn Kimball Mizelle, re: 62 Notice of Appeal - Interlocutory as to Emmanuel Ayala. Court Reporter/Transcriber: Bill Jones. Email address: bill_jones@flmd.uscourts.gov. Telephone number: 8133016158. NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 4/26/2024. Redacted Transcript Deadline set for 5/6/2024. Release of Transcript Restriction set for 7/5/2024. (HWJ) (Entered: 04/05/2024) | |
| 71 | 04/05/2024 | NOTIFICATION that transcript has been filed by Bill Jones re: 62 Notice of Appeal - Interlocutory as to Emmanuel Ayala. USCA number: 24-10462. (HWJ) (Entered: 04/05/2024) | |
| 72 | 05/02/2024 | MOTION to Withdraw as Attorney  by Ross Roberts. by USA as to Emmanuel Ayala. (Roberts, Ross) Motions referred to Magistrate Judge Amanda Arnold Sansone. (Entered: 05/02/2024) | |
| 73 | 05/02/2024 | ENDORSED ORDER granting 72 Motion to Withdraw as Attorney. Ross Roberts withdrawn from case as to Emmanuel Ayala (1). Signed by Magistrate Judge Amanda Arnold Sansone on 5/2/2024. (ABC)  (Entered: 05/02/2024) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# Doc. 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.

EMMANUEL AYALA

CASE NO. 8:22 cr 369 KKM-AAS
18 U.S.C. § 930
18 U.S.C. § 111

## INDICTMENT

The Grand Jury charges:

## COUNT ONE

On or about September 14, 2022, in the Middle District of Florida, the

defendant,

EMMANUEL AYALA,

did knowingly possess and cause to be present a firearm, that is, a Smith & Wesson

9MM firearm, in a federal facility.

In violation of 18 U.S.C. § 930.

## COUNT TWO

On or about September 14, 2022, in the Middle District of Florida, the

defendant,

EMMANUEL AYALA,

did forcibly resist, oppose, impede, and interfere with an officer and employee of the

United States, while that officer and employee of the United States was engaged in

the performance of official duties.

In violation of 18 U.S.C. § 111.

## **FORFEITURE**

1.      The allegations contained in Counts One and Two are hereby incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).

2.      Upon conviction of a violation of 18 U.S.C. § 930, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c), all firearms and ammunition involved in or used in the violation.

3.      The property to be forfeited includes, but is not limited to, the following: Smith & Wesson 9MM Semi-Automatic firearm and 12 9MM rounds of ammunition.

4.      If any of the property described above, as a result of any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the

provisions of 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).



A TRUE BILL.

Foreperson

ROGER B. HANDBERG
United States Attorney

By: _____
Abigail K. King
Assistant United States Attorney

By: _____
Stacie B. Harris
Assistant United States Attorney
Chief, Special Victims Section

FORM OBD-34
October 22

No. 2022R01811

## UNITED STATES DISTRICT COURT
Middle District of Florida
Tampa Division

THE UNITED STATES OF AMERICA

vs.

EMMANUEL AYALA

## INDICTMENT

Violations: 18 U.S.C. §§ 930 and 111

A true bill,

_____
Foreperson

Filed in open court this 26 day of October 2022.

_____
Clerk

Bail $_____

GPO 863 525

# Doc. 23

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                              **Case No.: 8:22-cr-00369-KKM-AAS**

**EMMANUEL AYALA**

_____/

## DEFENDANT'S AS-APPLIED CHALLENGE TO THE CONSTITUTIONALITY OF 18 U.S.C. § 930 AND MOTION TO DISMISS THE INDICTMENT

The Defendant, Emmanuel Ayala, by and through his attorney, pursuant to the Second Amendment to the United States Constitution, the Fourth Amendment, the Due Process Clause of the Fifth Amendment, and Federal Rule of Criminal Procedure 12(b) moves to: (1) challenge the constitutionality of section 930, Title 18 of the United States Code, as applied to him; and (2) dismiss Counts One and Two of the Indictment.

## INTRODUCTION

On September 14, 2022, Mr. Ayala was working as a semi-truck driver for the United States Postal Service delivering parcels. He has the lawful right to possess a concealed firearm and has a security license under Florida law. He was accosted and tackled in and around the post office parking lot by unknown agents from the Office of Inspector General who hadn't identified themselves or

1

stated their business with him; he fled instinctively in fear of being kidnapped by these unknown persons.

Section 930, Title 18 of the United States Code, is unconstitutional as applied to Mr. Ayala. Section 930(a) violates Mr. Ayala's constitutional right to carry a firearm for self-defense on the job because the Second Amendment's plain text protects his conduct, and the Government cannot prove a historical analog regulating the possession of firearms at post offices.

Additionally, section 930 violates Mr. Ayala's constitutional right to due process of law under the Fifth Amendment because the statute is vague and ambiguous. The statute as written doesn't put him on fair notice as to what is criminalized or who can be prosecuted. Moreover, he should be shielded from criminal prosecution because he qualifies as a section 930(d) person under the rule of lenity.

By extension, Mr. Ayala should not stand prosecution for violating section 111, Title 18 of the United States Code, because he resisted an unlawful arrest under the common law and under the Fourth Amendment; he fled out of sheer instinct and abject terror. The charges against him must be dismissed. The Court should consider the following facts and memorandum of law in support of Mr. Ayala's motion.

## FACTS

Mr. Ayala is a United States citizen and has been employed with USPS for about fourteen years as a semi-truck driver hauling packages and mail. He is a law-abiding citizen and is legally entitled to possess firearms under the Second Amendment. He is not, nor has he ever been deemed, a prohibited person from possessing firearms within the meaning of section 922(g), Title 18 of the United States Code. Notably, Mr. Ayala has a concealed weapons permit and a class "G" security license under Florida law pursuant to sections 790.06 and 493.6115, Florida Statutes (2022), respectively. He got these licenses to work as an armed security guard when he was sidelined from USPS due to a labor dispute. When that dispute passed, he was back to driving semi-trucks for USPS. Little did Mr. Ayala know that September 14, 2022, would be one of the worst days of his life.

The morning of September the fourteenth started off just like any other workday for Mr. Ayala. He works out of the post office located at 3501 Bessie Coleman Blvd Fl 3, Tampa, FL 33630. He parked his car a quarter-of-a-mile away at a designated parking lot just north of his workplace off Airport Service Road. He got out of his car, grabbed his red fanny pack, and swung it across his chest clipping it into place. Mr. Ayala always keeps his firearm, a Smith & Wesson 9mm, concealed inside his fanny pack.

3

He carries his gun primarily for self-defense while he's on the job and driving on the roadways. Most of the time he leaves his fanny pack and concealed firearm inside his parked car off site and grabs it after he picks up his semi-truck for his daily route. But from time to time, he carries his concealed firearm inside his fanny pack for extra protection on the short walk to work (it also cuts down on the extra trip it takes him to grab it from his car after he picks up his work truck).

That day, Mr. Ayala took his fanny pack and concealed weapon with him to his workplace. He walked from the Northern employee parking lot to his building with his fanny pack strapped across his chest. He entered through the metal turnstiles and walked inside the employee main entrance. He clocked in, exited the building, and made his way toward the work bay to pick up his clip board with the day's route and his assigned semi-tractor trailer. As he was walking towards his semi-truck, two strangers in plainclothes—a man and a woman—exited an unmarked black Dodge Caravan and walked towards Mr. Ayala. Unbeknownst to him, these strangers were agents with the USPS Office of Inspector General.

The agents never identified themselves as being affiliated with OIG, they never stated their business with Mr. Ayala, and they certainly never informed him that he was under investigation for committing any crimes on USPS

4

property. They were complete strangers to Mr. Ayala. Instead, the unknown man asked him if he was Emmanuel Ayala. Mr. Ayala hesitated for a moment. He didn't know who this man was but confirmed his identity with him anyway. After Mr. Ayala gave his name, the unknown woman went back towards the minivan, slid the door open forcefully, and got the handcuffs from out of the van.

The unidentified man then took Mr. Ayala's arm, placed it behind his back, and forcefully directed ushering him towards the passenger side of the minivan. Mr. Ayala peered inside the minivan and noticed, to his horror, that some of the passenger seats were missing. There was nothing but a bare floor inside.

Panic struck him. Fear instantly flooded in. And a choking sense of terror began to consume him. Mr. Ayala thought he was being taken.

The unknown man then tried to place the handcuffs on Mr. Ayala, but he managed to jerk his arm away in the nick of time. His fight-or-flight response kicked in. Mr. Ayala had to make a split-second decision: stand his ground or run. He chose without thinking. It was instinct. He ran for his life.

The strangers caught up to him and tackled him to the ground near the truck parking lot entrance. Mr. Ayala managed to get back up and ran out of the parking lot. He was tackled to the ground a second time and managed to break free. He ran south across Economy Parking Road and crossed the street heading

east onto oncoming traffic on Airport Service Road. He managed to escape into the safety of a parking garage at Tampa International Airport.

He ran into an elevator and tried to frantically close the doors behind him. Before the elevator doors could close shut, uniformed officers with the Tampa Police Department announced their presence, drew their weapons, and ordered Mr. Ayala to drop the firearm. "Drop the firearm?" he thought to himself. "This is what all this was about?", Mr. Ayala internalized. Only then did he realize that this whole ordeal was about his concealed weapon. He immediately unclipped his fanny pack. It fell to the ground. He stepped out of the elevator, was tackled to the ground by Tampa police officers, and was taken into custody.

Mr. Ayala was arrested and later charged in a two-count Indictment for possession of a firearm at a federal facility in violation of section 930, Title 18 of the United States Code, and for forcibly resisting arrest in violation of section 111, Title 18 of the United States Code. This as-applied motion challenging the constitutionality of the law prohibiting the possession of a firearm at a federal facility and seeking dismissal of both counts of the Indictment soon followed.

### MEMORANDUM OF LAW

Section 930 is unconstitutional as applied to Mr. Ayala because it infringes on his Second Amendment right to carry or possess a firearm for self-defense and because it violates his right to due process of law under the Fifth

Amendment. Count One of the Indictment must be dismissed on these constitutional grounds. Because of these constitutional violations, Mr. Ayala should not be prosecuted for resisting an unlawful arrest under section 111. Count Two must also be dismissed.

This memorandum of law is broken down into three parts. Part I analyzes the as-applied challenge on Second Amendment grounds. Next, Part II discusses the as-applied challenge on due process grounds under the Fifth Amendment. Lastly, Part III centers around the dismissal of the section 111 charge for resisting an unlawful arrest based on the deprivations of Mr. Ayala's constitutional rights.

### I. Section 930 is unconstitutional as applied to Mr. Ayala because it infringes on his Second Amendment right to carry or possess a firearm for self-defense.

Section 930 infringes on Mr. Ayala's Second Amendment right to possess a concealed firearm and to protect himself when he's on the job. The issue as it relates to this Second Amendment as-applied challenge is whether a postal worker's right to lawfully carry a concealed firearm while on the job at his or her federal workplace can be stripped away and punished criminally under section 930. The Second Amendment's plain text and the facts of this case demand that the question presented be answered in the negative.

"A well regulated militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const.

amend. II. The Second Amendment protects an individual's right to keep and bear arms for self-defense, both in and outside the home. *N.Y. State Rifle and Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122, 2125 (2022) (outside the home); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (inside the home). "The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.' " *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635).

The Supreme Court recently cemented the government's burden of proof in firearm regulation cases: When an individual's conduct is covered under the Second Amendment's plain text, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. Justice Clarence Thomas, writing the majority opinion in *Bruen*, took the time to reiterate and detail the government's heavy burden of proof:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2129–30 (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10, (1961)).

The Second Amendment's plain text covers Mr. Ayala. First, he is among "the people" protected under the Second Amendment. He is an "ordinary, law abiding adult citizen[]." *Bruen*, 142 S. Ct. at 2134. He is not a convicted felon nor is he a person that is prohibited from possessing firearms under section 922(g), Title 18 of the United States Code. Moreover, he has a concealed weapons permit along with a security license under Florida law. Second, his conduct—carrying a firearm for self-defense outside the home—is protected by the amendment's plain text. *See id.* at 2134–35. Hence, Mr. Ayala was presumptively in lawful possession of a concealed firearm under the Second Amendment at his workplace.[1]

Because the plain text of the Second Amendment covers Mr. Ayala's conduct, the government must prove that section 930 is consistent with this Country's historical tradition of firearm regulation. Let's turn to the pertinent language of the criminal regulation at issue:

**Possession of firearms and dangerous weapons in Federal facilities**

(a) Except as provided in subsection (d), whoever knowingly *possesses or causes to be present* a firearm or other dangerous weapon in a Federal facility . . . , or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.

---

[1] Indeed, nothing in the Second Amendment makes a distinction between people who bear arms for self-defense in or out of work. *Cf. Bruen*, 132 S. Ct. at 2134 (noting the absence of a home/public distinction in the Second Amendment's text).

18 U.S.C. § 930 (emphasis added).

Only if the government proves that the regulation is consistent with the Nation's historical tradition of firearm regulation can this Court hold that Mr. Ayala's conduct fails to conform to the Second Amendment's "unqualified command." When the challenged regulation addresses a "general societal problem that has persisted since the 18th century," the Government must show "distinctly similar" historical regulations addressing that problem. *Id.* at 2131. Alternatively, when the regulation implicates "unprecedented societal concerns or dramatic technological changes" the Government must point to historical regulations that are "relevantly similar," at least in "how and why" they "burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. The relevant historical record is the founding era when the Second Amendment was adopted in 1791. *Id.* at 2136. And the Government must demonstrate a robust historical tradition of analogous firearms regulation and cannot make that showing with a handful of outliers. *Id.* at 2142, 2148 n.24, 2153. This Court must put the Government to task in answering this historical question. *Id.* at 2134.

The Government cannot meet its burden of showing a historical tradition of banning the possession of firearms for self-defense in post offices and their parking lots. Early America had a postal system. *See* Christina M. Bates, *From 34 Cents to 37 Cents: The Unconstitutionality of the Postal Monopoly*, 68 Mo. L. Rev. 123,

126–31 (Winter 2003) (discussing the history of the American postal system); *see also* U.S. Cont. art. I, § 8, cl. 7 (authorizing Congress "to establish Post Offices"). Yet the government did not ban firearms in all post offices and postal parking lots until 1972. *See* 39 C.F.R. § 232.1(l); D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 276 (2018). And section 930 was not enacted until 1988. *See* PL 100–690 (HR 5210), PL 100–690, November 18, 1988, 102 Stat 4181.

The Government may point to the so-called "sensitive places" doctrine articulated in *Heller*: "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." 554 U.S. 570, 626–27. But as *Bruen* recognized, the historical record reveals "relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." 142 S. Ct. at 2133. The "settled" sensitive places are "legislative assemblies, polling places, and courthouses." *Id.* By contrast, as explained above, post offices and post office parking lots were not places where the government traditionally disenfranchised the people of lawfully possessing firearms. And under *Bruen*, the Government cannot just claim that a particular location is a "sensitive place"—there must be a historical basis to claim so, or at least a historical regulation that is sufficiently analogous. *See id.* at 2133–34 (rejecting the government's effort to expand the

category of "sensitive places"). There is no such historical basis or analogous

regulation here.

Because the government cannot prove that section 930—a criminal statute

that specifically bans the possession of firearms for self-defense by all persons at

federal facilities, including postal workers in employee parking lots—is rooted in

this Country's history and tradition of firearm regulation, Mr. Ayala's conduct

falls *inside* rather than outside the Second Amendment's edict: that the right of

the people to keep and bear arms shall not be infringed. Section 930 is

unconstitutional as applied to Mr. Ayala. Accordingly, Count One of the

Indictment must be dismissed.

## II.    Section 930 is unconstitutionally vague as applied to Mr. Ayala under the Fifth Amendment's Due Process Clause. He did not have fair notice that his conduct was criminal. Moreover, he is immune from criminal prosecution under the rule of lenity.

Mr. Ayala wasn't given fair notice under the Fifth Amendment's Due

Process Clause that lawfully carrying a firearm on the job at the post office

amounted to crime. The issue as it pertains to this as-applied Fifth Amendment

challenge is whether section 930, being a vague and ambiguous statute, gives Mr.

Ayala fair notice that his actions amounted to a crime.[2] The answer to the

---

[2] A statute can be facially void for vagueness even if it is not vague in all its applications. *Johnson v. United States*, 576 U.S. 591, 602–03 (2015). Mr. Ayala maintains that he may bring a facial vagueness challenge without first showing that section 930 is unconstitutionally vague as

question presented is self-evident: ambiguous statutes that don't provide the accused with fair notice are void.

"A criminal statute is unconstitutionally vague in violation of the Fifth Amendment due process clause if it 'fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.' " *United States v. Turner*, 842 F. 3d 602, 604 (8th Cir. 2016) (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015)). "Vague laws contravene the first essential of due process of law that statues must give people of common intelligence fair notice of what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (internal quotations and citations omitted).

When it comes to analyzing the due process considerations apparent in Mr. Ayala's case, here are the relevant portions of the criminal statute at play:

**Possession of firearms and dangerous weapons in Federal facilities**

(a) *Except as provided in subsection (d)*, whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal

---

applied to him. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1214 n.3 (2018); *Johnson*, 576 U.S. 591, 602–03. However, he acknowledges Eleventh Circuit cases prior to *Johnson* and *Dimaya* hold that vagueness challenges must be evaluated in light of the facts of the case at hand. *See United States v. Marte*, 356 F. 3d 1336, 1342 (11th Cir. 2004) (citing *United States v. Fisher*, 289 F. 3d 1329, 1333 (11th Cir. 2002)). He respectfully submits that *Johnson* and *Dimaya* undermine *Marte* to the point of abrogation. In any event, to the extent the Court needs additional factual development to decide Mr. Ayala's as-applied and/or facial challenges to section 930, Mr. Ayala requests an evidentiary hearing and/or an opportunity to preserve and renew this Motion after evidence is presented at trial.

facility . . . , or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.

. . .

(d) *Subsection (a) shall not apply to*—
(1) the lawful performance of official duties by an officer, agent, or employee of the United States, a State, or a political subdivision thereof, who is authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of law;
(2) *the possession of a firearm* or other dangerous weapon *by a Federal official* or a member of the Armed Forces *if such possession is authorized by law*; or
(3) *the lawful carrying of firearms* or other dangerous weapons in a Federal facility *incident to hunting or other lawful purposes*.

. . .

(g) As used in this section:
(1) The term "Federal facility" means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties.
(2) The term "dangerous weapon" means a weapon, device, instrument, material, or substance, animate or inanimate, that is used for, or is readily capable of, causing death or serious bodily injury, except that such term does not include a pocket knife with a blade of less than 2 ½ inches in length.

18 U.S.C. § 930 (emphasis added).

A plain reading of section 930 totally exempts persons under subsection (d) from criminal prosecution for possessing a firearm in a federal facility. Said another way, section 930(d) persons are criminally immune from section 930(a) prosecutions. What is less clear, however, is who falls within section 930(d)'s protections. How can the law as written give Mr. Ayala and others who are similarly situated fair notice that their conduct of possessing a concealed firearm

14

at a post office is criminal? Or that they might belong to a class of persons immune from criminal prosecution? The law can't. It doesn't. It's void.

There's a sub-issue as it relates to due process: whether Mr. Ayala belongs to a category of persons who are immune from prosecution under the rule of lenity. The answer to this sub-issue is clear: vague exclusions to criminal prosecution should favor the accused under principles of lenity. He ought to qualify as a member of the category of persons immune from criminal prosecution under section 930(d) because the exclusion is ambiguous.

The rule of lenity dictates that vague and ambiguous statutes favor the accused:

> [T]he rule of lenity[ ] teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor. And much like the vagueness doctrine, it is founded on "the tenderness of the law for the rights of individuals" to fair notice of the law "and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department."

*Davis*, 139 S. Ct. at 2333 (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (Marshall, C.J.) and *United States v. Lanier*, 520 U.S. 259, 265–267, and n.6 (1997)).

Section 930(d)(1) looks pretty clear on its face—law enforcement officers and agents are the types of people exempt from criminal prosecution. But section 930(d)(2) persons isn't as clear. It's self-evident who members of the Armed Forces are in subsection (d)(2). But who's a "federal official"? Are "federal

officials" separate and distinct from federal employees? Are they one in the same? Are all federal employees "federal officials" and vice versa? Which of these terms nestles neatly into the other? Do they even nestle into each other at all? How do we know who is who in this Russian nesting doll conundrum?

Section 930(d)(2) exempts members of the Armed Forces and "federal officials"—whoever they are—from criminal prosecution, allowing them to possess firearms "if such possession is authorized by law." But authorized by which law? State law? Federal law? Tribal law? All of the above? Importantly, the terms "federal official" and "federal employee" are not defined under section 930(g). Moreover, these phrases are undefined in section 921, Title 18 of the United States Code (the definitions section of Chapter 44). In fact, Chapter 44, which governs firearms, is entirely devoid of any definitions for the terms "federal official" or "federal employee." The same is true for the phrases "authorized by law" and "other lawful purposes" in sections 930(d)(2) and (d)(3), respectively.

Lastly, section 930(d)(3) doesn't revolve around a distinct group of people like subsections(d)(1) and (d)(2) do. Rather, section 930(d)(3) is written in the passive voice. It describes an amorphous and broad category of somebodies who can lawfully carry firearms. So, who belongs in (d)(3)? Section 930(d)(3) includes those who can lawfully carry firearms: (a) incident to hunting; or (b) *incident to*

16

*other lawful purposes*. Therein lies the ambiguity of the class of persons exempt from criminal prosecution under sections 930(d)(2) and (d)(3).

How then can Mr. Ayala have fair notice that section 930 applies to him at all? Or that he is *not* exempt from criminal prosecution? After all, he's a federal employee who works for USPS. Does that also make him a "federal official" under section 930(d)(2)? Or is it the other way around? He could very well be considered a "federal official" since that term is undefined under the law. Does it depend on the person's subjective belief that he or she is a "federal official"? Or is it an objective standard whether they are or aren't a "federal official"? Just as important, Mr. Ayala was authorized by Florida law to carry a concealed weapons permit and has a security license. So, he could be a person—or thought he was a person—who is exempt from prosecution under section 930(d)(2) because he's a federal official authorized by law to possess a concealed firearm.

And if Mr. Ayala fits within the category of persons in section 930(d)(2), then he most certainly fits the bill of a section 930(d)(3) person. People under section 930(d)(3) are even broader in scope than those in (d)(2). Invariably, it must include Mr. Ayala: a law-abiding citizen with his Second Amendment rights intact, who possesses his firearm for a lawful purpose—for purposes of self-defense outside the home.

17

As applied to Mr. Ayala, section 930 is void for vagueness under the Due Process Clause of the Fifth Amendment. Even if there was any ambiguity as to whether he falls within the category of persons described in sections 930(d)(2) and (d)(3), then the rule of lenity instructs us that the ambiguity falls in Mr. Ayala's favor. The tie, so to speak, goes to the runner. Hence, he is immune from prosecution. Count One must therefore be dismissed. But Mr. Ayala's right to due process of law and his right to possess firearms for self-defense aren't the only rights at issue. He faces prosecution for resisting what can only be considered an unlawful arrest.

### III.    Mr. Ayala lawfully evaded an illegal arrest and should not face prosecution under section 111 given the totality of the circumstances and the constitutional deprivations as applied to him.

Admittedly there is scant legal support in the Eleventh Circuit for the proposition that Mr. Ayala shouldn't face criminal prosecution for resisting or impeding the unknown agents' arrest in this case. However, the constitutional deprivations of his Fourth and Fifth Amendment rights as applied to Mr. Ayala and the totality of the circumstances surrounding his arrest are downright concerning at best and completely horrifying at worst.

"One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases." *United States v. Di Re*, 332 U.S. 581, 594 (1948). "If the officer had no right to arrest, the other party might resist

the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest." *John Bad Elk v. United States*, 177 U.S. 529, 535 (1900). Mr. Ayala's case is "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973).

But the common law right to resist an unlawful arrest has *nearly* been abolished in the Eleventh Circuit: "The common law recognized the right of a citizen to use reasonable force to resist an unlawful arrest. . . . The common-law rule, however, has been greatly eviscerated, if not virtually abolished, in this circuit." *United States v. Bailey*, 691 F. 2d 1009, 1018 (11th Cir. 1982) (citing *United States v. Danehy*, 680 F. 2d 1311, 1315–16 (11th Cir. 1982)). But the common law right to resist an unlawful arrest hasn't been *totally* abolished in this Circuit. Until that time comes, this is precisely the type of case where a person should have the common law right to resist an unlawful arrest and avoid criminal prosecution.[3]

The agents exercised poor professional judgment when they approached Mr. Ayala in the semi-truck parking lot. They did so without announcing

---

[3] *Cf. Bailey*, 691 F. 2d at 1018, n.9 ("We are not confronted here with any suggestion that agents Markonni and Dorsett intentionally provoked Bailey's flight or that the agents otherwise generated the second resisting arrest crime as a pretext to provide an independent, legitimate basis for the prior illegal arrest. *Of course, we would not tolerate that, and we are satisfied that courts will be alert to discern such abuses*.") (emphasis added).

themselves, without stating their purpose for talking to him, without informing him that he was suspected of possessing a firearm at a federal facility, and without telling him that he was under arrest for committing a crime while at work. He was illegally seized. The agents needed to have done better. And they knew or should have known to do all of these things and more. Someone could have gotten seriously injured, hurt, or killed that day. But thankfully Mr. Ayala exercised restraint and instinctively chose to flee, believing that he was being abducted by unknown individuals. He resisted an unlawful arrest. Count Two cannot stand.

## CONCLUSION

Enshrined in the Bill of Rights are bedrock principles in our constitutional form of government: that the right of the people to keep and bear arms shall not be infringed under the Second Amendment; and that the criminally accused are entitled to fair notice and due process of law under the Fifth Amendment. Mr. Ayala was deprived of each of these fundamental rights on that fateful September day.

Section 930 as applied to him is unconstitutional. His Second Amendment right to possess a firearm for self-defense on the job was infringed. Mr. Ayala is a law-abiding citizen with his Second Amendment rights intact. He's a person who could lawfully possess a firearm, he's a person who lawfully concealed his

firearm, and he's a person who carried his weapon for a lawful purpose—for self-defense. The government cannot prove that his conduct falls outside of the Second Amendment. He ought to have the constitutional right to keep a lawfully concealed firearm to protect himself when he's at work and not suffer any criminal liability.

Section 930 as applied to him is void for vagueness under the Fifth Amendment's Due Process Clause. Mr. Ayala is a person who was not on fair notice that his actions were criminal. It's unclear whether he is or isn't a section 930(d) person who is shielded from a section 930(a) prosecution. The rule of lenity instructs us that this ambiguity runs in Mr. Ayala's favor. He is therefore immune from criminal prosecution under sections 930(d)(2) and (d)(3).

21

And all things considered, Mr. Ayala should not be prosecuted for resisting arrest under section 111. He fled in fear from an untenable and unlawful arrest. His rights under the Second, Fourth, and Fifth Amendments were ultimately infringed. For the foregoing reasons, Counts One and Two of the Indictment must be dismissed.

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

*/s/ Stephen Consuegra*
Stephen Consuegra, Esq.
Florida Bar No. 105816
Assistant Federal Defender
400 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Facsimile: (813) 228-2562
E-mail: Stephen_Consuegra@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 5, 2023, a true and correct copy of the

foregoing was furnished using the CM/ECF system with the Clerk of the Court,

which will send notice of the electronic filing to the following:

Abigail King, AUSA


<u>*/s/ Stephen Consuegra*</u>
Stephen Consuegra, Esq.
Assistant Federal Defender

# Doc. 25

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.

                                     CASE NO. 8:22-cr-369-KKM-AAS

EMMANUEL AYALA

## UNITED STATES' RESPONSE IN
## OPPOSITION TO AYALA'S MOTION TO DISMISS

    The United States of America, by and through the undersigned Assistant United States Attorney, hereby submits its response in opposition to Emmanuel Ayala's Motion to Dismiss (Doc. 23). Ayala advances the following arguments in an effort to dismiss the Indictment:

1. The offense alleged in Count One (18 U.S.C. § 930) is unconstitutional as applied to Ayala because it infringes on his Second Amendment right to carry or possess a firearm for self-defense;

2. Section 930 is unconstitutionally vague as applied to Ayala under the Fifth Amendment's Due Process Clause; and

3. Ayala lawfully evaded an illegal arrest and should not face prosecution under section 111.

*See* Doc. 23.

## Procedural History

On or about September 26, 2022, a federal grand jury returned an indictment charging Ayala with violations of 18 U.S.C. § 930 (Count One) and 18 U.S.C. § 111 (Count Two). Doc. 1. Count One alleges that Ayala:

> "did knowingly possess and cause to be present a firearm, that is, a Smith & Wesson 9MM firearm, in a federal facility."

Count Two alleges that Ayala:

> "did forcibly resist, oppose, impede, and interfere with an officer and employee of the United States, while that officer and employee of the United States was engaged in the performance of official duties."

On or about November 16, 2022, Ayala self-surrendered pursuant to an arrest warrant that was issued on or about November 26, 2022, based on the above-detailed charges (Doc. 16). Ayala was ordered released on conditions pending trial (Doc. 17).

## Memorandum Of Law

Federal Rule of Criminal Procedure 12(b)(3)(B) provides that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B). When ruling on a motion to dismiss an indictment for failure to state an offense, "a district court is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes." *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006). The court must view that language "in the light most favorable to the government." *Id.* at 1258.

"The propriety of granting a motion to dismiss an indictment under [Fed. R. Crim. P.] Rule 12 by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." *United States v. Miller*, 491 F.2d 638, 647 (5th Cir. 1974).[1] Because the sufficiency of an indictment is determined on its face, it is reversible error for a Court to look beyond the face of the indictment in ruling on a motion to dismiss for failure to state an offense. *See generally Sharpe*, 438 F.3d 1257 (reversing dismissal of indictment where "the allegations in the indictment were sufficient to state the charged offenses as a matter of law … because the counts contained all of the elements of the offense charged and informed the defendants of the charges they faced"); *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) (reversing the dismissal of an indictment and explaining "[t]here is no summary judgment procedure in criminal cases" … "[n]or do the rules provide for a pre-trial determination of sufficiency of the evidence.").

Under Fed. R. Crim. P. 7(c), "[t]he indictment [] must be a 'plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" The indictment is sufficient if "[i]t (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

against double jeopardy for any subsequent prosecution for the same offense." *United States v. Walker*, 490 F.3d 1282, 1296 (11th Cir. 2007) (quoting *United States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir. 2002)).

The indictment against Ayala is sufficient to satisfy the requirements that the Eleventh Circuit has articulated. The charges detailed in the indictment present the essential elements of the charged offenses, notify Ayala of the charges to be defended against, and specify precisely the type of weapon in question, enabling Ayala to rely upon a judgment under the indictment as a bar against double jeopardy.

## I.   The Indictment does not violate Ayala's Second Amendment liberties.

The Second Amendment recognizes "the right of the people to keep and bear Arms" and says that this right "shall not be infringed." U.S. Const. amend II. Yet that right "is not unlimited," *D.C. v. Heller*, 554 U.S. 570 (2008), and the Second Amendment is not a "regulatory straightjacket," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022). The Second Amendment does not prohibit laws forbidding the carrying of firearms in sensitive places, such as schools and government buildings. *D.C. v. Heller*, 554 U.S. 570 at 2786, *N.Y. State Rifle & Pistol Ass'n Inc. v. Bruen*, 142 S. Ct. 2111 at 2118. A government building has been deemed a sensitive place that can ban the carrying of firearms while not violating an individual's Second Amendment rights and is consistent with the Nation's historical tradition of firearm regulation. *Id*. at 2117-2118.

4

In this case, Ayala carried his Smith & Wesson 9mm firearm into a United States Postal Service (USPS) federal facility within the Middle District of Florida. Any legal ability to carry a firearm halts once an individual enters a government facility, which includes this USPS facility. Ayala's Second Amendment right was not violated by his inability to carry his firearm into the USPS federal facility, as the federal facility has been deemed a sensitive place consistent with the United States' historical tradition of firearm regulation.

## II.   Ayala's argument that the charged offense is unconstitutionally vague and violates the Fifth Amendment's Due Process Clause is foreclosed by Eleventh Circuit Precedent.

Despite Ayala's contention, Doc. 23 at 13, the Supreme Court's decision in *Johnson v. United States*, 132 S. Ct 2561 (2020), does not overrule the Eleventh Circuit's precedent in *Marte*. The void-for-vagueness doctrine requires that a penal statute "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Fisher*, 289 F.3d 1329, 1333 (11th Cir. 2002) (citation and internal quotation omitted), *cert. denied*, 537 U.S. 1112 (2003). "Except where First Amendment rights are involved, vagueness challenges must be evaluated in the light of the facts of the case at hand." *Id. United States v. Marte*, 356 F.3d 1336. 1343 (11th Cir. 2004).

In *Johnson*, the Supreme Court held that the Fifth Amendment provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of

law." Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983). The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926). These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences. *United States v. Batchelder*, 442 U.S. 114, 123 (1979). *Johnson v. United States*, 576 U.S. 591, 595–96 (2015). Although *Marte* predates *Johnson*, a review of the two opinions shows that *Johnson* relied on *Kolender* and *Connally*. *Marte* relied on *Fisher*, which also relies on *Kolender*. The underpinning of both decisions relied on the holding in *Kolender.* Given these overlapping legal foundations, *Johnson* did not overrule *Marte*, and it remains binding precedent in the Eleventh Circuit.

The charged statute, 18 U.S.C. § 930, provides that it is a federal crime to knowingly possess or cause to be present a firearm or other dangerous weapon in a federal facility (other than a federal court facility), or to attempt to do so. The statute details exceptions for individuals who would not commit a federal crime by knowingly possessing a firearm in a federal facility. Specifically, the law does not apply to: (1) the lawful performance of official duties by an officer, agent, or employee of the United States, a State, or a political subdivision thereof, who is

6

authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of law; (2) the possession of a firearm or other dangerous weapon by a federal official or a member of the Armed Forces if such possession is authorized by law; or (3) the lawful carrying of firearms or other dangerous weapons in a federal facility incident to hunting or other lawful purposes. 18 U.S.C. § 930(d).

Ayala does not fall within subsection (d)(1) of 18 U.S.C. § 930. Ayala's employment as a truck driver with USPS does not entail him engaging in official duties to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of law. Therefore, his possession of a firearm would not be exempt under this exception.

Likewise, Ayala does not fall within subsection (d)(2) of 18 U.S.C. § 930. Although his employment with USPS would make him a federal employee, possession of a firearm by a USPS employee is not authorized by law within federal USPS facilities. As set out in the government's discovery in this case, all USPS employees are provided an Administrative Support Manual during their orientation. Section 276 of that manual addresses firearms, specifically. That section provides that, unless authorized by the chief postal inspector or inspector general, Postal Service employees are prohibited from possessing firearms in the following instances: (a) while on official duty, either on or off Postal Service property; (b) while on or within Postal Service property at any time. This section further specifies that "possessing" includes the carrying or storing of firearms.

Additionally, Ayala possessed a Florida license to carry a concealed weapon or firearm. Applicable Florida law provides that an individual can obtain a license to carry a concealed weapon or firearm; however, that individual is not authorized to carry a concealed weapon or firearm into any place where the carrying of firearms is prohibited by federal law. Fla. Stat. § 790.06(12)(a). The statute specifies that even if an individual has a license to carry a concealed weapon or firearm, the license does not authorize a person to carry a concealed weapon or firearm into "any place where the carrying of firearms is prohibited by federal law". Fla. Stat. § 790.06(12)(a)(15).

Meanwhile, there is no evidence in this case that Ayala carried his concealed firearm during his employment with USPS on multiple dates incident to hunting or other lawful purposes. Accordingly, he is not exempt from prosecution under subsection (d)(3) of 18 U.S.C. § 930.

Ultimately, the statute is not vague as it applies to Ayala because it clearly details that he does not fall within any of the exemptions to be able to lawfully carry his concealed firearm during his employment with USPS. He additionally received notification through his onboarding with USPS as well as during his concealed weapon licensing that he would not be allowed to possess a weapon in a federal facility.

**III.    Ayala is not charged with evading an arrest. Ayala is properly charged under 18 U.S.C. § 111.**

Ayala argues that he lawfully evaded an illegal arrest and, thus, should not face prosecution under 18 U.S.C. § 111. Doc. 23 at 18. Section 111 criminally

8

penalizes an individual who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties". Section 1114, meanwhile, provides for the protection of "officers and employees of the United States," applying to "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance."

When they approached Ayala to speak with him on September 14, 2022, Special Agents Scott Cunningham and Jill Younce were acting in their official capacity as special agents with the USPS Office of Inspector General (USPS-OIG). Their entire initial interaction was captured on video surveillance that was provided to Ayala in discovery. The special agents both wore their USPS-OIG badges around their necks, and Special Agent Younce separately showed Ayala her USPS-OIG photo credentials. By repeatedly running away, Ayala did forcibly resist, oppose, impede, and interfere with Special Agents Cunningham and Younce as they were acting in their official capacities as governmental officer. Specifically, those agents were investigating Ayala's behavior on the job, which included allegations of smoking marijuana within his USPS vehicle, racking and possessing a firearm within his USPS vehicle, and bringing his firearm into the USPS Tampa Processing and Distribution Center. Indeed, Ayala had a 9mm pistol in his possession when he was

eventually apprehended at the Tampa International Airport. Therefore, the agents were warranted in approaching Ayala with caution and seeking to briefly detain and question him. As the defense points out, "[s]omeone could have gotten seriously injured, hurt, or killed that day," given that Ayala fled throughout Tampa International Airport property carrying a pistol and loaded magazine.

The argument that Ayala resisted an "unlawful arrest" simply does not apply to the facts and circumstances of the encounter that occurred on September 14, 2022. Rather, Ayala forcibly resisted, opposed, impeded, and interfered with USPS-OIG agents as they were attempting to conduct an investigation and perform their official duties that day—knowing that he was likely (and, indeed, was) illegally armed on USPS property.

## IV.   Conclusion

For all the foregoing reasons, the Court should deny the Defendant's motion. The United States further submits that no hearing is necessary given the claims raised and the ability of the pleadings to resolve the Court's questions. *See* Rule 3.01(j), Local Rules, United States District Court, Middle District of Florida.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:   */s/ Abigail K. King*
Abigail K. King
Assistant United States Attorney
Florida Bar Number 294963
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:  (813) 274-6000
Facsimile:  (813) 274-6358
Email: Abigail.king@usdoj.gov

**U.S. v. Emmauel Ayala**          **Case No. 8:22-cr-369-KKM-AAS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2023, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to:

Stephen Consuegra, Esq.

*/s/ Abigail K. King*
Abigail K. King
Assistant United States Attorney
Florida Bar Number 294963
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:  (813) 274-6000
Facsimile:  (813) 274-6358
Email: Abigail.king@usdoj.gov

# DOC. 32

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

     v.                       CASE NO. 8:22-cr-369-KKM-AAS

EMMANUEL AYALA

### GOVERNMENT'S SUPPLEMENTAL BRIEF TO DEFENDANT'S MOTION TO DISMISS INDICTMENT

The United States of America, by Roger B. Handberg, United States Attorney for the Middle District of Florida, files this supplemental brief as ordered by the Court. *See* Doc. 26.

### Background and Introduction

The defendant, Emmanuel Ayala, has moved to dismiss charges that he possessed a firearm in a federal facility, in violation of 18 U.S.C. § 930, and that he resisted a federal officer, in violation of 18 U.S.C. § 111. *See* Doc. 23. The United States has opposed dismissal. *See* Doc. 25. This Court ordered supplemental briefing regarding the firearm charge. *See* Doc. 26.

Section 930 prohibits the possession of firearms in federal facilities except in certain circumstances.[1] One exception is that the statute does "not apply to … the lawful carrying of firearms … in a Federal facility incident to hunting or other lawful purposes." § 930(d)(3). Ayala argues that section 930 violates the Second

---

[1] A federal facility is any "building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g)(1).

Amendment, as applied to him. *See* Doc. 23 at 1, 6–7 (reiterating as-applied challenge). The indictment alleges that Ayala "did knowingly possess and cause to be present a firearm, that is, a Smith & Wesson 9MM firearm, in a federal facility, in violation of 18 U.S.C. § 930." Doc. 1 at 1. In his motion to dismiss, Ayala claims that he is a federal employee with a state-issued concealed weapons permit and security license. *See* Doc. 23 at 3–4. He admits that he brought a loaded handgun to the post office where he works (a "federal facility") and carried it while on duty. *Id.* (These additional facts, however, are not alleged in the indictment). He also argues that the statute is unconstitutionally vague.

## Memorandum Of Law

**I.  *Bruen*, *McDonald*, and *Heller* require no further inquiry into the history of "presumptively lawful" firearm regulations in government buildings and schools.**

Ayala's motion is predicated on the Supreme Court's most recent Second Amendment decision, *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2125 (2022), which rejects the "'two-step' framework" under which appellate courts had previously "combine[d] history with means-end scrutiny" in analyzing Second Amendment challenges after *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). *Bruen* clarifies that a firearm regulation comports with the Second Amendment so long as it is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms"; neither strict nor intermediate scrutiny comes into play. *Bruen*, 142 S. Ct. at 2127.

"Part of" the historical tradition, *Bruen* explains, means "consistent with"—*i.e.*, not contrary to—that tradition. *Id.* at 2130.

*Bruen* is no help to Ayala. While clarifying that means-end scrutiny plays no role in a Second Amendment challenge, *Bruen* unequivocally affirms *Heller* and *McDonald. See, e.g., Bruen*, 142 S. Ct. at 2134 (making the "constitutional standard endorsed in *Heller* more explicit" and applying the same standard). Those cases expressly affirmed the common-sense notion that the government may regulate firearms in government buildings. Nothing in *Bruen* undermines or abrogates that. To the contrary, *Bruen* reiterates that the government may prohibit firearms in government buildings, schools, and other "sensitive places." *See Bruen,* 142 S. Ct. at 2133. The Supreme Court has now said so three times. *See also Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786.

Ayala does not dispute that a post office is a government building and a federal facility. *See* U.S. Const. Art. I § 8 ("The Congress shall have Power … to establish Post Offices and post Roads."); Doc. 23 at 7–12. This Court ordered further briefing on "historical evidence of regulation of firearms at post offices" (re: buildings and employees) "with a particular view to the time of the Founding." Doc. 26 at 4–5. And, in relation to Ayala's vagueness argument, the Court ordered the government to address the meaning of "other lawful purposes" in section 930(d)(3). *Id.* The government addresses both issues in the memorandum of law below. But first, some important context:

There is no evidence of firearms being prohibited at post offices, specifically, or of postal workers being prohibited from carrying them, at the time of the founding. This is not surprising. The evidence that the government has been able to find of analogous historical restrictions is described below. In the end, however, no further historical analysis is necessary, because the Supreme Court has already answered the question. It has repeatedly said that the government may restrict firearms in government buildings of whatever type, drawing from analogues like polling places, courthouses, and legislative assemblies. That is the appropriate framework here. *See Bruen*, 142 S. Ct. at 2132 ("[L]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar'"—not necessarily identical.). Whatever this Court concludes about the evidence below, the Supreme Court has stated several times now the Second Amendment permits firearm restrictions in government buildings (which include post offices). *See Bruen,* 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786. To carve out a post-office exception would be in grave tension, if not direct conflict, with each opinion.

*Heller* began with the observation that "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. With that general principle in mind, *Heller* explained that striking down a local ordinance that had prohibited the

keeping of handguns in homes "should [not] be taken to cast doubt on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* The Court identified such sensitive-place restrictions as but one example in a non-exhaustive list of "presumptively lawful regulatory measures" that do not implicate the Second Amendment (also including "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms"). *Id.* at 627 n.2.

Two years later, *McDonald* reiterated: "We made it clear in *Heller* that our holding did not cast doubt on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings [or other presumptively lawful restrictions] … *We repeat those assurances here.*" 561 U.S. at 786 (emphasis added). And *Bruen* again reaffirms firearm restrictions in schools and government buildings, noting that modern regulations require only "a well-established and representative historical *analogue*, not a historical *twin.*" 142 S. Ct. at 2133 (emphases in original; internal citations and quotations omitted). It is "settled," says *Bruen*, that schools and government buildings are among the "sensitive places" where firearms may constitutionally be prohibited:

> Consider, for example, *Heller*'s discussion of longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that

> these locations were "sensitive places" where arms carrying could be
> prohibited consistent with the Second Amendment. And courts can use
> analogies to those historical regulations of "sensitive places" to
> determine that modern regulations prohibiting the carry of firearms in
> *new* and analogous sensitive places are constitutionally permissible.

*Id*. (emphasis in original; citations and some internal quotation marks omitted).

Whether *Bruen* means to say that schools and government buildings are themselves

*historically* sensitive places (of the same vintage as legislative assemblies, polling

places, and courthouses), or *new* and *modern* analogues to the enumerated examples,

is debatable but irrelevant. The point, regardless, is that this part of *Bruen* explains

why it is "constitutionally permissible" to prohibit the carrying of firearms in schools

and government buildings (as *Heller* and *McDonald* said): either because the

lawfulness of such prohibitions may be presumed "settled" given the lack of any

historical dispute or because schools and government buildings—of whatever type—

are "analogous enough to pass constitutional muster" when compared to other

presumptively settled sensitive places. *Id*. Nothing in *Bruen* purports to narrow or

restrict the categories of sensitive places that *Heller* and *McDonald* specifically

identified. *See id*. at 2157 ("Nor have we disturbed anything that we said in *Heller* or

*McDonald* ... about restrictions that may be imposed on the possession or carrying of

guns ... Our decision, as noted, does not expand the categories of people who may

lawfully possess a gun.") (Alito, J., concurring); *see also id*. at 2161 ("Properly

interpreted, the Second Amendment allows a 'variety' of gun regulations," including

"'laws forbidding the carrying of firearms in sensitive places such as schools and

government buildings.'") (Kavanaugh, J., concurring) (quoting *Heller* and *McDonald*).

For 35 years, 18 U.S.C. § 930 has restricted the possession of firearms in any "building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." *See* Pub. L. No. 100-690 § 6215 (Nov. 18, 1988). *McDonald* reiterated *Heller*'s "assurances" that the Second Amendment casts no doubt on longstanding "laws forbidding the carrying of firearms in ... government buildings" (or other sensitive places). *McDonald*, 561 U.S. at 786. *Bruen* again reiterates *Heller* (and *McDonald*). If *Bruen* was an invitation to scrutinize firearm restrictions for particular types of government buildings—and there are myriad different types—it would cast significant "doubt" on section 930, contrary to the assurances in *Heller* and *McDonald* that *Bruen* affirms and reiterates. There is no subsequent case interpreting *Bruen* that way.

To the contrary, lower courts have consistently recognized that *Bruen* protects firearm regulations in all manners of government buildings (and, by the same reasoning, in schools). Two magistrate judges in the District of Maryland, for instance, have repeatedly rejected post-*Bruen* Second Amendment challenges to a federal regulation prohibiting firearms on the National Institutes of Health campus in Maryland. *See United States v. Marique*, No. 8:21-po-02263-AAQ, 2022 WL 17822443 (D. Md. Dec. 20, 2022); *United States v. Tallion*, No. 8:22-po-01758-AAQ, 2022 WL 17619254 (D. Md. Dec. 13, 2022); *United States v. Power*, No. 20-PO-331-GLS, 2023

WL 131050 (D. Md. Jan. 9, 2023); *United States v. Robertson*, No. 22-PO-867-GLS, 2023 WL 131051 (D. Md. Jan. 9, 2023). The regulation challenged in those cases states that "[n]o person other than a specifically authorized police officer shall possess firearms, explosives, or other dangerous or deadly weapons or dangerous materials intended to be used as weapons either openly or concealed" on the NIH property. 45 C.F.R. § 3.42(g). In each case, the court upheld the regulation and refused to dismiss the indictment, because the NIH property is a "government building," and therefore—according to *Bruen*—a "sensitive place" where firearms may constitutionally be prohibited. *See Marique*,  2022 WL 17822443, at *8 (ruling that "the Supreme Court has already engaged in the analogical reasoning regarding schools and government buildings," and rejecting defendant's argument that certain government buildings may not be sensitive places); *Tallion*, 2022 WL 17619254, at *7 (same); *Power*, 2023 WL 131050, at *8–9 ("[B]ecause the NIH is a government building(s), it is a sensitive place [where firearms may be banned].");  *Robertson*, 2023 WL 131051, at *8–9 (same). A district court in Minnesota similarly observed, albeit in dicta, that "[a]lthough the *Bruen* Court identified few other founding-era sensitive places with outright prohibitions on weapons, the lack of evidence of 'disputes regarding the lawfulness of such prohibitions' suggested that 'arms carrying could be prohibited [in schools and government buildings] consistent with the Second Amendment.'" *Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *5 n.12 (D. Minn. Mar. 31, 2023) (quoting *Bruen*; brackets in original). And a district court in New Jersey refused to temporarily restrain enforcement of a statute barring firearms

at playgrounds because, the court concluded, "*Bruen* and *Heller* ... expressly identified restrictions at certain sensitive places (such as schools) to be well-settled, even though the 18th- and 19th-century evidence has revealed few categories in numbers." *Siegel v. Platkin*, No. CV-22-7464, 2023 WL 1103676, at *10 (D.N.J. Jan. 30, 2023). "Playgrounds fall within the sphere of schools," the court decided, and "[t]herefore, under *Bruen*, the Court 'can assume it settled' that playgrounds are a 'sensitive place.'" *Id*. (quoting *Bruen*); *see also Frey v. Nigrelli*, No. 21-CV-05334, 2023 WL 2473375, at *20 (S.D.N.Y. Mar. 13, 2023) (likewise reading *Bruen* to have "'assumed it settled that' schools full of children were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment'") (quoting *Bruen*). The few courts that have thus far addressed these issues consistently recognize that *Bruen*, *McDonald*, and *Heller* foreclose any Second Amendment challenge to firearm regulations in government buildings or schools, period.

"[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Bruen,* 142 S. Ct. at 2133. Courts should neither "uphold every modern law that remotely resembles a historical analogue" nor strike down every modern law that lacks an identical historical analogue. *Id*. *Bruen*, *McDonald*, and *Heller* make clear that government buildings—including post offices—fall on the constitutionally-regulable side of that line. This Court should not second-guess the Supreme Court's "repeat[ed] … assurances" that its recent precedents cast no doubt on firearm restrictions in such places. *McDonald*, 561 U.S.

at 786.

## II. Historical Traditions in the United States Support the Ban on Firearms at Post Offices

### A. *New York State Rifle & Pistol Association v. Bruen*

When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022). The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Id.* at 2130. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Id*. Even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster. *Id*. at 2118. Analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical *twin*. *Id.*at 2132. Courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible. *Id.* at 2118.

Although the historical record yields relatively few 18th- and 19th-centruy "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—there is no dispute regarding the lawfulness of such prohibitions; thus it is settled that those locations were "sensitive places" where arms carrying could be prohibited consistent with the Second

Amendment. *Id.* at 2132. Additionally, where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide the interpretation of an ambiguous constitutional provision. *Id.* at 2137 (citing *NLRB v. Noel Canning*, 572 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)).

### B. Historical Analysis of Post Offices and "Sensitive Places"

The ban of firearms at federal facilities is supported by legal and historical precedents. "Sensitive places" such as government buildings have long been exceptions to the Second Amendment, and post offices fall under that umbrella. Pursuant to *Bruen*, although the government is required to conduct a historical analysis of the firearm ban in question, the government is not required to provide a "historical twin." There is sufficient historical support of a weapons ban at post offices; however, the more relevant analysis is the historical ban of weapons at "sensitive places," as post offices are designated sensitive places and fall within the category of a government building.

The United States Postal Service is a quasi-governmental corporation established by Congress and is the successor to the United States Post Office. *United States v. Dorosan*, 2008 WL 2622996, (E.D. La. June 30, 2008). The business of USPS is mail. *Id.* The U.S. Constitution authorizes Congress "[t]o establish Post Offices and post Roads," which Congress has done throughout nearly the entirety of the history of the United States. *See* U.S. Const. art. I, § 8, cl. 7; *Postal History*,

https://about.usps.com/who/profile/history/ (including timeline of significant dates, beginning with Benjamin Franklin's appointment as first Postmaster General in 1775, and including lists of historical post offices). The Property Clause authorizes Congress to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The Property Clause authorizes the enactment and enforcement of regulations that are designed to maintain safety and order on government property. *See United States v. Brown*, 552 F.2d 817 (8th Cir. 1977); *Robbins v. United States*, 284 F. 39 (8th Cir. 1922); *United States v. Matherson*, 367 F.Supp. 779 (E.D. NY 1973).

The United States Postal Service is a state actor rather than a private business, so its actions must comply with the Constitution. *Bonidy v. United States Postal Service*, 790 F.3d 1121, 1126 (10th Cir. 2015). The government has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office) than when it is acting as a sovereign (such as when it regulates private activity unconnected to a government service. *Id.* Ultimately, the United States Postal Service has broad discretion to govern its business operations according to the rules it deems appropriate, and a regulation banning firearms on postal property is consistent with the United States Postal Service objectives, which include providing a safe environment for its patrons and employees. *Id.* at 1127. Certainly, our Founders understood that property owners had the right to exclude others from their property and, along with it, the lesser power to restrict the actions or conduct of visitors as a condition of admittance. *See* William Michael Treanor, *The Original Understanding of*

*the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 826–27 (1995)

("Blackstone's conception, while narrower than Locke's, was still broad, as well as

remarkably modern: The individual's right of property 'consists in the free use,

enjoyment, and disposal of all acquisitions, without any control of diminution, save

only by the laws of the land.'") (quoting Blackstone's Commentaries); *see also*

*Nekrilov v. City of Jersey City*, 45 F.4th 662, 683–84 (3d Cir. 2022) (Bibas, J.,

concurring) (similarly describing the Founders' "broad conception" of property

rights) (also citing Blackstone's Commentaries).

Although the American postal network operated under the Continental

Congress and Confederation Congress from 1775 to 1781, the post office essentially

remained a mirror image of the royal postal system for British North America as it

had existed in the period prior to 1775. Founding-Era Socialism: The Original

Meaning of the Constitution's Postal Clause, 7 Brit. J. Am. Legal Stud. 1, 25 (2018).

In 1788, there were approximately 69 post offices across the continental United

States. *Id.* at 28. The post offices at the time of the Founding were starkly different

from the post offices in modern day America. In some colonies, every family sent a

member onboard incoming ships for the purpose of receiving letters. In the King's

Service (2009), https://www.archives.gov/publications/prologue/2009/summer/

finlay.html. Letters that were unclaimed on the ships were taken to a nearby

coffeehouse or tavern that was heavily frequented by the community. *Id.* Letters were

spread out on a table and people would come and not only gather their own mail but

gather the letters belonging to people in their neighborhood. *Id.* A local magistrate or

minister was ultimately responsible to distribute letters or packages for individuals that lived far from the city. *Id.*

Post offices were only loosely, if at all, regulated, and the employees and patrons of post offices were not regulated either. In 1794, Congress established the Post Office indefinitely. 1 Stat. 354 (1794). From 1790 to 1860, the number of post offices increased from 75 to 28,498. The United States Postal Service, An American History (2022), https://about.usps.com/publications/pub100.pdf. Through the evolution of mail carrier systems, post offices became similar to what they are in modern day America. As such, regulations of the firearms at post offices evolved in similar time.

In 1962, as part of the new Federal Property Management Regulations, firearms and other weapons or explosives were banned from federal property except for official purposes. 29 F.R. 15982 (1964). In 1972, the United States codified the ban of firearms, dangerous or deadly weapons, or explosives on postal property except for official purposes. Conduct on Postal Property, 37 Fed. Reg. 24346, 24347 (November 16, 1972). In 1988, Congress outlawed carrying a firearm or other dangerous weapon in a federal facility. 18 U.S.C. § 930. The term "federal facility" means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties. *Id.*  Additionally, in 1998 the same ban was codified, reinforcing that "[n]o person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal

property, except for official purposes". Conduct on Postal Property, 39 C.F.R. § 232.1(l).

The *Bruen* court held that courts can use analogies to longstanding laws forbidding the carrying of firearms in sensitive places to determine whether modern regulations are constitutionally permissible. *Bruen*, 142 S. Ct. at 2118 (citing *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)). The *Bruen* court further held that although there were few 18th- and 19th-century "sensitive places" where weapons were altogether banned—*e.g.*, legislative assemblies, polling places, and courthouses—there was no dispute regarding the lawfulness of such prohibitions. *Id.* at 2133. As such, those locations are settled "sensitive places" where arms carrying may be prohibited consistent with the Second Amendment, despite the lack of historical analogue. *Id.* Post offices and other government buildings are, at a minimum, analogous to the specific historical examples cited in *Bruen*—if not among those examples themselves (this part of *Bruen* is ambiguous). *Id.* at 2133. Under either reading, a post office is a "sensitive place" that does not require further historical analysis beyond that already established in *Bruen*.

At the time of the Founding, Delaware enacted a "sensitive place" ban on firearms at polling places. D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms, 13 Charleston L. Rev. 205, 235–36 (2018). Additionally, during the colonial and Founding periods, a few jurisdictions had laws against carrying arms into centers of government deliberation, including polling places. *Id.* at 244. These restrictions became more prominent in the late 17th-

century, with Louisiana, Maryland, and Texas implementing polling place firearm bans. *Id*. at 245.

In 1874, the Georgia Supreme Court upheld a statute against carrying weapons into a court of justice, citing the right of individuals to safely seek the privileges of a courthouse without being surrounded by weapons. *Id*. at 246. It wasn't until the late twentieth century that firearm bans at schools rose in popularity; firearms previously were typically present at schools as students stored them in their lockers or vehicles to go hunting or target shooting after school. *Id*. at 263.

Courts across the country have held that the United States Postal Service, acting as a proprietor, can prohibit the presence of firearms on its properties, specifically as it relates to Postal Service employees. The Fifth Circuit, for example, upheld the ban of firearms in all post offices and post office parking lots. *United States v. Dorosan*, 350 F. App'x 874 (5th Cir. 2009). The *Dorosan* court held that because the Postal Service used the parking lot as a place of regular government business, it fell within the "sensitive places" exception and thus Dorosan could not lawfully bring his firearm to the postal parking lot. *Id*. at 875. The Tenth Circuit reached the same decision and held that the Postal Service parking lot in question did not infringe on an individual's Second Amendment rights because the Second Amendment right to carry firearms does not apply to federal buildings and the parking lot qualified because it contained a drop-off mailbox. *Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015). The defendant in that case had a valid concealed-carry permit under Colorado law and claimed he should be able to bring his gun into the post office

building and store the gun in the post office parking lot when he picked up his mail. *Id*. at 1123. The Tenth Circuit ruled that the firearm ban on postal property is substantially related to the Postal Service's important interest in creating a safe environment for its patrons and employees, and only affects private citizens when they are doing business with the Postal Service or on Postal Service property. *Id*. at 1127. The *Bonidy* court also held that a concealed-carry permit did not override the constitutionality of the Postal Service regulation banning firearms from its property. *Id*.

Throughout the history of the United States, firearm regulations have ebbed and flowed, with more regulations enacted in the nineteenth and twentieth centuries. Post offices fall within the category of a government building, protected by the "sensitive place" exception to the Second Amendment, even though—as *Bruen* acknowledged—there were "relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited" at the time of the Founding. *Bruen*, 142 S. Ct. at 2133. Specific, pre-existing firearm prohibitions on postal property or for postal employees at the time of the Founding are not necessary to justify the longstanding, presumptively lawful firearm prohibitions in government buildings (including post offices), as *Bruen*, *Heller*, and *McDonald* recognize. The historical analogues cited above (and in *Bruen*) are sufficient.

Besides, Ayala argues that section 930 is unconstitutional *as applied to him*. *See* Doc. 23 at 1, 6–7. Even if *Bruen* left any doubt about firearm prohibitions in post offices or other government buildings as a general matter (it doesn't), Ayala certainly

cannot show that the Second Amendment prevents the government from prohibiting

its own employees from bringing guns to work.

### III. The "Other Lawful Purposes" Exception under 18 U.S.C. § 930(d)(3) Does Not Apply to Ayala.

 Section 930(d)(3) permits the "lawful carrying of firearms or other dangerous

weapons in a Federal facility incident to hunting or other lawful purposes." There are

three cases that interpret this exception to the firearm prohibition, none of which

support Ayala's broad reading of the statute. *See Yorzinski v. Imbert*, 39 F. Supp. 3d

218, 227 (D. Conn. 2014); *Tagore v. United States*, No. CV H-09-0027, 2012 WL

12877829, at *22–23 (S.D. Tex. Feb. 2, 2012); *United States v. De la Cruz-Bancroft*,

2010 WL 8752034 (D.N.M. Jan. 4, 2010). These cases either hold or endorse the

view that section 930(d)(3) requires that the firearm be both lawfully carried *and*

carried for a "lawful purpose that is related to the federal facility." *De la Cruz-Bancroft*,

2010 WL 8752034 at *2–3; *see also Yorzinksi*, 39 F. Supp. at 227; *Tagore*, 2012 WL

12877829, at *22–23.

Regardless, a plain reading of the text shows that the exception does not

provide blanket authorization for all ostensibly "lawful carrying." It is far more

limited than that. For one thing, the lawful carrying in the federal facility must be

"incident to" some "lawful purpose" (as the cases above recognize). Lawful carrying

is necessary but not sufficient. The latter requirement—lawful purpose—would be

superfluous if it was synonymous with lawful carrying, and statutes should be read to

avoid surplusage. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal

principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").

Moreover, the scope of "other lawful purpose" is informed by the specific example that the statute provides: hunting. When a statute includes a "'catchall phrase' to 'an enumeration of specifics,' additional inclusions would be appropriate if they are sufficiently similar [to the specifics]." *Hicks v. City of Tuscaloosa*, 870 F.3d 1253, 1259 (11th Cir. 2017) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012)). This canon of statutory interpretation is known as "ejusdem generis." *Id*. With this principle in mind, section 930(d)(3) is best read to encompass (1) the lawful carrying of a hunting rifle into a federal facility where hunting is permitted—such as a national park—for that particular purpose (hunting), or (2) sufficiently similar conduct for sufficiently similar purposes. Ayala's purported conduct—carrying a concealed handgun for "self defense," while working at a post office—appears to lack any particular purpose at all; certainly not one related to the federal facility, and it's qualitatively different than hunting on federal lands, regardless. In any event, whether or not Ayala lawfully carried the weapon, and for a lawful purpose, would be up to a jury to decide. *See generally United States v. McArthur*, 108 F.3d 1350, 1354–56 (11th Cir. 1997) (similar exception to section 930—permitting firearms in federal facilities if they fail to post conspicuous notice of the prohibition—is an affirmative defense). It has no bearing on the sufficiency of the indictment.

Finally, "other lawful purpose" should not be equated with state-licensed carrying or possession both because being licensed is not a purpose and because Congress explicitly exempts state-licensed carrying or possession from firearm prohibitions when it wants to do so. Elsewhere in Chapter 44 of Title 18 (where section 930 likewise resides), for instance, Congress has prohibited individuals from transferring firearms "to any person ... who the transferor knows or has reasonable cause to believe does not reside in ... the State in which the transferor resides"—but not if the transfer involves a firearm bequeathed to "*a person who is permitted to acquire or possess a firearm under the laws of the State of his residence.*" 18 U.S.C. § 922(a)(5). Another example is the general prohibition against firearms in school zones. *See* 18 U.S.C. § 922(q)(2). There, Congress made clear that the prohibition does not apply "if the individual possessing the firearm is licensed to do so by the State" and the state requires law enforcement to "verify that the individual is qualified under law to receive the license." § 922(q)(2)(B)(ii). Congress could have similarly provided in section 930 for the carrying of firearms in federal facilities by those with a state permit or license, if that's what it intended. But that's not what subsection (d)(3) says.

The statute calls for inquiry into a defendant's purpose in bringing the firearm to a federal facility, and the possession of the firearm must be not only lawful but also for a lawful purpose that is related to the federal facility. Any other interpretation would fail to give full effect to every word in the statute, as other courts have recognized. If mere lawful possession of a firearm outside the federal

facility were enough to permit someone to bring it inside, then almost anyone could bring a weapon inside a federal facility for any reason. Ultimately, this is not consistent with either the statutory text or the legislative intent of preventing firearms within federal facilities, and it also raises the probability of inconsistent results across the United States, where each state has varying gun-control and carrying laws.

Ayala argues that subsection (d)(3) is ambiguous and that he should benefit from lenity. 18 U.S.C. § 930(d)(3). But whatever ambiguity might exist at the margins, the statute is not grievously ambiguous. It plainly does not permit the carrying of firearms in federal facilities without a specific lawful purpose similar to hunting, as explained above. Ayala identifies no such purpose. Ultimately, Ayala is not immune under 18 U.S.C. § 930(d)(3) simply because he may have been permitted to carry his weapon outside of federal facilities. Ayala's position as a delivery driver does not grant him authority to carry a firearm. He was not acting in the capacity of a security guard or individual tasked with maintaining order and security at the postal facilities. The United States Postal Service explicitly bans employees from carrying firearms as part of their employment unless specifically authorized to do so as part of their job responsibilities. As such, Ayala is unable to point to a lawful purpose for bringing a firearm into a federal facility and is not permitted to do so under 18 U.S.C. § 930(d)(3).

In any event, there is nothing vague about Ayala's alleged offense. The firearm count in this indictment clearly alleges that Ayala knowingly possessed a firearm in a federal facility, in violation of 18 U.S.C. § 930. Doc. 1 at 1. That is all that it alleges.

Prohibiting firearms in federal facilities raises no Second Amendment concerns for the reasons above, whatever exceptions Congress may choose to provide (or not provide). The "other lawful purposes" exception in section 930(d) is subject to the same sort of interpretation as most any statutory provision. Reasonable minds may dispute which purposes suffice. Nevertheless, mere ambiguity about the scope of a potential exception to a criminal statute does not create the sort of fair-notice and arbitrary-enforcement problems that implicate the Due Process clause. Determining whether a purpose was "lawful" within the meaning of section (d)(3) does not require the same sort of wide-ranging and indeterminant inquiry as—by contrast— whether a defendant's years- or decades-old predicate offense was of the type that, at that time, categorically involved conduct presenting "a serious potential risk of physical injury to another" in the abstract sense. *See contra Johnson v. United States*, 576 U.S. 591, 593–97 (2015) (finding Armed Career Criminal Act's residual clause unconstitutionally vague).

## IV.     Conclusion

Because post offices are government buildings and, consequently, sensitive

places, the historical analysis that *Bruen* otherwise normally required is not necessary

here. Additionally, the fact that Ayala may have been permitted to carry a firearm

under state law does not create a "lawful purpose" under 18 U.S.C. § 930(d)(3) to

carry it in a federal facility.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:     /s/ *Sean Siekkinen*
Sean Siekkinen
Assistant United States Attorney
Illinois Bar No. 6297623
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Sean.Siekkinen@udsoj.gov


/s/ *Abigail K. King*
Abigail K. King
Assistant United States Attorney
Florida Bar No. 294963
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:    (813) 274-6358
E-mail: Abigail.King@udsoj.go

**U.S. v. Emmanuel Ayala**  **Case No. 8:22-cr-369-KKM-AAS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Stephen Consuegra, FPD

/s/ *Abigail K. King*
Abigail K. King
Assistant United States Attorney
Florida Bar No. 294963
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone:   (813) 274-6000
Facsimile:   (813) 274-6358
E-mail: Abigail.King@usdoj.gov

# Doc. 57

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                          Case No: 8:22-cr-369-KKM-AAS

EMMANUEL AYALA,

    Defendant.

_____

## ORDER

The United States indicted Emmanuel Ayala, a postal worker, for possessing a firearm in a Federal facility in violation of 18 U.S.C. § 930(a). Ayala argues that statute is unconstitutional as applied to him because the historical record does not support a law banning firearms in post offices. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Relying on dicta from earlier cases, the United States responds that the Second Amendment allows it to punish the bearing of arms inside *any* government building. But the Supreme Court has been clear: the government must point to historical principles that would permit it to prohibit firearms possession in post offices. *See id.* at 17, 24. The United States fails to meet that burden. Thus, I dismiss the § 930(a) charge because it violates Ayala's Second Amendment right to bear arms.

## I.   BACKGROUND

Ayala worked for the U.S. Postal Service as a semi-truck driver hauling packages out of a facility located in Tampa. MTD (Doc. 23) at 3; Gov't Position in Opp'n to Evid. Hr'g (Doc. 43) at 1. He possesses a Florida concealed carry permit and "ke[pt] his firearm, a Smith & Wesson 9mm, concealed inside his fanny pack" for self-defense while on the job. MTD at 3–4; Gov't Position in Opp'n to Evid. Hr'g at 1. "[F]rom time to time," he carried the firearm onto Post Office property when retrieving his semi-truck from work "for extra protection on the short walk" to and from the employee parking lot. MTD at 4.

On September 14, 2022, Ayala wore his fanny pack, with the gun inside, as he walked from the employee parking lot through the metal turnstiles and into the post office. *Id.* at 3–4. After he clocked in, two agents from the U.S. Postal Service's Office of Inspector General stopped him and tried to detain him. *Id.* at 4–5. Ayala fled, but was eventually arrested by officers from the Tampa Police Department. *Id.* at 5–6. A grand jury indicted him for violating 18 U.S.C. § 930(a) by knowingly bringing a firearm into a Federal facility and 18 U.S.C. § 111 by forcibly resisting arrest. *See* Indictment (Doc. 1).

Ayala moves to dismiss both counts. First, he argues that § 930(a), as applied to an ordinary post office, violates his Second Amendment right to carry a firearm for self-defense. MTD at 2. Second, he argues that § 930(a) and its incorporated exceptions in § 930(d) are vague and ambiguous in violation of the Fifth Amendment. *Id.* Finally, he

argues that he "should not stand prosecution for violating [§ 111] because he resisted an unlawful arrest under the common law and under the Fourth Amendment." *Id.*

After reviewing Ayala's motion and the United States' response, I directed further briefing on the Second Amendment question. *See* Suppl. Briefing Order (Doc. 26); *see also* Appendix B. I outlined *Bruen*'s analytical framework and explained that the United States' response to Ayala's Second Amendment challenge was "unhelpful in this task." App. B at 3. That two-paragraph response lacked any "searching analysis into the historical record to determine whether § 930 as applied to Ayala" complies with the Second Amendment. *Id.* Thus, I granted both parties another opportunity to brief the issue. *See id.* at 1, 5–6. That briefing is now complete. *See* Gov't Suppl. Br. (Doc. 32); Def. Suppl. Br. (Doc. 39).

## II. LEGAL STANDARD

In a criminal case, "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). An issue may be resolved on a pretrial motion under Rule 12(b)(1) "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60 (1969) (footnote omitted).[1]

---

[1] *Covington* interpreted an older version of Rule 12(b)(1) that referred to "trial of the general issue" rather than "trial on the merits." *See* 395 U.S. at 60. But the amendment that made this change merely substituted

## III.   ANALYSIS

This order resolves only Ayala's Second Amendment challenge. The sole relevant facts are that Ayala carried a firearm into an ordinary post office, which neither party disputes. As a result, this issue presents a pure question of law ripe for disposition. Because I conclude that Count I must be dismissed on Second Amendment grounds, I need not consider Ayala's vagueness challenge. Ayala's challenge to Count II cannot be resolved on a motion to dismiss because, even if Ayala could have lawfully resisted arrest, the jury must resolve the contested factual issues surrounding his resistance.

### A. Second Amendment Challenge

*New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), requires the United States to present historical support for § 930(a)'s application to Ayala, which it fails to do. Post offices have existed since the founding, as have threats to the safety of postal workers and the public entering those locations. Yet the historical record yields no "distinctly similar historical regulation addressing" those safety problems by regulating firearms in post offices. *Id.* at 26. *Bruen* deems this absence strong evidence of the statute's unconstitutionality. *Id.* Even if the lack of a distinctly similar historical regulation was not dispositive, the United States has offered no relevant historical analogues. Although not

---

"[t]he more modern phrase 'trial on the merits' . . . for the more archaic phrase 'trial of the general issue.' No change in meaning [was] intended." *See* FED. R. CRIM. P. 12(b)(1) advisory committee's note to 2014 amendment.

my burden, I conduct a more robust historical inquiry and likewise uncover no tradition of relevantly similar firearms regulations.

I then dispel two misapprehensions held by the parties. First, nothing in Supreme Court dicta establishes that the United States may ban firearms in all government buildings. Second, the scope of the Second Amendment right is a legal question, not a factual one, and I need not hold an evidentiary hearing to resolve it. Instead, the government bears the burden to identify historical evidence supporting its challenged regulation.

Finally, I explain why the United States errs in arguing that its proprietorship of federal land and buildings excludes vast swathes of the country from the protection of the Second Amendment.

## 1. *Bruen*'s Second Amendment Standard and 18 U.S.C. § 930(a)

When a firearms regulation is challenged under the Second Amendment, "the government must affirmatively prove that [the challenged] regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. If "the Second Amendment's plain text covers an individual's conduct," then "the Constitution presumptively protects that conduct" and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation." *Id.* at 24. Regulations that sweep

beyond our historical tradition flout the Second Amendment's "unqualified command" that "the right of the people to keep and bear Arms, shall not be infringed." *Id.* at 17, 20.

This historical test often requires a searching inquiry, but not always. When a "general societal problem" has persisted since the founding, the inquiry is "fairly straightforward": "[T]he lack of a distinctly similar historical regulation addressing [the] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. "Likewise, if earlier generations addressed the societal problem, but did so through materially different means," that is evidence "that a modern regulation is unconstitutional." *Id.* On the other hand, cases that implicate "unprecedented societal concerns or dramatic technological changes," *id.* at 27, require courts to consider "how and why historical regulations burden a law-abiding citizen's right to armed self-defense," *id.* at 29. Stated differently, addressing "regulations that were unimaginable at the founding" "will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id.* at 28.

This latter approach, which requires the government to "identify a well-established and representative historical *analogue*," *id.* at 30, has caused some confusion.[2] To be clear,

---

[2] Some have criticized lower courts for failing to understand this aspect of *Bruen*. In a recent article, two scholars explain that *Bruen* encourages "an inquiry into the general law"—meaning an inquiry into the traditional scope of the Second Amendment right codified by the Founders. William Baude & Robert Leider, *The General Law Right to Bear Arms*, 99 NOTRE DAME L. REV. (forthcoming 2024) (Dec. 12, 2023, manuscript at 18) (available at https://perma.cc/XS5W-NA9F). Under this approach, the role of the court is "looking to a wide range of cases, parsing the close cases, setting aside unusual outliers, and trying to distill the general principles," *id.*, rather than engaging in a so-called "mindless parsing of historical

that inquiry requires a historical example that is "relevantly similar" to the challenged regulation, *id.* at 29 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)), not "a historical *twin*," *id.* at 30. When the government's proffered examples are not directly on point, courts must distill the underlying legal principles from the historical record. In other words, I must determine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29.

> With the *Bruen* test in mind, I turn to § 930(a), which provides that:

> Except as provided in [a subsection not relevant here], whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility (other than a Federal court facility), or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.[3]

A Federal facility is "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g)(1).

---

analogies," *id.* at 40. The U.S. Solicitor General's arguments in *United States v. Rahimi* sounded in much the same register. *See* Transcript of Oral Argument at 40:4–12, *United States v. Rahimi*, 22-915 (2023) ("The way constitutional interpretation usually proceeds is to use history and regulation to identify principles, the enduring principles that define the scope of the Second Amendment right. And so we think that you should make clear the courts should come up a level of generality and not nit-pick the—the historical analogues that we're offering to that degree.").

[3] The statute contains two potentially relevant operative provisions: Subsection 930(a), quoted above, and subsection 930(b). The latter requires that the defendant "inten[d] that [the] firearm or other dangerous weapon be used in the commission of a crime." 18 U.S.C. § 930(b). Although the indictment does not specify the applicable subsection, the omission of § 930(b)'s mens rea element removes any doubt. The United States charges Ayala with violating § 930(a) only. *See* Indictment at 1. Accordingly, this Order is limited to the issue before me—§ 930(a)'s constitutionality as applied to Ayala.

Possessing a firearm in a Federal facility is an activity that falls within the plain text of the Second Amendment. *See* U.S. CONST. amend. II; *see also Bruen*, 597 U.S. at 32–33 (reiterating that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008))). Thus, the United States must show that a ban on firearms in ordinary post offices is consistent with our nation's founding-era tradition of firearms regulation.

## 2.  Section 930(a)'s Application to Post Offices Has No Historical Support

The United States concedes that "[t]here is no evidence of firearms being prohibited at post offices, specifically, or of postal workers being prohibited from carrying them, at the time of the founding." Gov't Suppl. Br. at 4. Despite the opportunity to present supplemental briefing, the United States fails to point to sufficient historical evidence supporting § 930(a)'s application here. *See id.* at 15–16 (providing only two paragraphs listing potential historical analogues without any analysis of how they are relevantly similar).

i.  The Historical Record Yields No "Distinctly Similar Historical Regulation Addressing" a Problem that "Has Persisted Since" the Founding

"Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (quotations omitted). To decide the constitutionality of this *federal* statute, then, I must ascertain the scope of the Second

8

Amendment right against the federal government in 1791. *See id.* at 37–38 (declining to decide whether the appropriate time period for ascertaining the meaning of the right against a state was 1868 when the Fourteenth Amendment was ratified or the founding because, "for all relevant purposes, [the right was] the same with respect to public carry").

As explained earlier, if a "general societal problem" has persisted since the founding, "the lack of a distinctly similar historical regulation addressing [the] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. And "if earlier generations addressed the societal problem, but did so through materially different means," that too is relevant evidence "that a modern regulation is unconstitutional." *Id.* at 26–27. Here, any potential societal problems that § 930(a) might seek to remedy have persisted since the founding.

Although the United States does not explain a specific reason for banning firearms in Federal facilities, § 930(a) could reasonably be understood to target one of three problems. First, Congress might have sought to promote public safety generally. Of course, if the United States' purpose amounts to a policy disagreement about the virtue of the right to bear arms, the Constitution forecloses that as an impermissible basis to regulate. *See Bruen*, 579 U.S. at 78 (Alito, J., concurring) (explaining that *Heller* rejected arguments "the real thrust" of which are "that guns are bad and that States and local jurisdictions should be free to restrict them essentially as they see fit" (footnote omitted)). And even if

9

a proper purpose exists, it still remains unclear why restricting firearms in government buildings, rather than private buildings or public spaces generally, would uniquely promote public safety. Public safety concerns were not unknown to the Founders. Yet such concerns were not addressed through sweeping bans on firearms possession. Just the opposite. *See Heller*, 554 U.S. at 601 ("Many colonial statutes required individual arms bearing for public-safety reasons—such as the 1770 Georgia law that 'for the security and *defence of this province* from internal dangers and insurrections' required those men who qualified for militia duty individually 'to carry fire arms' 'to places of public worship.' " (quoting 19 Colonial Records of the State of Georgia 137–39 (A. Candler ed. 1911 (pt. 1)))).

A second concern might be some combination of postal-employee safety and ensuring the efficacy of mail delivery. Again, these concerns pose no new problems. Post offices have existed since before the founding. The British ran postal lines up through the Revolution, and the colonies started their own competing system for inter-colonial mail service when they declared independence. *See* OFFICE OF THE HISTORIAN, CORPORATE AFFAIRS, U.S. POSTAL SERVICE, THE UNITED STATES POSTAL SERVICE: AN AMERICAN HISTORY 2–3 (2022) (hereinafter USPS, AN AMERICAN HISTORY), https://perma.cc/9J86-6DEQ. Of course, the Constitution gave Congress authority to create more post offices, which it did. *See* U.S. CONST. art. I § 8. cl. 7. Between 1790 and 1828, the Post Office grew from 75 offices to 7,530. USPS, AN AMERICAN HISTORY at

8–9. "By 1831, postal employees accounted for 76 percent of the civilian federal workforce." *Id.* at 9.

Since the Post Office's creation, mail carriers have faced the risk of violence. Passengers of nineteenth-century stagecoaches, which carried mail, "risked death or injury if coaches were attacked by robbers or Indians." USPS, AN AMERICAN HISTORY at 5, 17. Recognizing this reality, Congresses in the first half of the nineteenth century appropriated money to reward individuals who helped apprehend postal robbers. *See, e.g.*, An Act for the Relief of D.W. Haley, ch. 66, 25 Stat. 713 (1838). In the latter half of the nineteenth century, when locomotive became the dominant way to move mail, bandits threatened postal workers aboard trains. *Colorado Train Robbers*, N.Y. TIMES, 2 Sept. 1891, at 8. Yet the federal government never sought to ban firearms to protect employees or secure mail delivery. In fact, when mail train robberies became a growing threat in the early twentieth century, the Postmaster General *armed* railway mail clerks with "government-issued pistols" from World War I. USPS, AN AMERICAN HISTORY at 23, 107.

Although the "general societal problem[s]" of violence directed towards postal employees and threats to mail delivery "ha[ve] persisted since" at least the founding, there is a "lack of a distinctly similar historical regulation addressing that problem." *Bruen*, 597 U.S. at 26. As the United States acknowledges, the first prohibition on firearms possession

in government buildings was not codified until 1964. 29 Fed. Reg. 15,982 (1964); *see also* Gov't Suppl. Br. at 14. And the first regulation specifically banning arms on post office property was codified in 1972. 37 Fed. Reg. 24,346–47 (1972). Section 930 itself was not enacted until late 1988, a mere thirty-five years ago. Pub. L. 100-690, § 6215(a), 102 Stat. 4361 (1988).

The final potential concern that § 930 might address is intimidation during official government proceedings. This generalized concern was known at the founding, as evidenced by a handful of founding-era anti-intimidation laws banning firearms during specific times and at specific places. Yet there is no evidence that Congress ever sought to address intimidation at post offices with firearms bans. And as I explain in the next subsection, the legal principles supporting those few anti-intimidation laws do not apply to post offices in any relevant sense. In short, post offices do not resemble the narrow classes of government buildings that were, at times, firearms-free zones at the founding.

All of the societal problems identified above have either persisted since the founding without being regulated by means of broad firearms prohibitions or are inapplicable to ordinary post offices like the one here. Even according to the United States, the first firearms prohibitions in relevantly similar federal buildings did not appear until the mid-twentieth century—over 170 years after the founding. That fact is "relevant evidence"

that § 930(a) "is inconsistent with the Second Amendment" as applied to Ayala.[4] *Bruen*, 597 U.S. at 26. Indeed, *Bruen* classifies this scenario as "fairly straightforward." *Id.*

      ii.    There Is No Relevantly Similar Historical Analogue to § 930(a) as Applied to Post Offices

The United States does not contend that § 930(a) addresses "unprecedented societal concerns or dramatic technological changes" requiring comparison to "a well-established and representative historical *analogue.*" *Bruen*, 579 U.S. at 27–30. Nor could it, as the government attempts to address age-old problems through a new and near-complete firearms ban. But even if *Bruen* contemplated that old problems might be constitutionally addressed through novel regulations, the United States fails to identify any relevantly similar analogue, and my own research uncovers none. Thus, the United States fails to carry its burden under *Bruen* to identify a historical tradition from the founding that supports the application of §930(a) to an ordinary post office.

The United States argues that some founding-era laws prohibited arms in legislatures, polling places, and courthouses. Gov't Suppl. Br. at 15–16. As the Supreme Court has explained, there were "relatively few" such laws. *Bruen*, 597 U.S. at 30 ("[T]he

---

[4] More modern regulations are not relevant. The Supreme Court has refused to even address twentieth-century historical evidence because it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66 & n.28; *see also id.* (like *Heller*, severely discounting the value of late-nineteenth century evidence that "contradicts earlier evidence"). I discount these more recent regulations on the same basis, at least to the extent that they contradict the founding-era record. And for reasons already explained, the pertinent time period for a Second Amendment (compared to a Fourteenth Amendment) challenge is the founding—not 1868.

historical record yields relatively few 18th- and 19th- century 'sensitive places' where weapons were altogether prohibited."). And the United States singles out only one example, a Delaware law banning arms at polling places before the founding. It then cites scholarship that refers to other examples, such as a pair of Maryland laws that prohibited arms while the legislature was in session. *See* David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 233 (2018). After offering this smattering of evidence, the United States proposes that prohibitions on "carrying arms into centers of government deliberation" existed at the Founding. The United States concludes by baldly proclaiming that "[p]ost offices and other government buildings are, at a minimum, analogous." Gov't Suppl. Br. at 15.

This unreasoned comparison fails. First, not every government building—certainly not ordinary post offices—constitutes a "center" of government deliberations. Second, the United States does not explain "how [or] why [§ 930(a)] burden[s] a law-abiding citizen's right to armed self-defense" in the same manner as laws prohibiting possession in legislative bodies, polling places, or courthouses. *Bruen*, 597 U.S. at 29. Nor could it. The United States' historical examples are not relevantly similar to § 930(a) in several important ways. For example, § 930(a) completely forbids possession in most government buildings. By contrast, the Maryland legislative assembly bans applied only when the legislature was in

14

session, 1647 Md. Laws 216 (prohibiting weapons in the chamber of the legislature when it was in session); 1650 Md. Laws 273 (extending the same prohibition to apply to both chambers when the legislature was split into two houses), and the Delaware election law governed polling places only on election day, *see* DEL. CONST., art. 28 (1776) (prohibiting weapons at elections, and militias from assembling within one mile of them within 24 hours of an election). These regulations contained meaningful time and place constraints; they were not perpetual exceptions to the right to bear arms. Finally, even if § 930(a) were analogous to these statutes, I doubt that so few regulations "could suffice to show a tradition." *Bruen*, 597 U.S. at 4 (calling into doubt whether three restrictions on public carry is enough).

Although I am "not obliged to sift the historical materials for evidence to sustain [the United States'] statute," *id.* at 60, I do so here. Unlike the plethora of post-*Bruen* challenges to 18 U.S.C. § 922, this case presents a unique sensitive-places challenge to § 930(a) that could have broader implications, so a thorough historical inquiry might inform future challenges. *Compare* Gov't Suppl. Resp. to MTD Ex. A (Doc. 68-2), *United States v. Beasley*, No. 23-cr-140-KKM-AAS (M.D. Fla. Oct. 17, 2023) (cataloging fifty-five pages of post-*Bruen* challenges to various parts of § 922), *with United States v. Tallion*, No. 22-po-01758, 2022 WL 17619254 (D. Md. Dec. 13, 2022) (one of two decisions I am aware of analyzing the constitutionality of this type of federal

building restriction under *Bruen*); *United States v. Marique*, 647 F. Supp. 3d 382 (D. Md. 2022) (same).[5]

To articulate the legal principles that underlie the Second Amendment, I begin by looking to English common law. After all, the Second Amendment codifies a preexisting right "inherited from our English ancestors." *Heller*, 554 U.S. at 599 (quotations omitted). And because the founding-era colonies and States were similarly codifying natural and customary law rights, their understanding of the right to bear arms is particularly informative about the scope of the Second Amendment's protections. Together, this evidence illustrates several legal principles, but none justify the application of § 930(a) to Ayala.

a.   The Statute of Northampton and State Copycats

The earliest potential analogue is the English Statute of Northampton, enacted around 1328. The statute provided:

> [N]o man great nor small, of what condition soever he be, except the king's servants in his presence, and his ministers in executing of the king's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] **be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms**, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other

---

[5] Whether the United States' position here—that no historical evidence exists related to post offices and very few analogues exist—forfeits the offering of otherwise uncited historical evidence on appeal is not for me to decide. I simply explain why the historical evidence of which I am aware does not support § 930(a)'s constitutionality here.

ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure.

2 Edw. 3, c. 3 (1328) (emphasis added).

*Bruen* discounts the latter half of the statute—the ban on going or riding "armed"—because later English law, such as *Sir John Knight's Case*, interpreted that provision to apply only to " 'going armed *to terrify* the King's subjects.' " 597 U.S. at 40–45 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686)). Unlike the provision interpreted in *Sir John Knight's Case*, the clause of the Statute of Northampton banning Englishmen from "com[ing] before the King's Justices or other of the King's Ministers doing their office, with force and arms" does not appear to have attached the same "terror" requirement. *See* Brief of *Amicus Curiae* The Independent Institute in Support of Petitioners at 10–11, 10 n.7, *Bruen*, 597 U.S. 1 (No. 20-843) (citing EDWARD COKE, 3 INSTITUTES OF THE LAWS OF ENGLAND 161–62 (6th ed. 1680) (discussing the case of a man arrested for concealed carrying in the palace and in Westminster Hall); STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 39 (2021)); Kopel & Greenlee, *supra*, at 213–15 (2018) (also discussing that case and noting "the ban on carrying around courts was enforced as written"); HALBROOK, *supra*, at 39 ("By the first half of the seventeenth century, it was thus established that [under the Statute of Northampton] a subject may not carry arms in a manner to terrorize other subjects *or in a place like a palace*

17

*where the Justices of the King's Bench were assembled.*" (emphases added)). With this limitation of the terror requirement in mind, the Statute of Northampton remains relevant in informing the historical tradition of firearms regulation. *Bruen*, 597 U.S. at 39, 45.

Three states—and possibly the District of Columbia—enacted near duplicates of the Statute of Northampton around the founding, and each included a version of this provision. *See* Appendix A (compiling copycat statutes from Massachusetts, North Carolina, Virginia, and the District of Columbia). But neither the Statute of Northampton nor its copycats help the United States justify applying § 930(a) to Ayala.

First, some copycats exclusively applied to judicial officers and thus extended only as far as bans in courthouses. For example, the Virginia statute applies only to "Ministers of Justice." COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE ch. 21, at 33 (1794); *see also* App. A at 1. And the draft District of Columbia statute refers to "the justices or judges of any court within the [District], or either of their ministers of justice," likewise focusing only on the judiciary. WILLIAM CRANCH, *An Act for Punishment of Crimes and Offences, within the District of Columbia*, § 40, *in* CODE OF LAWS FOR THE DISTRICT OF COLUMBIA: PREPARED UNDER THE AUTHORITY OF THE ACT OF CONGRESS OF THE 29TH OF APRIL, 1816 235, 253–54 (1818), https://perma.cc/88PB-Y654; *see also* App. A at 2–3 & 3 n.9. Thus, two of the four founding-era copycat statutes

exclusively apply to bans on firearms possession at judicial proceedings. Their purpose is obvious: to avoid intimidation or interference in the orderly administration of justice.

Next, the Statute of Northampton and its North Carolina copycat refer to "the King's justices," *see* Frederick Pollock, *The King's Justice in Early Middle Ages*, 12 HARV. L. REV. 227, 237 (1898) (explaining that in the Assize of Northampton the King appointed a group of justices "to see to the enforcement of criminal law and the Crown's dues" and to hear land disputes), as well as "the King's Ministers doing their office," 2 Edw. 3, c. 3 (1328); A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA 60–61 (F. Martin ed. 1792) (hereinafter NORTH CAROLINA STATUTES). But I doubt that the latter phrase encompasses ordinary postal employees. To start, a narrow reading comports best with the historical regulations' text and context. The statutes refer to "the King's justices, or other of the King's ministers," suggesting that the former is a subset of the latter and that both are similar in level of importance. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 31, at 195 (2012) ("Associated words bear on one another's meaning."). The statutes also contrast between "the King's servants" and "[the King's] Ministers," which implies that not everyone who worked for the King was one of "the King's Ministers." 2 Edw. 3, c. 3 (1328); NORTH CAROLINA STATUTES, *supra*, at

60–61; *e.g.*, SCALIA & GARNER, *supra*, § 26, at 174 ("If possible, every word and every provision is to be given effect.").

The list of officials authorized to execute the statutes sheds further light on who qualified as one of the "King's Ministers":

> [T]he King's Justices in their presence, Sheriffs, and *other Ministers [of the King] in their Bailiwicks*, Lords of Franchises, and their Bailiffs in the same, and Mayors and Bailiffs of Cities and Boroughs, within the same Cities and Boroughs, and Borough-Holders, Constables, and Wardens of the Peace within their Wards.

2 Edw. 3, c. 3 (1328) (emphases added); *see also* NORTH CAROLINA STATUTES, *supra*, at 60–61 (containing the same language). Each of these officials appears to have possessed an adjudicative or law enforcement function, often as the King's representative within a certain area. *See generally id.*

Other historical evidence supports defining "the King's Ministers" as high-ranking officials. One of the Ordinances of 1311, for example, purported to allow Parliament to appoint King Edward II's "Ministers," defined as a list of high-ranking officials including the Chancellor, the Chief Justices of the King's Bench, and the Treasurer. 5 Edw. 2, c. 14 (1311). Likewise, the Statute of 1341 purported to hold "any Minister of the King" to "answer in the Parliament." 15 Edw. 3, c. 3 (1341); Charles Donahue, Jr., *Magna Carta in the Fourteenth Century: From Law to Symbol?: Reflections on the "Six Statutes"*, 25 WM. & MARY BILL RTS. J. 591, 614–15 (2016). "The statute further attempt[ed] to require that

the king's ministers swear to uphold [Magna Carta] by taking an oath in parliament." *Id.*

At 621. The list of those required to be sworn—"the Chancellor, Treasurer, Barons, and

Chancellor of the Exchequer, the Justices of the one Bench and of the other, Justices

assigned in the Country, Steward and Chamberlain of the King's House, Keeper of the

Privy Seal, Treasurer of the Wardrobe, Controllers, and they that be chief deputed to abide

nigh the King's Son Duke of Cornwall"—is far narrower than the universe of everyone who

worked for the King. *Id.* at 614; *see also* Charles Donahue, Jr., *What Happened in the*

*English Legal System in the Fourteenth Century and Why Would Anyone Want to Know*,

63 S.M.U. L. REV. 949, 959 (2010) (characterizing this portion of the Statute of 1341 as

an attempt by Parliament "to control the appointment of [Edward III's] *ministers*"

(emphasis added)).

Finally, a copycat from colonial Massachusetts referred to "their majesties' justices

or other their officers or ministers doing their office." Ma. Province Laws ch. 18, § 6

(1692); *see also* App. A at 1. This statute cannot carry the United States' burden to prove

a tradition of firearms bans in any building with federal employees. First, this statute, like

the Virginia and District of Columbia copycats, might only extend to judicial officers.

Second, the Supreme Court already explained that the Massachusetts statute "merely

codified the existing common-law offense of bearing arms to terrorize the people, as had

the Statute of Northampton itself." *Bruen*, 597 U.S. at 47. As discussed, although the

Statute of Northampton's "Ministers" clause does not appear to attach the same terror requirement as its public carry provision, neither did Northampton extend to every soul who performed a duty for the Crown. Third, absent *Bruen* and other countervailing historical evidence, reading "officers" to cover every government employee would come dangerously close to endorsing a de facto ban on public carry. *Cf.* U.S. BUREAU OF LABOR STATISTICS, *May 2022 Nat'l Occupational Emp. & Wage Estimates: Federal, state and local gov't* (last modified Apr. 25, 2023) (noting over 21.3 million government employees across various sectors), https://perma.cc/8RE4-QTZ2. The sensitive-places exception cannot sweep so broadly. *See Bruen*, 597 U.S. at 31; Baude & Leider, *supra*, at 35.[6]

At most, the United States may be able to analogize to modern-day equivalents of the listed officials from the Statute of Northampton, or to the especially high-ranking officials sometimes referred to elsewhere in the Statutes of the Realm as "the King's Ministers." Ordinary postal employees at an ordinary post office do not fit the bill.[7]

---

[6] Even giving "officer" its broadest possible meaning, Supreme Court precedent provides that there is a lower class of government workers, "employees," that do not qualify as officers. *See Lucia v. SEC*, 138 S. Ct. 2044, 2049, 2051 (2018).

[7] In the final paragraph of *Bruen*'s analysis, the Supreme Court summed up its conclusions: "The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. Those restrictions, for example, limited . . . the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials." 597 U.S. at 70 (citations omitted). At first glance, the reference to "other government officials" could be taken as support for applying § 930(a) to ordinary post offices. But this passage refers, in part, to the historical evidence that I just discussed: The Statute of Northampton and its copycats. For the reasons I just explained, those laws do not apply to *all* government officials. Although history supports firearms restrictions in the presence of some "other government officials," that does not include ordinary postal workers.

Again, it is the United States' burden to point to a "relevantly similar" historical analogue in support of § 930(a)'s application to Ayala. To do so, it must marshal the historical record and explain "how" and "why" the founders similarly burdened the right to bear arms. *Bruen*, 597 U.S. at 29, 58 n.25. The United States does not point to the Statute of Northampton or any of its copycats, let alone address their meaning. At most, only three of the statutes appear to have extended beyond the context of judicial proceedings. And even those laws did not prohibit weapons everywhere that a government employee worked. Thus, I do not find them relevantly similar to § 930(a) as applied to Ayala. *Cf. id.* at 44 n.11 ("[F]avor[ing] the [interpretation of *Sir John Knight's Case*] that is more consistent with the Second Amendment's command" despite "multiple plausible interpretations.").

b.  Prohibitions in Legislatures and Polling Places

Besides the copycat Northampton statutes, I have identified a total of three founding-era firearms restrictions that could be understood as "sensitive-place" regulations—two Maryland laws and a provision of the Delaware constitution. It remains doubtful that such sparse evidence alone can constitute a "tradition." *See Bruen*, 597 U.S. at 46. Nonetheless, giving the examples full weight, the general principle to be discerned from them is that governments may restrict firearms possession in places where important

and legally definitive governmental decisions are regularly made. But this principle is inapplicable to § 930(a) because post offices are not ordinarily the sites of such decisions.

First in 1647, and again in 1650, Maryland restricted persons from "com[ing] into the howse of Assembly (whilst the howse is sett) with any weapon upon perill of such fine or censure as the howse shall thinke fit." 1647 Md. Laws 216; *see also* 1650 Md. Laws 273 ("That none shall come into eyther of the houses whilst they are sett, with any gun or weapon uppon perill of such fine or censure as the howses shall thinke fitt."). In modern parlance, Maryland banned firearms possession in legislative chambers while those bodies were in session. Because the two laws were essentially identical and the latter was passed separately to cover both houses of the same colonial legislature after splitting into an upper and lower house, they serve as a single historical datapoint. As far as I am aware, no other colony or state followed suit near to the founding. Nevertheless, in the light of similar English regulations, I will consider this precedent as a permissible tradition restricting the right to bear arms. *Cf. e.g.*, COKE, *supra*, at 160 (explaining that arms are banned wherever Parliament sits because otherwise the proceedings would be "hindered or disturbed").

The second piece of relevant evidence is contained in the Delaware Constitution of 1776. "To prevent any violence or force being used at . . . elections," Delaware prohibited individuals from "com[ing] armed to any [elections]." DEL. CONST. art. 28 (1776). This is the first polling-place carry restriction. New York also passed a law in 1787 that

prohibited individuals from interfering with a citizen's right to vote "by force of arms" or "malice," or by otherwise "disturb[ing] or hinder[ing]" citizens from freely voting. New York Act of Jan. 26, 1787, ch. 1., cl. 9. But New York's law focused on carrying with an impermissible intent—not carrying in a sensitive place. Thus, I do not consider it as a sensitive-place regulation.

In sum, two founding-era state governments prohibited individuals from carrying during legislative sessions or at polling places. The lone polling-place restriction applied only on election day and only at the polls. Likewise, the lone legislative restriction did not extend beyond an active session. Accepting these as part of the historical tradition of firearms regulation, the record demonstrates a very limited principle: firearms regulation may be permissible in places to prohibit intimidation or interference with important and legally definitive governmental decisions. Indeed, the Delaware Constitution explicitly justifies its restriction in these terms. DEL. CONST. art. 28 (1776) (restricting firearms so "[t]hat every elector may, in a peaceable and orderly manner, give in his vote on the said day of election"). This principle could reasonably extend to courthouses and perhaps high-level executive branch offices where weighty decisions with legally determinative consequences are a common occurrence. But such regulations are inarguably limited to locations where important and final governmental decisions are made.

The government has not justified Ayala's prosecution in the light of this principle. On average, the decisions made by post office employees are far from the weighty subject matter of elections or the legislative process. True, during the short window of time before an election, some post offices may receive mail-in ballots, making them more analogous to polling places. But even polling places were not protected indefinitely; instead, restrictions were tailored to the date of an election. That makes sense given the legal reason for these regulations—to prevent intimidation or interference with important government decisions. Thus, a blanket restriction on firearms possession in post offices is incongruent with the American tradition of firearms regulation.

### 3. Dicta in *Heller*, *McDonald*, and *Bruen* Do Not Establish That All Government Buildings Are Sensitive Places

In the United States' view, all the above historical analysis is unnecessary. It claims that the Supreme Court has "settled" whether arms prohibitions in "all manners of government buildings" can categorically survive a Second Amendment challenge. *See* Gov't Suppl. Br. at 5–7. I am not convinced.

The United States first points to a passage in *Heller*, which declared that—without "an exhaustive historical analysis today of the full scope of the Second Amendment"— "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing

conditions and qualifications on the commercial sale of arms." 554 U.S. at 626–27. Without elaboration, the Supreme Court repeated those assurances verbatim in *McDonald*, 561 U.S. at 786. And the Supreme Court had good reason not to comment further, as neither *Heller* nor *McDonald* implicated the issue. The United States contends that these opinions' references to "schools and government buildings" as sensitive places were an "express[] affirm[ance]" that "the government may regulate firearms in government buildings," period. Gov't Suppl. Br. at 3.

The United States misunderstands what these cases held. Neither statement was necessary to the reasoning of either case; they were pure dicta. *See Kanter v. Barr*, 919 F.3d 437, 453–54 (7th Cir. 2019) (Barrett, J., dissenting) (calling *Heller*'s language identifying presumptively lawful regulatory measures "dictum"). Nor were they even related to the topics addressed. *Id.* at 453. *Heller* concludes that the right to bear arms includes the right to possess a handgun in the home. *McDonald* extends that right against the States. No sound argument exists that either *Heller* or *McDonald* or both logically entail a rule that "all manners of government buildings" are sensitive places. Notwithstanding any dicta to the contrary, only "the holding of [a] prior decision" governs. 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 134.03[2] (Matthew Bender 3d ed. 2023). And the Eleventh Circuit has clearly reminded district courts not to follow dicta blindly. *See e.g.*, *Fresh Results LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1049 (11th Cir. 2019)

(concluding that a district court should not have followed Eleventh Circuit dicta because "[a]lthough our holdings are precedential, our dicta are not"); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 379 (1994) ("It is the holdings of our cases, rather than their dicta, that we must [follow].").

Perhaps I fundamentally part ways with the United States on what constitutes a holding. The traditional view is that a decision's holding consists of "the rule that is logically entailed by the reasoning that was necessary to reach the outcome on the basis of the legally salient facts and the arguments of the parties." *See* Lawrence B. Solum, *Originalist Theory and Precedent: A Public Meaning Approach*, 33 CONST. COMMENT. 451, 459 (2018) (referring to this as the "ratio decidendi" approach). This view comports with founding-era conceptions of stare decisis. *See* Brutus XII (Feb. 7, 1788), *in* 4 THE FOUNDER'S CONSTITUTION 236 (Philip B. Kurland & Ralph Lerner eds., 1987) (explaining that to resolve cases, "courts must and will assume certain principles, from which they will reason, in forming their decisions" and that "[t]hese principles, whatever they may be, when they become fixed, by a course of decisions . . . will be the rule"); *Cage v. Acton*, 12 Mod. 288, 294 88 Eng. Rep. 1327, 1331 (1796) (Holt, C.J.) ("[T]he reason of a resolution is more to be considered than the resolution itself."). In line with the Supreme Court's recent and repeated endorsements of the same approach, I adhere to it as well. *See, e.g., Ramos v. Louisiana*, 140 S. Ct. 1390, 1404 (2020) ("It is usually a judicial

decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases."); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) (explaining that the holding includes the result and "those portions of the opinion necessary to that result"); *see also United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) ("The holding of a case comprises both the result of the case and those portions of the opinion necessary to that result. . . . In contrast, dicta is a statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is necessary to the holding of the case." (citations and quotations omitted)).

The United States' position that the Supreme Court has "specifically identified" and "settled" the issue of whether all government buildings are sensitive places sounds in the "predictive approach." *Originalist Theory*, *supra*, at 459; Gov't Suppl. Br. at 5–6. That view of what constitutes a holding includes statements "far beyond the facts of the particular case," *Originalist Theory*, *supra*, at 459, including statements that look more like legislative pronouncements than legal reasoning, Lawrence B. Solum, *Holdings*, LEGAL THEORY LEXICON (last modified Jan. 29, 2023), https://perma.cc/DAZ2-JQGJ. This understanding of the judicial power raises serious constitutional concerns. *See* U.S. CONST. art. III, § 2 (limiting federal courts' jurisdiction to cases or controversies). The predictive approach improperly broadens the judicial power by allowing federal courts to announce binding rules unrelated to any controversy before them. *Cf. California v. Texas*,

141 S. Ct. 2104, 2115 (2021) (explaining that judicial remedies "operate with respect to specific parties" and "[i]n the absence of any specific party, they do not simply operate on legal rules in the abstract" (quotations and citations omitted)). And it contradicts the traditional view—stated repeatedly by Chief Justice John Marshall—"that the positive authority of a [judicial] decision is co-extensive only with the facts on which it is made." *Ogden v. Saunders*, 25 U.S. (12 Wheat) 213, 333 (1827) (Marshall, C.J., dissenting); *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("[R]egardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case."); *United States v. Files*, 63 F.4th 920, 928–29 (11th Cir. 2023) (noting that Eleventh Circuit caselaw "treat[s] as dicta" "legal conclusions predicated on facts that aren't actually at issue").

In addition to the comment in *Heller* and *McDonald*, the United States relies on a passage in *Bruen* elaborating on how to apply the sensitive-places exception. *See* Gov't Suppl. Br. at 5–6. The Court explained that where arms were historically prohibited without challenge, courts can assume regulation in the same manner is constitutional today:

> Consider, for example, *Heller*'s discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.' 554 U.S. at 626. Although the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); *see also* Brief for Independent Institute as *Amicus Curiae* 11–17. We therefore can assume it settled that

30

> these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

597 U.S. at 30. The United States claims that "these locations" in the third sentence refers to "sensitive places such as schools and government buildings," and therefore declares it "settled" that any weapons prohibition in any school or government building is constitutional. *See* Gov't Suppl. Br. at 5; *but see id.* at 15 (conceding that this portion of *Bruen* is ambiguous as to what "these locations" refers).

The United States' suggested reading of this key paragraph is mistaken, both as a grammatical matter and a contextual one. "[T]hese locations" refers to the nearest antecedent—"18th- and 19th-century 'sensitive places,'" such as "legislative assemblies, polling places, and courthouses"—in the second sentence, rather than "schools and government buildings" in the first sentence. *Bruen*, 597 U.S. at 30; *see* SCALIA & GARNER, *supra*, § 18, at 144 ("A pronoun, relative pronoun, or demonstrative adjective generally refers to the nearest reasonable antecedent."); *Washington Mkt. Co. v. District of Columbia*, 172 U.S. 361, 368 (1899) ("The grammatical structure of the sentence also supports the view that the [referenced] corporation . . . was the city government, for the nearest antecedent to the word 'corporation' is the city government.").

31

The context reinforces that reading. The Supreme Court was providing an example of how the *Bruen* test works in practice. It had earlier explained that largely unchallenged founding-era regulations will almost certainly be constitutional. It then provided three examples—legislative assemblies, polling places, and courthouses. The paragraph proceeds to direct lower courts to use these three places as analogues when deciding how the sensitive-places exception applies to modern regulations.

Finally, opinions are not subject to the rigorous interpretive methods used to discern the meaning of a statute or other positive law enactment. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979) ("[T]he language of an opinion is not always to be parsed as though we were dealing with language of a statute."); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("[J]udicial opinions are not statutes, and we don't dissect them word-by-word as if they were."). I will not overread this paragraph as if it were setting out the definitive boundaries of the sensitive-places exception for all government buildings, particularly when *Bruen* had no occasion to opine on government property at all. To be sure, *Bruen*'s above discussion is "reasoned dicta," *Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 915 (11th Cir. 2022) (quotations omitted), and is thus "not something to be lightly cast aside," *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997). As the Eleventh Circuit notes, "there is dicta and then there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). The highest-level dictum is "well

thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court," *id.*, not bare legislative statements like those in *Heller* and *McDonald*, *see Heller*, 554 U.S. at 635 (acknowledging that the opinion did not cite historical authority for its assurances and explaining that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us"). I do not cast aside this section of *Bruen*'s analysis. Instead, I follow its lead and look to the reasoning for why firearms were historically banned in certain places to draw relevant analogies in evaluating § 930(a).

Reading the passage as the United States urges would put *Bruen*'s dicta in direct contradiction with *Bruen*'s holding. Indeed, it would render the analogical reasoning required by *Bruen* pointless. 597 U.S. at 31 (rejecting an analogy between legislative bodies, polling places, and courthouses and the whole of Manhattan because "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly"). Because there is neither a holding nor reasoned dicta from the Supreme Court answering whether all government buildings are sensitive places, *Bruen* requires the above historical analysis. For the reasons explained already, there is no historical practice of a near-total prohibition on firearms in ordinary post offices and there is no relevantly similar historical analogue supporting such a prohibition.

### 4. Whether a Firearms Regulation Is Consistent with Our Nation's Historical Tradition Is a Legal Question, Not a Factual One, and the United States Bears the Burden to Marshal the Historical Record in Support of its Legal Argument

Before applying the *Bruen* test, Ayala requests an evidentiary hearing so that I can make "findings of fact, based on evidence received in the record, that the post office where Mr. Ayala worked was a historically 'sensitive place.'" Def. Br. in Supp. of Evid. Hr'g (Doc. 42) at 2. He claims that such evidence "cannot come in the form of artfully drafted prose, from compelling briefs or legal memoranda, or from cited law review articles." *Id.* at 3. Instead, according to Ayala, it "must" come from "an expert historian produced by the Government." *Id.*

The existence, or lack thereof, of a particular historical practice is of course in some sense factual. But whether Ayala's motion to dismiss should be granted turns on a distinct *legal* question to which certain historical facts are merely relevant—whether the United States has shown an analogous tradition of founding-era firearms regulation that justifies its prosecution of Ayala under § 930(a). *See Bruen*, 597 U.S. at 27–30. For example, background facts about the history of the English language, the common usage of a word by a particular kind of merchant, or the circumstances of a written instrument's formation can all inform a court's conclusion about the meaning of a standard commercial contract. But few people would suggest that I must hear from a linguistics expert or a historian

specializing in the practice of merchants before resolving a motion to dismiss in a contract dispute.

The above example illustrates that the relevant inquiries are *interpretive* and that the questions at bottom are *legal*. Nothing differs about constitutional cases—the Supreme Court did not require expert testimony to determine the original meaning of the Confrontation Clause in *Crawford* or the Vesting Clause of Article II in *Seila Law*. *See Crawford v. Washington*, 541 U.S. 36 (2004); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020). After all, it is the judicial function—not that of an expert witness—"to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

### 5. The United States' Proprietor Argument Cannot Justify Excluding All Federal Property from Second Amendment Scrutiny

Beyond its scant analogical reasoning and its appeals to dicta, the United States' supplemental brief argues that its power to exclude individuals from its own property includes "the lesser power to restrict the actions or conduct of visitors as a condition of admittance." Gov't Suppl. Br. at 12.

This idea does not fit cleanly into *Bruen*'s established framework. Instead, the United States seems to contend that it need not apply the Second Amendment at all to its property. It is one thing for the United States to fail to carry its burden under *Bruen* to fully marshal the historical record. As I have demonstrated above, courts can (but need not) address such failures by conducting independent historical research. It is another thing

entirely to imply that a separate legal principle—whatever that might be—narrows the constitutional right to bear arms outside the Supreme Court's ordinary analytical framework. Accordingly, any "government-as-property-owner" idea distinct from *Bruen* presents a separate legal issue from the "searching analysis into the historical record" undertaken above.

The United States dedicates only a handful of pages to advancing its government-as-proprietor theory and does not explain how that theory interacts with *Bruen* or any other Second Amendment precedent. *See id.* at 11–14. The United States simply asserts that at least some gun regulations—those governing citizens whose daily lives bring them onto government property—are exempt from Second Amendment analysis. I can find no support for that proposition in the Supreme Court's cases, and the United States furnishes none. Furthermore, although I do not disagree that "[t]he government has more flexibility to regulate when it is acting as a proprietor," *id.* at 12, that does not mean it can bring *criminal charges* for conduct that occurs on its property regardless of an individual's constitutional rights. Applying that principle in any other context reveals its absurdity. Would an indictment for failing to submit to a full body cavity search when showing up at the District of Columbia Department of Motor Vehicles to apply for a learner's permit pass Fourth Amendment muster? Or could the United States charge the adherent of a

non-favored religion with trespass for entering government property without offending the Free Exercise or Establishment Clauses? I think not.

Of course, in First Amendment speech cases, government regulation on government property can be subject to varying levels of means-end scrutiny. *See, e.g.*, *United States v. Kokinda*, 497 U.S. 720, 726–27 (1990) (plurality opinion) (noting that different levels of scrutiny apply in different places). But *Bruen* explicitly rejected that kind of judicial interest balancing in the Second Amendment context. *See* 597 U.S. at 26. Moreover, First Amendment government-as-proprietor regulations are best understood as being analyzed *within* the Supreme Court's First Amendment framework, not outside the scope of the right altogether. *Cf. Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1136 n.7 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part) (noting that, in his view, firearms regulations in some government buildings *survive* Second Amendment scrutiny, but the scope of the Second Amendment still extends to those buildings). The same logic applies here. The United States must point to a historical tradition justifying any claimed power to regulate conduct protected by the Second Amendment's plain text, even as a proprietor. *See Bruen*, 597 U.S. at 24. As discussed in detail above, the United States identifies no such tradition.

Given the expansive modern role of the federal government in everyday life, an even more fundamental problem with the United States' position remains. *City of Arlington,*

*Tex. v. F.C.C.*, 569 U.S. 290, 313 (2013) (Roberts, C.J., dissenting) ("The administrative state 'wields vast power and touches almost every aspect of daily life.' " (quotations omitted)). Whatever the historical record permits with respect to firearms regulation on government property, that legal principle cannot be used to abridge the right to bear arms by regulating it into practical non-existence. *See* Baude & Leider, *supra*, at 35 (identifying this as "probably the most important [Second Amendment] principle"). For example, take the criminal statute here: It bans knowingly possessing a firearm in a Federal facility, which is defined as "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g)(1). The plain language captures everything from the White House to toll booths in national parks to Social Security Administration buildings. Under this criminal statute, with the proliferation of the federal government comes the diminution of the People's right to bear arms. At some point, when twenty-eight percent of land in the United States is owned by the federal government and many ordinary activities require frequenting a "Federal facility," the government's theory would amount to a nullification of the Second Amendment right altogether. *See* CAROL HARDY VINCENT ET AL., CONGRESSIONAL RESEARCH SERVICE, FEDERAL LAND OWNERSHIP: OVERVIEW AND DATA 1 (Feb. 21, 2020), https://perma.cc/55NA-S9UV.

### 6. The United States Fails to Raise Any Argument Regarding Its Authority to Restrict Firearms as an Employer

Lastly, when I directed supplemental briefing on what kinds of firearms regulations were permitted, I specifically asked how the United States' employment relationship with Ayala might affect the analysis. *See* App. B at 4 ("Ayala's situation presents another potential wrinkle: what kinds of firearms regulations at the founding applied to postmasters (or other postal office employees)? The government's obligation here thus requires a survey of . . . historical evidence of firearms regulations, at post offices and of their *workers*." (emphasis added)). In a single sentence, the United States suggests that it can do whatever it wants when acting as an employer: "Even if *Bruen* left any doubt about firearms prohibition in post offices or other government buildings as a general matter (it doesn't), Ayala certainly cannot show that the Second Amendment prevents the government from prohibiting its own employees from bringing guns to work." Gov't Suppl. Br. at 18. This throw-away line fails to present the issue or develop any argument.

In this case, the United States *indicted* Ayala under § 930(a) for knowingly possessing a firearm on federal property. I do not know whether the United States also fired him or took any other disciplinary action for carrying a firearm in violation of a condition of his employment. Whether such a condition of employment would comport with the Second Amendment has gone entirely unbriefed and remains wholly irrelevant. As it stands, the criminal prosecution is completely divorced from his status as a postal

employee. I repeat the United States' single line on this point: "Ayala certainly cannot show that the Second Amendment prevents the government from prohibiting its own employees from bringing guns to work." *Id.* That is all. No citation, no authority, no reasoning.

While it is my job to apply the correct law, I cannot explore every unturned stone. *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation."). Parties "are responsible for advancing the facts and arguments entitling them to relief." *Id.* at 244 (footnote omitted) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)). The facts and arguments advanced by the United States fail to carry their burden under *Bruen*, much less preserve potential wrinkles based on competing constitutional principles. "[D]istrict courts should not 'be expected to construct full blown claims from sentence fragments.' " *T.P. ex rel. T.P. v. Bryan Cnty. Sch. Dist.*, 792 F.3d 1284, 1291 (11th Cir. 2015) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)); *cf. NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.").

### B. Count II

As for Count II, Ayala argues that he had a "common law right" to resist the postal inspectors' attempted arrest because the arrest was illegal under "the totality of the circumstances." MTD at 18–19. There is, as Ayala concedes, "scant legal support" for this argument. *Id.*; *see United States v. Bailey*, 691 F.2d 1009, 1018 (11th Cir. 1982) (explaining that, although "[t]he common law recognized the right of a citizen to use reasonable force to resist an unlawful arrest," that rule "has been greatly eviscerated, if not virtually abolished, in this circuit"). But more importantly for my purposes, it is not a proper basis for a motion to dismiss because it would require looking beyond the allegations in the indictment to the facts and circumstances of the arrest. *See John Bad Elk v. United States*, 177 U.S. 529, 535 (1900) (evaluating justified resistance based on whether the defendant employed "no more force than was absolutely necessary to repel" the unlawful arrest); *see also United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987) ("[A] court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial."); FED. R. CRIM. P. 12(b)(1). Thus, Ayala's motion is denied as to Count II.

## IV.  CONCLUSION

The United States fails to meet its burden of pointing to a historical tradition of firearms regulation justifying Ayala's indictment under § 930(a). Accordingly, the following is **ORDERED**:

1.      Ayala's Motion to Dismiss (Doc. 23) is **GRANTED in part**.

2.      Count I of the Indictment (Doc. 1) is **DISMISSED with prejudice**.

3.      Ayala's Motion for an Evidentiary Hearing (Doc. 40) is **DENIED**.

4.      No later than **January 19, 2024**, the parties are **DIRECTED** to file a joint

notice as to whether the pending Motion to Suppress (Doc. 44) is moot,

including proposed dates for a suppression hearing if necessary.

**ORDERED** in Tampa, Florida, on January 12, 2024.

Kathryn Kimball Mizelle
United States District Judge

# Appendix A

There were at least four Northampton copycats around the time of the founding.

First, a Massachusetts province law enacted in 1692 provided:

That **every justice of the peace in the county where the offence is committed, may cause to be staid and arrested** all affrayers, rioters, disturbers or breakers of the peace, and **such as shall ride, or go armed offensively before any of their majesties' justices or other their officers or ministers doing their office** or elsewhere by night or by day in fear or affray of their majesties' liege people, and such others as shall utter any menaces or threatening speeches ; and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison until he find sureties for the peace and good behaviour, and seize and take away his armour or weapons, and shall cause them to be apprized and answered to the king as forfeited.

Ma. Province Laws ch. 18, § 6 (1692).

Closer to the founding, a 1786 Virginia statute provided:

Be it enacted by the General Assembly, that no man, great nor small, of what condition soever he be, except the Ministers of Justice in executing the precepts of the Courts of Justice, or in executing of their office, and such as be in their company assisting them, **be so hardy to come before the justices of any court, or either of their Ministers of Justice, doing their office, with force and arms**, on pain, to forfeit their armour to the Commonwealth, and their bodies to prison, at the pleasure of a Court; nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the county, upon pain of being arrested and committed to prison by any Justice on his own view, or proof by others, there to abide for so long a time as a jury, to be sworn for that purpose by the said Justice, shall direct, and in like manner to forfeit his armour to the Commonwealth; but no person shall be imprisoned for such offence by a longer space of time than one month.

COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A

PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE ch. 21, at 33 (1794).

1

North Carolina followed in 1792:

Item, it is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, **be so hardy to come before the King's justices, or other of the King's Ministers doing their office with force and arms**, nor bring no force in affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs and other ministers in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and boroughholders, constables and wardens of the peace within their wards shall have power to execute this etc. [in original] And that the Justices assigned, at thier coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE

STATE OF NORTH CAROLINA 60–61 (F. Martin ed. 1792).

Lastly, an 1818 Draft Code of the District of Columbia provided:

No man, great nor small, of what condition soever he be, except the ministers of justice in executing the precepts of the courts of justice, or in executing their office, and such as may be in their company assisting them, **shall be so hardy as to come before the justices or judges of any court within the District of Columbia, or either of their ministers of justice, doing their office**, on pain to forfeit his armour to the United States, and his body to prison, at the pleasure of such court; nor go, nor ride armed by night nor by day, in fairs, or markets, or in other places, in terror of the country, upon pain of being arrested and committed to prison by any justice or judge on his own view, or proof by others, and of forfeiture of his armour to the United States;

but no person shall be imprisoned for any offense against this act, by a longer
space of time than one month.

WILLIAM CRANCH, *An Act for Punishment of Crimes and Offences, within the District
of Columbia*, § 40, *in* CODE OF LAWS FOR THE DISTRICT OF COLUMBIA: PREPARED

UNDER THE AUTHORITY OF THE ACT OF CONGRESS OF THE 29TH OF APRIL, 1816

235, 253–54 (1818), https://perma.cc/88PB-Y654.[8]

---

[8] It is unclear from the historical record whether this provision ever possessed the force of law. *See* Act of
Apr. 29, 1816, ch. 148, § 1, 1 Stat. 323 (1816) (authorizing "the judges of the circuit court, and the Attorney
for the District of Columbia" to "prepare and digest a code of jurisprudence, both civil and criminal, for the
said district, to be hereafter submitted to the Congress of the United States, to be modified, altered or
adopted, as to them shall seem proper"); Walter S. Cox, *Efforts to Obtain a Code of Laws for the District
of Columbia*, 3 RECS. COLUMBIA HIST. SOC'Y, WASH., D.C. 115, 117 (1900) (explaining that had the
1818 code "been adopted, [it] would have advanced us very little. It was, however, not acted upon by
Congress, and the whole subject was allowed to sleep for some twelve years, when a committee of the House
of Representatives, who had been directed to inquire into the expediency of providing for the appointment
of commissioners to digest and form a code of civil and criminal law for the District, etc., made a report.").
Thus, I consider the draft code only as confirmatory evidence that the Virginia copycat was not considered
defunct soon after the founding.

# Appendix B

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No: 8:22-cr-369-KKM-AAS

EMMANUEL AYALA,

    Defendant.
_____

### ORDER

To assist in the fully informed resolution of Mr. Ayala's motion to dismiss with respect to count one of the indictment, the government is ordered to provide additional briefing on the historical evidence of regulations banning firearms in post offices and the meaning of "other lawful purposes" in 18 U.S.C. § 930(d)(3). Ayala may respond.

Ayala brings an as-applied constitutional challenge to his indictment under § 930, arguing that there is no historical evidence justifying bans on firearms in post offices. That is the right inquiry for purposes of the Second Amendment: "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127 (2022). If a regulation exceeds that historical tradition, the Second Amendment's "unqualified command" protects an individual's right. *Id.* at 2126.

It is true that neither *District of Columbia v. Heller*, 554 U.S. 570 (2008), nor *McDonald v. City of Chicago*, 561 U.S. 742 (2010), "cast doubt" on "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626; *McDonald* 561 U.S. at 786. But the Supreme Court in *Bruen*— while noting it had "no occasion to comprehensively define sensitive places"—clarified the sensitive places exception and instructed courts to use that test to evaluate future constitutional challenges:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244– 247 (2018); *see also* Brief for Independent Institute as *Amicus Curiae* 11– 17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

142 S. Ct. at 2133.

Other lower courts have taken the cue from *Bruen* to apply the proper historical test to determine whether other "longstanding prohibitions" and "sensitive places" bans, *Heller*,

554 U.S. at 626, are consistent with the Second Amendment. *See e.g.*, *Siegel v. Platkin*, No. 22-7464, 2023 WL 1103676 (D.N.J. Jan. 30, 2023) (granting temporary restraining order in part on challenge to New Jersey law banning guns in several places including public libraries, museums, parks and restaurants); *United States v. Power*, No. 20-po-331, 2023 WL 131050 (D. Md. Jan. 9, 2023) (denying motion to dismiss indictment for bringing gun into National Institute of Health campus after government presented evidence that it is analogous to sensitive places recognized at the Founding); *Range v. Attorney General*, 53 F.4th 262 (3d Cir. 2022) (concluding 18 U.S.C. § 922(g)(1) is constitutional only after a historical review), *vacated en banc* 56 F.4th 992 (3d Cir. 2023).

I must do likewise. The government's response to Ayala's motion to dismiss on this ground is unhelpful in this task. It consists of two paragraphs summed up as follows: "A government building has been deemed a sensitive place that can ban the carrying of firearms while not violating an individual's Second Amendment rights and is consistent with the Nation's historical tradition of firearm regulation." Resp. (Doc. 25) at 4. That assertion simplifies (and likely overstates) the sensitive places exception as definitely carving out from Second Amendment protection all government buildings. But *Bruen* requires a more searching analysis into the historical record to determine whether § 930 as applied to Ayala defeats the "presumpt[ion]" that the Constitution protects his conduct. *See* 142 S. Ct. at 2127. The government has the burden to "affirmatively prove" that its firearms

regulation in non-public areas of post offices is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

Because the government squarely fails to do so in its initial response, the government must submit supplemental briefing that examines the historical evidence of regulation of firearms at post offices, with a particular view to the time of the Founding. *Bruen*, 142 S. Ct. at 2135–38 (explaining the inherent limitations of evidence that either long predates or postdates ratification of the Second Amendment).[9] Given that the Constitution gave Congress the power "[t]o establish Post Offices" even before the States ratified the Second Amendment, *see* Art. I, § 8, Const., the existence—or lack thereof—of firearms regulations governing post offices is highly informative.

Ayala's situation presents another potential wrinkle: what kinds of firearms regulations at the Founding applied to postmasters (or other postal office employees)? The government's obligation here thus requires a survey of both kinds of historical evidence of firearms regulations, at post offices and of their workers.

---

[9] The Eleventh Circuit recently held that Reconstruction Era historical sources "are more probative of the Second Amendment's scope than" Founding Era sources when determining the scope of the Second Amendment right incorporated against the States. *Nat'l Rifle Ass'n v. Bondi*, __ F.4th __, 2023 WL 2416683, at *3 (11th Cir. 2023). This is because "the Fourteenth Amendment is what *caused* the Second Amendment to apply to the States," so "the understanding that prevailed when the States adopted the Fourteenth Amendment . . . is what matters." *Id.* But here, Ayala challenges a federal statute, so the scope of the Second Amendment when it was adopted is what matters. *Id.* (quoting *Bruen*, 142 S. Ct. at 2136) ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.").

Ayala also attacks § 930 as unconstitutionally vague as applied to him. Before analyzing the merits of any Due Process Clause concern, I must first attempt to determine the scope of § 930(d)(3) to know whether Ayala falls within the exception that permits possessing a firearm in a federal facility. That subsection excludes from prosecution "the lawful carrying of firearms or other dangerous weapons in a Federal facility incident to hunting *or other lawful purposes*." (emphasis added). If Ayala's conduct falls within the plain meaning of that provision, he is entitled to dismissal of count one without resort to any vagueness challenge. Because Ayala had a concealed weapons permit and a class "G" security license under Florida law (which the government does not dispute), the key inquiry is whether he carried the firearm for another "lawful purpose" while at work at the post office. But neither party attempts to define—using ordinary tools of statutory construction, including the relevance of any corollary federal regulations—what "other lawful purposes" means in context of § 930(d). The government asserts that "there is no evidence" that "Ayala carried his concealed firearm during his employment with USPS on multiple dates incident to hunting or other lawful purposes." Once again, that is a conclusion without explanation of the legal rule applied.

Accordingly, the government must submit supplemental briefing not to exceed 30 pages no later than **April 14, 2023**. Ayala may respond no later than **May 5, 2023**, in

briefing not to exceed 20 pages. The status conference remains scheduled for **March 14, 2023**.

ORDERED in Tampa, Florida, on March 13, 2023.

Kathryn Kimball Mizelle
United States District Judge

# CERTIFICATE OF SERVICE

## Certificate of Service

I certify that a copy of this appendix and the notice of electronic filing was sent by CM/ECF on July 1, 2024, to:

LAURA J. DAINES, ESQ.
Federal Public Defender's Office

*Counsel for Emmanuel Ayala*

*s/ Sean Siekkinen*
SEAN SIEKKINEN
Assistant United States Attorney