# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### APPEAL NO. 24-10462-DD

---

### UNITED STATES OF AMERICA

## Plaintiff-Appellant,

## v.

### EMMANUEL AYALA

## Defendant-Appellee.

---

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA

---

### PRINCIPAL BRIEF OF APPELLEE EMMANUEL AYALA

---

**A. Fitzgerald Hall, Esq.**
**Federal Defender**
**Middle District of Florida**

**Laura Jessica Daines, Esq.**
**Assistant Federal Defender**
**Florida Bar No. 105060**
**400 N. Tampa St., Ste. 2700**
**Tampa, Florida 33602**
**Telephone: (813) 228-2715**
**Facsimile: (813) 228-2562**
**E-Mail: laura_daines@fd.org**
**Counsel for Appellee**

# Appeal No. 24-10462-DD

## *United States of America v. Emmanuel Ayala*

### CERTIFICATE OF INTERESTED PERSONS

In addition to the persons identified in the Certificate of Interested Persons and Corporate Disclosure Statement in the United States' principal brief, the following persons have an interest in the outcome of this case:

Carter, Janet

Everytown for Gun Safety (formally, Everytown for Gun Safety Action
    Fund)

Everytown Law

Taylor, William J., Jr.

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

This case addresses whether the government can impose criminal penalties on an employee who enters a United States Post Office and its parking lot during work while carrying a firearm for self-defense. Whether this is constitutional under the Second Amendment involves an issue of first impression regarding the Second Amendment sensitive places doctrine. Because this case involves interpretation of a significant constitutional right, argument by counsel familiar with the case would assist the Court in resolving this case.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................... C1

Statement Regarding Oral Argument............................................. i

Table of Contents ...................................................................... ii

Table of Authorities.................................................................... iv

Statement of Subject Matter and Appellate Jurisdiction ............................ ix

Statement of the Issues ...............................................................1

Statement of the Case.................................................................1

    Course of Proceedings.............................................................1

        A.    The indictment, motion to dismiss, response, and order for supplemental briefing ........................................ 2

        B.    The parties' supplemental briefs ...................................... 4

        C.    The district court's order.................................................. 8

    Statement of the Facts ........................................................13

    Standards of Review .........................................................13

Summary of the Arguments ........................................................13

Arguments and Citations of Authority .......................................15

    The district court correctly found that the government failed to meet its burden of showing that § 930(a) is consistent with this Nation's tradition of firearms regulations as applied to Mr. Ayala...................................................................15

## TABLE OF CONTENTS - *CONT'D*

A.   The Supreme Court requires courts to conduct a historical analysis.............................................................16

B.   *Heller*, *McDonald*, and *Bruen* do not hold that § 930 is constitutional............................................................ 25

     i.    *Heller's* language on presumptively lawful regulatory measures is dicta ................................. 27

     ii.   *Bruen* did not identify all government buildings as sensitive places ................................. 35

C.   The government failed to meet its burden of showing § 930, as applied to Mr. Ayala is consistent with this Nation's history and tradition of firearm regulations.....38

     i.    Medieval Era regulations .......................................41

     ii.   Colonial and Founding Era regulations................. 45

D.   The Property Clause does not permit the government to violate the Second Amendment ................................. 53

E.   The government cannot impose criminal penalties simply because it acted as an employer ......................... 55

Conclusion.................................................................. 59

Certificate of Compliance with Type-Volume Limit...................................60

Certificate of Service...................................................................60

iii

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) ...................................30

*Bonidy v. United States Postal Service*, 790 F.3d 1121
   (10th Cir. 2015)................................................................................ 52, 53

*Bryant v. Jones*, 575 F.3d 1281 (11th Cir. 2009).........................................56

*District of Columbia v. Heller*, 554 U.S. 570
   (2008) ....................................... 3-6, 11, 16-22, 24-36, 39, 41, 45, 48, 50, 52

*Garland v. Range*, 144 S. Ct. 2706 (2024)...................................................30

*Gercetti v. Ceballos*, 547 U.S. 410 (2006) ...................................................57

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ..............................................28

*Lyng v. NW Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988)........ 57

*McCulloch v. Maryland*, 17 U.S. 316 (1819).................................................54

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .. 4-6, 11, 15-17, 20, 25-26

*Metro Washington Airports Auth. v. Citizens for Abatement
   of Aircraft Noise, Inc.*, 501 U.S. 252 (1991) .............................................. 53

*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ..................... 3-6, 8-9, 11-12, 15-16, 19-26, 31, 33, 35-41,
   44-45, 48-49, 51, 52, 54-56, 59

*New York v. United States*, 505 U.S. 144 (1992) .........................................54

*Public Workers v. Mitchell*, 330 U.S. 75 (1947) ....................................32, 34

*Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) ..........................................30

TABLE OF AUTHORITIES - *CONT'D*

**Cases**                                                           **Page(s)**

*Robbins v. United States*, 284 F. 39 (8th Cir. 1922) ................................... 55

*Schwab v. Crosby*, 451 F.3d 1308 (11th Cir. 2006) ...............................27-28

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) ................................. 26

*Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016) .......... 33

*U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114
    (1981) ................................................................................................. 57

*United States v. Brown*, 552 F.2d 817 (8th Cir. 1977) ............................... 54

*United States v. Comstock*, 560 U.S. 126 (2010) ....................................... 54

*United States v. Connolly*, --- F.4th ---, 2024 WL 3963874
    (5th Cir. 2024) ......................................................................... 49

*United States v. Dubois*, 94 F.4th 1284 (11th Cir. 2024) ...........................30

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) .............. 13

*United States v. Lopez*, 805 F. App'x 921 (11th Cir. 2020) .........................56

*United States v. Matherson*, 367 F. Supp. 779 (E.D.N.Y. 1973) ................. 55

*United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024) ...................38

*United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) ......................... 29-31

*United States v. Tolmosoff*, No. 6:23-po-187, 2024 WL 1575071
    (E.D. Cal. Apr. 11, 2024) ......................................................... 53

*United States v. Williams*, --- F.4th ---, 2024 WL 3912894
    (6th Cir. 2024) .................................................................30, 49

## TABLE OF AUTHORITIES - *CONT'D*

**Cases**                                                                 **Page(s)**

*United States vs. Rahimi*, 144 S. Ct. 1889
  (2024) .........................................15-16, 21-24, 28, 32-35, 38-39, 45, 47-50

*Waters v. Churchill*, 511 U.S. 661 (1994)...................................................... 57

**Statutes**

18 U.S.C. § 111.................................................................................................. 2

18 U.S.C. § 922 .......................................................................................22-24, 50-51

18 U.S.C. § 930 .............1-3, 5-6, 8-10, 13-16, 24-28, 35, 37-48, 51, 53, 55, 58

18 U.S.C. § 3231......................................................................................... ix

18 U.S.C. § 3731......................................................................................... ix

**Federal Rules**

Fed. R. App. P. 4........................................................................................ ix

Fed. R. App. P. 27.......................................................................................60

Fed. R. App. P. 32.......................................................................................60

**Other Authorities**

2 Edw. 3, c. 3 (1328) ............................................................................ 43-44

5 Edw. 2, c. 14 (1311)................................................................................ 43

7 Edw. 2 (1313) .......................................................................................... 42

39 C.F.R. § 232.1........................................................................................ 52

TABLE OF AUTHORITIES - *CONT'D*

## Other Authorities                                                Page(s)

134 Cong. Rec. S17360-02, 1988 WL 182529 (Nov. 10, 1988) ................... 39

1647 Md. Laws 216 ....................................................................... 46

1786 Va. Acts 33, ch.21 ............................................................... 46

A statute forbidding Bearing of Armour. *A Statute forbidding
    Bearing of Armour (1313)*, legislation.gov.uk
    (last visited Aug. 30, 2024), https://tinyurl.com/3zesjk8r .................... 42

Brief for Independent Institute as *Amicus Curiae* 11–17 ........................... 36

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*,
    13 Charleston L. Rev. 205 (2018) ............................................... 36-37, 43

Del. Const. art. 28 (1776) ............................................................. 46

Eben Moglen, *Statutes & Royal Ordinances, Edward II* English
    Legal History and its Materials
    (last visited Sept. 3, 2024), https://tinyurl.com/5dmrfa2r .................... 42

New York Act of Jan. 26, 1787, ch. 1, cl. 9 ..................................... 48

Office of the Historian, *One of the "Six Buildings," Washington
    September 1800-May 1801*
    (last visited Sept. 3, 2024), https://tinyurl.com/54jz44e8 ................... 47

Presumption, Black's Law Dictionary (12th ed. 2024) .............................. 29

Richard E. Gardiner, *The True Meaning of "Going Armed" in the
    Statute of Northampton: A response to Patrick J. Charles*,
    71 Clev. St. L. Rev. 947 (2023) ............................................... 44

Tex. Fam. Code Ann. § 85.025(c) (West 2019) ..................................... 23

TABLE OF AUTHORITIES - *CONT'D*

## Other Authorities                                    Page(s)

The Charter and Ordinances of the City of Providence,
  *An Ordinance in Relation to the Firing of Guns, Pistols and
  other Fire-arms*, (1835)...........................................................48

U.S. Const., art. I, § 8 ...................................................................54

U.S. Const., article IV, § 3, cl. 2 .................................................53

United States General Services Administration, *A timeline of
  Architecture and Government*
  (last visited Sept. 3, 2024),https://tinyurl.com/3wnfy2cv ....................47

### STATEMENT OF SUBJECT-MATTER
### AND APPELLATE JURISDICTION

This is an appeal of orders entered by the United States District Court for the Middle District of Florida, Tampa Division, dismissing one of two counts alleged in an indictment against Mr. Ayala on January 12, 2024. Docs. 57-58. The government filed a timely notice of appeal on February 12, 2024. Doc. 62; Fed. R. App. P. 4(b)(1)(B)(i). The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 18 U.S.C. § 3731.

## STATEMENT OF THE ISSUES

Whether the district court correctly found that the government failed to meet its burden of showing that 18 U.S.C. § 930(a) is consistent with this Nation's tradition of firearms regulations as applied to Mr. Ayala.

## STATEMENT OF THE CASE[1]

Mr. Ayala is a law-abiding citizen who enjoys rights under the Second Amendment. The government is seeking criminal sanctions against him under 18 U.S.C. § 930 for possessing a handgun for self-defense while on duty at a United States Post Office, where he worked as a semi-truck driver for the United States Postal Service (USPS). The district court correctly sustained Mr. Ayala's as-applied challenge under § 930 because the government failed to meet its burden of showing the USPS office was a sensitive place and that its regulation fell within this Nation's historical tradition of firearm regulation.

---

[1] Documents filed in the district court are cited as "Doc. ___" and documents filed in this Court are cited as "11th Cir. Doc. ___." Page numbers refer to the page assigned by the CM/ECF filing stamp.

COURSE OF PROCEEDINGS

## A. The indictment, motion to dismiss, response, and order for supplemental briefing

Mr. Ayala was charged with knowingly possessing a firearm in a federal facility in violation of § 930. Doc. 1.[2] He moved to dismiss the charge as unconstitutional as applied under the Second Amendment. Doc. 23 at 7-12.[3]

The motion to dismiss detailed the relevant facts, which were explicitly agreed to or unopposed by the government and found by the district court. On September 14, 2022, Mr. Ayala was employed as a semi-truck driver for the USPS and was licensed by the State of Florida to carry a concealed weapon or firearm. *Id.* at 1, 3; Doc. 25 at 7-8; Doc. 57 at 2.[4] That day, he carried a concealed firearm in a fanny pack from the employee parking lot,

---

[2] Mr. Ayala was also charged with violating 18 U.S.C. § 111. Doc. 1. He pleaded not guilty and proceedings on that count are stayed pending this appeal. Docs. 13, 63. Facts relevant to that charge, which is not at issue in this appeal, are not included here.

[3] Mr. Ayala raised additional arguments that were not addressed by the district court because it resolved the motion on Second Amendment grounds. Doc. 23 at 12-18; Doc. 57 at 4.

[4] The government seeks to avoid the fact that Mr. Ayala was a concealed carry permit holder. 11th Cir. Doc. 13-1 at 14-15. It agreed to this fact in the district court as a basis for avoiding an evidentiary hearing and should not be allowed to change its position on appeal. Doc. 43.

2

through the metal turn styles, and into the post office, where he clocked in to work before being arrested. Doc. 23 at 4; Doc. 57 at 2.

Mr. Ayala argued the charge must be dismissed because the Second Amendment's plain text protected him against criminal prosecution based on carrying a concealed firearm for self-defense while on the job at his federal workplace. Doc. 23 at 7. Because Mr. Ayala is among the people protected by the Second Amendment and carrying a firearm outside the home for self-defense is conduct that falls within the Second Amendment's plain text, his actions were presumptively lawful and the government bore the burden of justifying § 930 as-applied to him. *Id.* at 9 (citing *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 32-34 (2022)). To do so, the government was required to show § 930 was consistent with the Nation's historical tradition of firearm regulation. *Id.*

The government responded that § 930 did not violate Mr. Ayala's Second Amendment rights. Doc. 25 at 4-5. The government asserted that *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008), and *Bruen*, 597 U.S. at 30, established that all government buildings are sensitive places where the government can ban carrying firearms without violating the Second Amendment. *Id.* at 4.

3

The district court found the government's response inadequate to carry its burden. Doc. 26. The court rejected the argument that Supreme Court precedent established all government buildings as sensitive places and concluded that, under *Bruen*, courts must determine whether bans in purported sensitive places are analogous to ones that were historically recognized. *Id.* at 3-4. The court instructed the government to "submit supplemental briefing that examine[d] the historical evidence of regulation of firearms at post offices, with a particular view to the time of the Founding." *Id.* at 4. It further instructed the government to submit historical evidence of firearms regulations as they applied to postmasters or their employees. *Id.*

## B.   **The parties' supplemental briefs**

The government submitted a supplemental brief arguing that the Supreme Court's decisions in *Heller*, *Bruen*, and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), held that all government buildings were sensitive places and foreclosed Mr. Ayala's challenge without the need for further analysis. Doc. 32 at 2-9. It also argued (1) the Constitution's Property Clause authorized it to enact any regulations it deemed appropriate, regardless of the Second Amendment; and (2) a historical analysis supported finding post offices to be sensitive places. *Id.* at 10-18.

4

As to the first argument, the government recognized that because the USPS is a state actor, "its actions must comply with the Constitution." *Id.* at 12. It asserted, however, that when it acted as a proprietor—such as when managing a post office—rather than a sovereign, it had more discretion to regulate as it deemed appropriate. *Id.* The government did not address how its criminal prosecution was an act of the USPS as a proprietor, and not an act of a sovereign. It did not, for example, assert that other mail carriers acting as proprietors have the authority to criminally prosecute employees.

For the sensitive places argument, the government stated that *Bruen* settled that legislative assemblies, polling places, and courthouses are places where firearms may be banned, and "[p]ost offices and other government buildings are . . . analogous to . . . if not among those examples themselves . . . ." *Id.* at 15. The government provided little historical support for "sensitive places" laws, and no analysis on why those were like § 930.

Mr. Ayala responded that the government had not met its burden. Doc. 39 at 2-18. First, Mr. Ayala contended that *Bruen*, *Heller*, and *McDonald* did not hold that all government buildings are sensitive places or foreclose his arguments. Those cases did not confront the constitutionality of a regulation prohibiting firearm possession in government buildings, identify any regulations on that issue, or conduct any historical analysis for such

5

regulations. Instead, in a portion of the opinion unrelated to the regulation being examined, *Heller* stated longstanding regulations pertaining to carrying firearms in government buildings were presumptively lawful while recognizing that the Court did not clarify the entire field of Second Amendment law and would examine presumptively lawful regulations where the issues were actually presented. *Id.* at 3-5. *McDonald* simply recognized the Second Amendment applied to the states through the Fourteenth Amendment. *Id.* at 6-7. *Bruen* clarified the methodology (and provided an analytical framework) for determining whether a firearm regulation was constitutional under the Second Amendment. That methodology required the government to demonstrate its regulation was consistent with the Nation's historical tradition of firearm regulation. *Id.* at 8, 9-10. Mr. Ayala argued that test must be employed in deciding his challenge to § 930. *Id.* at 12.

Mr. Ayala also argued that the government could not succeed under this test because it failed to find a historical comparator for § 930 that established post offices as "sensitive places." *Id.* at 13-17. Additionally, he contended the district court should reject the government's Property Clause argument because the government was required to comply with the

Constitution, including the Second Amendment, when acting on government property. *Id.* at 17-18.

Mr. Ayala requested that the district court hold an evidentiary hearing on his motion. Doc. 40. He offered to submit evidence supporting his assertion that he was among the people and his proposed course of conduct was to "possess[] a concealed firearm for self-defense while at his federal workplace and while on duty in his work truck[.]" *Id.* at 1. Such a hearing would also provide the government the opportunity to prove that post offices are a historically-recognized sensitive place. *Id.* at 2.

The government opposed Mr. Ayala's request for an evidentiary hearing. Doc. 43. It stipulated to these facts:

> (1) Ayala was a federal employee; (2) Ayala was charged with bringing a firearm to the post office where he works, while on duty; (3) Ayala was not a security guard, investigator, agent or any other type of employee who might have been allowed to carry a weapon at work (he was a truck driver); and (4) Ayala possessed a concealed weapons permit at the time alleged in the indictment.

*Id.* at 1. Based on these stipulations, the government submitted that no critical facts were in dispute, making an evidentiary hearing unnecessary. *Id.* at 2.

7

## C.    The district court's order

The district court granted Mr. Ayala's motion to dismiss without an evidentiary hearing. Doc. 57. The court summarized its order:

> []*Bruen*[] requires the United States to present historical support for § 930(a)'s application to Ayala, which it fails to do. Post offices have existed since the founding, as have threats to the safety of postal workers and the public entering these locations. Yet the historical record yields no "distinctly similar historical regulation addressing" those safety problems by regulating firearms in post offices. *Bruen* deems this absence strong evidence of the statute's unconstitutionality. Even if the lack of a distinctly similar historical regulation was not dispositive, the United States has offered no relevant historical analogues. Although not my burden, I conduct a more robust historical inquiry and likewise uncover no tradition of relevantly similar firearms regulations.

*Id.* at 4-5.

The district court recognized that when a regulation addresses a "general societal problem" that has existed since the founding, "[t]he lack of a distinctly similar historical regulation addressing [the] problems is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (quoting *Bruen*, 597 U.S. at 26). But where a regulation implicates "unprecedented societal concerns or dramatic technological changes," courts must engage in analogical reasoning by considering "how and why historical regulations burden a law-abiding citizen's right to armed self-defense." *Id.* (quoting *Bruen*, 597 U.S. at 27-28).

8

The court also noted that analogues need only be "relevantly similar" to a challenged regulation, not "historical twin[s]." *Id.* at 7 (quoting *Bruen*, 597 U.S. at 29). The burden on the right to self-defense need only be "comparable." *Id.* (quoting *Bruen*, 597 U.S. at 29).

Although the government did not identify what societal problem § 930(a) was meant to address, the court offered suggestions, including generally promoting public safety, ensuring postal-employee safety and effective mail delivery, and intimidation during official government proceedings. *Id.* at 8-13. Because these were generalized concerns that existed since the founding, the district court considered the absence of any distinctly similar historical regulations as relevant evidence that § 930(a) was inconsistent with the Second Amendment as applied to Mr. Ayala. *Id.* at 12-13 (citing *Bruen*, 597 U.S. at 26).

Next, the district court evaluated whether there was a relevantly similar historical analogue. *Id.* at 13-26. It found the government's unreasoned comparison of post offices to a pre-founding Delaware law banning arms at polling places, and citation to a secondary source referring to a Maryland prohibition on carrying arms while the legislature was in session, did not meet its burden. *Id.* at 14. Neither regulation was like § 930 in how or why they burdened the right to self-defense because they contained

9

meaningful time and place constraints on weapons bans and "were not perpetual exceptions to the right to bear arms," like § 930(a). *Id.* at 14-15.

The district court also did its own research. *Id.* at 16-26. It examined the 1328 English Statute of Northampton and later copycat laws enacted by the states, which it interpreted as prohibiting going armed in front of high-ranking officials. *Id.* at 16-22. Such laws could not be extended to banning going armed in front of all government employees (numbering over 21.3 million) because not all government employees were modern-day equivalents of historical high-ranking officials. *Id.* at 22. And, as applied to Mr. Ayala, ordinary postal employees at ordinary post offices were not the kind of high-ranking officials contemplated by the historical regulations. *Id.*

The district court also identified potential "sensitive-place" analogues, from which it derived the "general principle" "that governments may restrict firearms possession in places where important and legally definitive governmental decisions are regularly made." *Id.* at 23-24. Those regulations included bans at legislatures and polling places and included significant limits—they did not disarm people at all times for all purposes in all government locations. *Id.* at 25. Prosecution of Mr. Ayala under § 930 was not consistent with the principles underlying the potential analogues and imposed a heavier burden on the Second Amendment right. *Id.* at 26.

The district court also addressed—and rejected—the government's argument that *Heller*, *McDonald*, and *Bruen* resolved the issue. *Id.* at 26-33. The court explained *Heller* and *McDonald* did not address sensitive places, the issues presented in the cases were unrelated to sensitive places, and the comments regarding sensitive places were unnecessary to the Court's reasoning in those cases. *Id.* at 27. "No sound argument exists that either *Heller* or *McDonald* or both logically entail a rule that 'all manner of government buildings' are sensitive places." *Id.*

Additionally, although *Bruen* "elaborate[ed] on how to apply the sensitive-places exception," *id.* at 30, it likewise did not, and "had no occasion to opine on government property at all," *id.* at 31. Rather, in reasoned dicta, the Supreme Court assumed that 18th and 19th-century laws where weapons were prohibited, which included "legislative assemblies, polling places, and courthouses," provided examples of historical places that the courts could look to as potentially analogous laws for determining whether "modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* at 30-31 (quoting *Bruen*, 597 U.S. at 30). This was simply an example of how the *Bruen* test worked in practice and provided the test that must be followed. *Id.* at 32.

11

The district court also rejected the government's proposition it could infringe on Mr. Ayala's Second Amendment right when it was acting as a property owner. *Id.* at 34-38. The government did not explain how its argument fit *Bruen*'s framework, except by suggesting gun regulations on government property are exempt complying with the Second Amendment *Id.* at 36. The government provided no support for that argument and the court could not find any. *Id.*

The district court accentuated the absurdity of the proposition that the government could circumvent the constitution and impose criminal sanctions for conduct occurring on government property. *Id.* "Would an indictment for failing to submit to a full body cavity search when showing up at the District of Columbia Department of Motor Vehicles to apply for a learner's permit pass Fourth Amendment muster?" *Id.* Of course not. Instead, the government must comply with the constitution and, with respect to the Second Amendment, show "a historical tradition justifying any claimed power to regulate conduct protected by . . . [its] plain text, even as a proprietor." *Id.* at 37.

Lastly, the district court found that the government failed to sufficiently argue why it could impose criminal penalties for firearms

regulations it enforces as an employer. *Id.* at 39-40. The single sentence devoted to this topic did not properly present the issue to the court. *Id.* at 40.

The district court therefore dismissed the § 930 count against Mr. Ayala with prejudice. *Id.* at 42; Doc. 58. This appeal by the government followed. Doc. 62.[5]

### STATEMENT OF THE FACTS

All relevant facts are in the Course of Proceedings.

### STANDARDS OF REVIEW

This Court reviews the constitutionality of a statute de novo. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1043 (11th Cir. 2022).

### SUMMARY OF THE ARGUMENTS

In every case addressing the constitutionality of a regulation burdening the individual right to bear arms, the Supreme Court has required a historical analysis addressing whether the regulation fit within the historic understanding of the Second Amendment. This is done by comparing how

---

[5] Everytown for Gun Safety moved for leave to file an amicus brief, stating it was necessary to refute any argument by Mr. Ayala or potential amici curiae that the government may prohibit guns only in places protected by comprehensive, government-provided security. 11th Cir. Doc. 15-1 at 5.

That argument was not presented in the district court and was not a basis for the district court's ruling. Because the brief is almost entirely unrelated to Mr. Ayala's circumstances or the arguments presented by the parties in this case, it is not otherwise addressed here.

and why the modern regulation burdens the right, and whether it's consistent with the principles underlying historic regulations.

The district court correctly engaged in that analysis, and this Court should do the same. Concluding that such an analysis is foreclosed by Supreme Court dicta broadly presuming longstanding regulations prohibiting carrying firearms in government buildings are constitutional would be inconsistent with the actual holdings and analyses in these cases. And such an analysis, which looks to how and why § 930 and the government's proposed analogues burden the Second Amendment right, shows that the government failed to meet its burden of demonstrating § 930 is constitutional as applied to Mr. Ayala.

ARGUMENTS AND CITATIONS OF AUTHORITY

**The district court correctly found that the government failed to meet its burden of showing that § 930(a) is consistent with this Nation's tradition of firearms regulations as applied to Mr. Ayala**

The Second Amendment protects "the right to keep and bear arms," which this Nation recognizes as "among the 'fundamental rights necessary to our system of ordered liberty.'" *United States vs. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889, 1897 (2024) (quoting *McDonald*, 561 U.S. at 778). The contours of the right are defined by the amendment's text and history. *Id.* Conduct that falls within the amendment's plain text is presumptively protected, *Bruen*, 597 U.S. at 24, and when the government intrudes onto this constitutionally protected right, it must justify the intrusion, *Rahimi*, 144 S. Ct. at 1897.

However, because the Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose," not all regulations violate the Second Amendment. *Id.* at 1897-98. Regulations are permitted if they are "consistent with the principles that underpin our regulatory tradition." *Id.* at 1897-98. To determine whether a regulation falls within this tradition, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit . . . ." *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 29). The Supreme Court explained:

15

Why and how the regulation burdens the right are central to this inquiry. [*Bruen*], [597 U.S.] at 29[]. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." *Id.*, at 30[]. The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin." *Ibid.* (emphasis deleted).

*Id.*

Here, the district court correctly employed this test to conclude the government failed to meet its burden of showing § 930, as applied to Mr. Ayala, is relevantly similar to laws our tradition is understood to permit. The government is incorrect that the district court's decision to engage in this analysis, and the analysis itself, was erroneous. 11th Cir. Doc. 13-1 at 24-34 (hereinafter "GB").

## A. The Supreme Court requires courts to conduct a historical analysis

The Supreme Court has addressed the individual right to bear arms in four cases: *Heller*, *McDonald*, *Bruen*, and *Rahimi*. Three of these cases (*Heller*, *Bruen*, and *Rahimi*) analyze whether firearms regulations infringe

16

on an individual's Second Amendment right.[6] Each time it confronted this question, the Supreme Court conducted an in-depth historical analysis. And with each decision, the Supreme Court reinforced that such an analysis was required.

The Supreme Court first recognized an individual fundamental right to bear arms in *Heller*, in which an individual challenged the District of Columbia's handgun ban. 554 U.S. at 574. He contended possessing a handgun in the home for self-defense was conduct protected by the Second Amendment, whereas the District of Columbia (the "District") argued the amendment protected "only the right to possess and carry a firearm in connection with militia service." *Id.* at 577. The Supreme Court sided with the individual and held that (1) the right conferred by the Second Amendment was an individual right unconnected with military service, and (2) banning possession of a handgun within the home for self-defense violated the Second Amendment. *Id.* at 635.

---

[6] *McDonald* held that the Second Amendment was fully applicable to the states through the Fourteenth Amendment and its analysis focused on the Fourteenth Amendment's Privileges or Immunities Clause without providing meaningful insight on the scope of the individual right protected by the Second Amendment. 561 U.S. at 750

To reach these holdings, the Court first evaluated what right the Second Amendment was intended to protect when it was ratified. It then considered whether the District's regulation was consistent with, or infringed on, that right as historically understood. For the first inquiry, the Court looked at the amendment's text and how the words it used were understood at the time of the founding. 554 U.S. at 579-600. The historical evaluation left the Court with "no doubt . . . that the Second Amendment conferred an individual right to keep and bear arms." *Id.* at 594. The Supreme Court confirmed this interpretation through examination of state constitutions that existed around the time of the founding. *Id.* at 601-03. Then it reviewed founding-era documents, post-ratification papers, pre-Civil War caselaw, and post-Civil war legislation and papers to discern the historical understanding of the Second Amendment. *Id.* at 603-19. In short, the Court engaged in an exhaustive examination of historic sources before reaching its conclusion on the scope of the Second Amendment.

It did the same when deciding the constitutionality of the District's handgun ban. The review revealed that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. And some of those few have been struck down." *Id.* at 629. The Court cited to early cases striking down firearms regulations, and the reasoning of

18

those cases, before examining historic regulations that proponents of the handgun ban relied on to argue it was similar to historically-accepted burdens on the right to bear arms. *Id.* at 629-34. The Court found these regulations to differ from the handgun ban, either in how they burdened the Second Amendment right or why. *Id.* at 631-34.

The analysis conducted at both steps showed that the scope of the Second Amendment, and whether a regulation was consistent with the amendment, is decided through the lens of history by analysis of historical sources. *Heller* did not, however, explicitly instruct that courts should look solely to history when deciding Second Amendment challenges. And, after *Heller*, circuit courts adopted a test that combined history with means-end scrutiny. *Bruen*, 597 U.S. at 17.

The Supreme Court rejected this test in *Bruen*, where it made clear that the only relevant inquiry was whether the regulation "is consistent with the Nation's historical tradition of firearm regulation."—"[t]he test we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 25-26. Under *Bruen*'s test, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must

19

then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24 (quotation omitted).

To evaluate whether this burden is met, courts must "consider whether 'historical precedent' from before, during, and even after the founding evince[] a comparable tradition of regulation." *Id.* at 28. In cases where modern-day regulations address concerns "unimaginable at the founding," "this historical inquiry . . . will often involve reasoning by analogy . . . ." *Id.* The *Bruen* Court did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but distilled two metrics for analogical reasoning from its precedent: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* (citing *McDonald*, 561 U.S. at 767).

As it did in *Heller*, the Court applied this test through a lengthy evaluation of whether the challenged regulation—a New York licensing regime that made it a crime to carry a firearm outside the home without a license, and required proper cause to obtain such a license—was consistent

20

with regulations historically understood to comport with the Second Amendment. *Id.* at 38-70. The Court examined myriad resources from all relevant periods to understand their meanings and determine how they related to the modern regulation. *Id.*

Ultimately, the Court held New York did not meet its burden of showing its regulation followed an American tradition of firearm regulation. *Id.* at 70. It also extended *Heller*'s recognition of the Second Amendment right to possess a weapon in the home to outside the home, holding that "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id.* (citing *Heller*, 554 U.S. at 581).

Most recently, in *Rahimi*, the Supreme Court reaffirmed and clarified *Bruen*'s history-based analysis. The Court reiterated that the "appropriate analysis" for a Second Amendment challenge "involve[d] considering whether the challenged regulation [wa]s consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 28). Although the court emphasized that a challenged regulation need

21

"not match its historical precursors," or be a "dead ringer" or "historical twin," it must "comport with the principles underlying the Second Amendment . . . ." *Id.*

*Rahimi* then conducted the same analysis found in *Heller* and *Bruen* by evaluating whether the challenged regulation—18 U.S.C. § 922(g)(8)(C)(i), which bars firearm possession by individuals subject to a domestic violence restraining order—was comparable to founding-era regulations. *Id.* at 1899-1902. The Court determined that surety laws and so-called "going armed" laws restricted firearm possession for similar reasons and imposed similar burdens as § 922(g)(8)(C)(i). *Id.* As to why, § 922(g)(8)(C)(i) "restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do." *Id.* at 1901. And they were similar in how they burdened the right. The Court explained:

> Section 922(g)(8) applies only once a court has found that the defendant "represents a credible threat to the physical safety of another" § 922(g)(8)(C)(i). That matches the surety and going armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon.

> Moreover, like surety bonds of limited duration, Section 922(g)(8)'s restriction was temporary as applied to Rahimi. Section 922(g)(8) only prohibits firearm possession so long as the defendant "is" subject to a restraining order. § 922(g)(8). In Rahimi's case that is one to two years after his release from

> prison, according to Tex. Fam. Code Ann. § 85.025(c) (West 2019). App. 6–7.
>
> Finally, the penalty—another relevant aspect of the burden—also fits within the regulatory tradition. The going armed laws provided for imprisonment, 4 Blackstone 149, and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible.

*Id.* at 1901-02. In other words, specific aspects of the historic regulation were distinctly similar to § 922(g)(8)(C)(i) such that the modern regulation fit within a historically-accepted regulatory regime.

The Supreme Court recognized that, in *Bruen*, these same proposed analogues were found to be insufficiently analogous to New York's licensing regime. That was because "[u]nlike the regulation struck down in *Bruen*, Section 922(g)(8) does not broadly restrict arms use by the public generally." *Id.* at 1901. Although "focused regulations like the surety laws are not a historical analogue for a broad prohibitory regime like New York's," they could "be an appropriate analogue for a narrow one." *Id.* at 1902. In other words, analogical reasoning requires comparing scope and justification of the specific modern regulation with the scope and justification for the specific historical analogue.

*Rahimi* also provided insight on what types of similarities may justify a modern regulation. Relevant factors that made surety and going armed

23

laws relevantly similar to § 922(g)(8)(C)(i) were (1) limited duration on the length of time the Second Amendment right was burdened; (2) the existence of similar procedural protections before the Second Amendment right was burdened; and (3) significance of the potential penalties. These are therefore the factors courts should look to when conducting a historic analysis.

*Heller*, *Bruen*, and *Rahimi* provide unequivocal instruction that whether a law is constitutional under the Second Amendment is evaluated by examining history and engaging in analogical reasoning. The district court below correctly identified this framework. Doc. 57 at 5-8. It recognized that the government had the burden of identifying a "well-established and representative historical analogue," that need only be "relevantly similar" to § 930, and "not 'a historical twin.'" *Id.* at 6-7 (quoting *Bruen*, 597 U.S. at 29-30). It explained that "[w]hen the government's proffered examples are not directly on point, courts must distill the underlying legal principles from the historical record," and "determine 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.'" *Id.* at 7 (quoting *Bruen*, 597 U.S. at 29). By identifying and applying this analytical framework, the district court remained faithful to the Supreme Court's clear instructions. The government's arguments to the contrary are unpersuasive.

24

## B.   *Heller*, *McDonald*, and *Bruen* do not hold that § 930 is constitutional

The government seeks to circumvent historic analysis by arguing that in *Heller*, *McDonald*, and *Bruen*, the Supreme Court pre-approved any firearms prohibition in all government buildings. GB at 28-29.[7] In other words, the government argues no court may ever review whether § 930, or any other regulation pertaining to government buildings, as applied or otherwise, is constitutional. *Id.* at 33-34.

The government misunderstands what these cases held. What should be evident from the above discussion is that neither the holdings of these cases, nor the reasoning supporting those holdings, related to whether post offices, or any government buildings, are places where firearms bans historically have been permitted. None of these cases resolved questions about the sensitive places doctrine and any discussion of sensitive places or government buildings as sensitive places was extraneous to the questions

---

[7] The government does not suggest *McDonald* is of any particular significance outside of quoting *Heller*. The sole relevant portion of *McDonald* states: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as . . . 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . .'" 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626-27). *McDonald* was not a sensitive places case and provided no analysis, reasoning, or insight into the sensitive places doctrine. Mr. Ayala therefore does not separately analyze *McDonald*.

presented in those cases. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."). *Heller*, *McDonald*, and *Bruen* therefore are not binding on whether post offices are sensitive places or § 930 is constitutional.

The Supreme Court has never taken a case presenting the issue of whether all government buildings, in all circumstances, are sensitive places. It has not taken a case asking whether post offices are sensitive places. The government identified no Supreme Court case where the question presented involved whether a government building is a sensitive place. It likewise has identified no Supreme Court case where the question was whether § 930 was constitutional. Lastly, it has not identified a Supreme Court case containing a historical analysis like that of *Heller* or *Bruen* for government buildings as sensitive places.

As a result, this Court should reject the government's attempt to label as resolved the constitutionality of an entirely unexamined issue. Doc. 57 at 26-33; GB at 24-37. Foreclosing the historical analysis would be wholly inconsistent with *Heller* and *Bruen*.

26

### i.   *Heller's language on presumptively lawful regulatory measures is dicta*

To support its position that § 930 must remain unexamined, the government makes much of *Heller*'s statement that:

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.
>
> > We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.

554 U.S. at 626-27 (internal citations omitted); GB at 29-30, 35-37.

The absence of any historic analysis to support this statement contrasts starkly with the in-depth investigation into the historical understanding of the Second Amendment necessary to *Heller*'s holdings, demonstrating it is neither a holding nor well-reasoned dicta. Doc. 57 at 27, 32-33 (describing the above-referenced quote as a "bare legislative statement[]," rather than a holding or even high-level dictum (citing *Schwab v. Crosby*, 451 F.3d 1308,

27

1325 (11th Cir. 2006))); *see also Rahimi*, 144 S. Ct. at 1944 n.7 (Thomas, J., dissenting) (describing *Heller*'s reference to presumptively lawful measures as dicta).

Likewise, the vagueness of the statement shows it was not a well-reasoned or carefully articulated part of the analysis. Various questions are unanswered, including what is sufficiently "longstanding" for a regulation to qualify as "presumptively lawful"? 50 years? 200 years? *Kanter v. Barr*, 919 F.3d 437, 453-54 (7th Cir. 2019) (Barrett, J., dissenting) (referring to *Heller*'s statement as dicta leaving unanswered questions). Certainly, the government makes no argument that § 930 itself—which was enacted in 1988—qualifies as longstanding. But neither the government nor the Supreme Court has identified what would. This supports that *Heller*'s statement was not part of its holding or reasoned analysis and cannot be a permanent bar to ever examining the constitutionality of § 930.

Two additional reasons undermine the government's argument that this statement forecloses historical analysis. First, *Heller* identifies such regulations as only *presumptively* lawful while stating that historic analysis is required to support a firearms regulation in sensitive places. Second, this approach was rejected by *Rahimi*.

28

As to the first point, if the Supreme Court conclusively resolved such issues, it would not describe such laws as "presumptively lawful." A presumption is only an "inference or assumption," or "[s]omething that is thought to be true because it is highly probable." Presumption, Black's Law Dictionary (12th ed. 2024). The government cannot explain why *Heller*'s use of the phrase "presumptively lawful" should be read to mean "conclusively lawful" in the context of firearms regulations in government buildings.

The government attempts to do so by relying on *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010), but fails to analyze the basis for the *Rozier* decision. GB at 36. There, this Court confronted the constitutionality of the federal felon disarmament law and relied on *Heller*'s statement that "nothing in [the] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," as "suggest[ing] that statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." *Rozier*, 598 F.3d at 771. It reasoned that the statement regarding felon-disarmament laws was part of the holding because *Heller* limited its "opinion to possession of firearms by *law-abiding* and *qualified* individuals . . . ." *Id.* at 771 n.6 (emphasis in *Rozier*). Even if the statement was dicta, the Court noted it was due considerable weight. *Id.* This Court reaffirmed its decision

29

that the presumption regarding felon-disarmament laws "was 'not dicta' because it limited the Second Amendment right to '*law-abiding* and *qualified* individuals.'" *United States v. Dubois*, 94 F.4th 1284, 1292 (11th Cir. 2024) (quoting *Rozier*, 598 F.3d at 771 n.6).[8]

There is no language in *Heller* that could transform its government buildings statement into part of the essential reasoning of the decision in the way *Heller*'s use of the terms "law abiding" and "qualified" did for felon disarmament laws. Whereas *Heller* repeatedly identified law-abiding

---

[8] The government incorrectly asserts that in *Dubois*, this Court explained *Heller* "'made [it] clear' that" the "presumptively lawful regulatory measures" were "subject to firearm restrictions." GB at 36 (citing *Dubois*, 94 F.4th at 1292). The relevant portion of *Dubois*, read in its entirety, states:

> "The first question" under *Heller*, we explained, "is whether one is *qualified* to possess a firearm." [554 U.S.] at 770. And felons are unqualified as "a class" because they are not "law-abiding citizens." *Id.* at 771. *Heller* "made this clear" by labeling the felon-in-possession ban "a presumptively lawful longstanding tradition." *Id.* . . . . And we said that this language from *Heller* was "not dicta" because it limited the Second Amendment right to "*law abiding* and *qualified* individuals." *Rozier*, 598 F.3d at 771 n.6.

94 F.4th at 1292 (cleaned up). *Dubois* emphasized that *Rozier* was based on *Heller*'s repeated use of the terms "law abiding" and "qualified," and not solely on the reference to felon dispossession laws as presumptively lawful.

Other circuit courts have disagreed with *Rozier* and *Dubois*. *See United States v. Williams*, --- F.4th ---, 2024 WL 3912894, at *4-5 (6th Cir. 2024); *Range v. Att'y Gen.*, 69 F.4th 96, 104 (3d Cir. 2023), *vacated on other grounds by Garland v. Range*, 144 S. Ct. 2706 (2024) (Mem.); *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023).

citizens as those protected by the Second Amendment, it did not limit the Second Amendment right to any particular location. *Bruen*, 597 U.S. at 32-33 (stating that although *Heller* focused on self-protection within the home, it did not "suggest that the need [for armed self-defense] was insignificant elsewhere, and could not have done so because "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to bear arms" and "confining the right to 'bear' arms to the home would make little sense"). Thus, *Rozier* has no bearing on whether *Heller*'s statement about the presumptive lawfulness of arms regulations in government buildings is binding.

Moreover, *Heller* stated further examination of regulations forbidding carrying firearms in sensitive places would be done where the issue was actually presented. 554 U.S. at 635. Justice Breyer's dissent criticized the majority's statement on presumptively lawful regulatory measures, asking:

> Why these [regulations]? Is it that similar restrictions existed in the late-18th century? The majority fails to cite any colonial analogues. And even were it possible to find analogous colonial laws in respect to all these restrictions, why should these colonial laws count, while the Boston loaded-gun restriction (along with the other laws I have identified) apparently does not count?

*Id.* at 721 (Breyer, J., dissenting) (internal citations omitted). The majority responded:

> Justice BREYER chides us for leaving so many applications of the right to keep and bear arms in doubt, and for not providing extensive historical justification for those regulations of the right that we describe as permissible. But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . . [T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.

*Id.* at 635 (internal citation omitted).

This response follows the principle that "Article III of the Constitution vests in th[e Supreme] Court the power to decide only the 'actual cas[e]' before [it], 'not abstractions.'" *Rahimi*, 144 S. Ct. at 1910 (Gorsuch, J., concurring) (quoting *Public Workers v. Mitchell*, 330 U.S. 75, 89 (1947)). Nonetheless, the government suggests this statement was not a recognition of a well-established jurisdictional limitation and was instead a ruling on the constitutionality of any number of unidentified regulations not at issue and without any analysis or explanation. GB at 36.

But the Supreme Court cannot rule on issues and regulations not part of the case or controversy. It is more logical to conclude that the Supreme Court did not ignore its jurisdictional limitations and, as it stated, declined to analyze and rule on issues until they were actually presented. Meanwhile, "[t]here is no reason for lower court judges to pass the time" declining to engage in the type of historical analysis *Heller* approved for determining the

scope of the Second Amendment and instead "wait[ing] for the Supreme Court to step in and do the historical analysis it has promised." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 704 (6th Cir. 2016) (Batchelder, J., concurring in most of the judgment).[9]

This leads to the second reason the Court should not rely on *Heller*'s dicta to foreclose historical analysis: It is an argument rejected by *Rahimi*. There, the government pulled from *Heller*'s dicta to argue: "This Court's precedents recognize that Congress may disarm persons who are not law-abiding, responsible citizens." Br. for the United States, *United States v. Rahimi*, No. 22-915, 2023 WL 5322645, at *11 (U.S. Aug. 14, 2023). The government contended that *Heller* "described the right to keep and bear arms as a 'right of law-abiding, responsible citizens,'" and "made clear that legislatures may adopt categorical prohibitions on the possession of arms by those who are not law-abiding and responsible, identifying 'longstanding

---

[9] Judge Batchelder recognized before *Bruen* that the post-*Heller* two-step test, which "put the historical inquiry at the center of the analysis, not at the margin," was wrong. *Tyler*, 837 F.3d at 703 (Batchelder, J., concurring in most of the judgment). Judge Batchelder criticized the approach for being "largely divorced from the text, history, and tradition of the Second Amendment." *Id.* at 704. In *Tyler*, she engaged in a *Bruen*-like historical analysis to determine whether the regulation under review impacted the Second Amendment right in the same way as historically accepted regulations. *Id.* at 705-707.

prohibitions on the possession of firearms by felons and the mentally ill' as 'examples' of 'presumptively lawful regulatory measures.'" *Id.* (quoting *Heller*, 554 U.S. at 635, 326, 627 n.26).

The Supreme Court clarified this was not part of *Heller*'s holding. *Rahimi*, 144 S. Ct. at 1903. It stated that, in *Heller*, the Court "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those decisions did not define the term and said nothing about the status of citizens who were not 'responsible.' The question was simply not presented." *Id.* (internal citations omitted). Like the "responsible citizen" question, the scope of the sensitive places doctrine was not presented or ruled on in *Heller*.

In a concurring opinion, Justice Gorsuch cautioned against reading dicta to foreclose a historical analysis. He advised litigants and courts to not read more into *Rahimi* than what was decided because the Court did not purport to approve specific firearms regulations in advance. *Id.* at 1910 (Gorsuch, J., concurring). The Court did not, under Article III, have the authority to do so. *Id.* (quoting *Mitchell*, 330 U.S. at 89). He explained that, "[a]s [the Supreme] Court has long recognized, what [it] say[s] in [its] opinions must be taken in connection with the case in which those expressions are used, and may not be stretched beyond their context." *Id.*

34

(internal quotations and citations omitted) (cleaned up). He emphasized that what *should* be taken from *Rahimi* was courts must focus on text, history, and tradition when evaluating Second Amendment challenges. *Id.* The government's argument here is directly contradictory to that advice.

This Court should, therefore, reject the government's contention that *Heller*'s presumptively lawful language resolves this case. Instead, the Court should follow the Supreme Court's instructions and analyze whether § 930, as applied, is consistent with history and tradition.

### ii.    *Bruen did not identify all government buildings as sensitive places*

The government also relies on *Bruen*'s sensitive places discussion to avoid historical analysis of § 930. There, New York argued "sensitive places" "include[d] all places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Bruen*, 597 U.S. at 30-31 (internal quotation omitted). Under this definition, New York categorized the island of Manhattan as a "sensitive place." *Id.* at 31.

The Supreme Court rejected this argument as without historical basis. The Court stated it had "no occasion to comprehensively define 'sensitive

places,'" but advised its analogical reasoning framework could be applied in

sensitive place cases:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626[]. Although the historical record yields relatively few 18th- and 19th century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); *see also* Brief for Independent Institute as *Amicus Curiae* 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

*Id.* at 30. The government reads this as authorizing all firearms restrictions

in all government buildings. GB at 27-29. It is wrong.

As an initial matter, the government concedes that it is not even sure

how to read this paragraph: "Whether *Bruen* means to say that schools and

government buildings are themselves *historically* sensitive places (of the

same vintage as, say, legislative assemblies, polling places, and courthouses)

or are *new* and *modern* analogues to the enumerated examples is debatable

but irrelevant." *Id.* at 28. Yet it is somehow certain this is a holding that all

firearms regulations in all government buildings are constitutional. *Id.*

36

*Bruen* was, however, quite clear. *Bruen* listed examples of places where the historical record supported firearms restrictions: legislative assemblies, polling places, and courthouses. Doc. 57 at 31-32. It cited to documents identifying historic laws prohibiting carrying firearms in these places. Kopel, *supra* p. 36, at 229-36, 244-47; Br. for Independent Institute, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843, 2021 WL 3127146, at *11-17 (July 20, 2021). The Court assumed these specific places could be used as historical analogues for new proposed sensitive places.

*Bruen* assumed these specific locations were sensitive places but did not engage in any analysis or analogical reasoning to determine how they would apply to any modern-day regulation, including those broadly applying to government buildings. Rather, *Bruen* directed courts to engage in that analysis when the issue was presented. Section 930 is a modern regulation that applies in places other than those listed in *Bruen*. Thus, under *Bruen*, this Court must engage in analogical reasoning to decide whether § 930, as applied to Mr. Ayala, is constitutional under the Second Amendment. Failing to engage in that analysis "would put *Bruen*'s dicta in direct contradiction with *Bruen*'s holding," and "render the analogical reasoning required by *Bruen* pointless." Doc. 57 at 33.

37

For these reasons, no Supreme Court decision holds § 930 is constitutional or forecloses an as-applied challenge by Mr. Ayala. Instead, all relevant Supreme Court decisions require a historical analysis of whether § 930 is consistent with the Nation's tradition of firearm regulation.

### C.    The government failed to meet its burden of showing § 930, as applied to Mr. Ayala, is consistent with this Nation's history and tradition of firearm regulations

Under *Bruen*, "the government bears the burden of showing *any* regulation infringing on Second Amendment rights is consistent with this nation's historical tradition of firearm regulation." *United States v. Perez-Garcia*, 96 F.4th 1166, 1175 (9th Cir. 2024); *see also Rahimi*, 144 S. Ct. at 1897 (reiterating the government bears the burden of justifying firearms regulations). The government seeks to meet its burden by relying on historic regulations banning possession of firearms at legislative assemblies, polling places, and courthouses, which it proposes are sufficiently analogous to post offices to show § 930 is consistent with the Nation's history and tradition of firearm regulations. GB at 39-49. The government's proposed analogues are not, however, "relevantly similar." Doc. 57 at 16.

The government fails to recognize that *Bruen* and *Rahimi* require proposed analogues to be similar in both how and why they burden the Second Amendment right—they must address similar concerns as those

38

addressed by § 930 for similar reasons in and similar ways. *Bruen*, 597 U.S. at 29; *Rahimi*, 144 S. Ct. at 1898. Although the government identifies the "why" of § 930—"to protect government officials and citizens alike in buildings where government business [is] conducted"—it fails to examine the "why" or "how" of any of its proposed analogues. GB at 40.[10] In fact, the government does not even provide the language of some of the regulations it relies on, and for others includes such limited excerpts that the scope or purpose of the regulations are unclear.

The failure to provide any historical analysis or justification should itself defeat the government's argument. It is neither Mr. Ayala's nor the Court's burden "to sift the historical materials for evidence to sustain" the government's statute. *Bruen*, 597 U.S. at 60. That is the government's burden. *Id.* As demonstrated by *Heller*, *Bruen*, and *Rahimi*, identifying the "how" and "why" of proposed analogues requires burdensome historic research. Because the government abdicated its responsibility to conduct this research, it should not prevail. Nonetheless, and regardless of this not

---

[10] Mr. Ayala agrees that § 930 was "intended to protect federal employees, witnesses, judges, and others present in places where the business of the federal government is conducted." 134 Cong. Rec. S17360-02, 1988 WL 182529 (Nov. 10, 1988).

39

being his burden, Mr. Ayala provides the required analysis, which shows why none of the proposed regulations are analogous to § 930 as applied.

As an initial matter, the government's proposed "why" of § 930—protecting against gun violence—is a general societal problem that existed since the time of the founding. Although it recognizes postal services predate the founding, it concedes that there were no early regulations that banned firearms at postal buildings and does not identify any regulations that prohibited people from appearing before post masters or persons engaged in the postal business while armed. GB at 46-47.

"[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. And "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26-27. Here, the problem identified by the government (potential interference with postal services at a postal building) lacks a distinctly similar historical regulation. Even if the problem is more broadly identified as interference with government business, the government points to no regulation that generally

40

banned firearms at places where government business was conducted. Instead, it identifies potential historical analogues with limitations as to the time and place firearms could be banned. This is relevant evidence that § 930 is inconsistent with the Second Amendment as applied to Mr. Ayala. Doc. 57 at 12-13.

Moreover, the government identifies a bare handful of proposed historical analogues. The Court should not stake its interpretation of the Second Amendment on such a limited historical record. *Bruen*, 597 U.S. at 65-66; *Heller*, 554 U.S. at 632. Considering the overwhelming indication that firearm possession was not banned in connection with postal services, the Court should conclude that § 930, as applied to Mr. Ayala, violates the Second Amendment. At the very least, the Court should view the limited historical record as evidence suggesting § 930 is unconstitutional as applied.

### i.  *Medieval Era regulations*

As its first proposed analogues, the government relies on two laws from the 1300s. These Middle Age regulations "ha[ve] little bearing on the Second Amendment adopted in 1791." *Bruen*, 597 U.S. at 39. They were enacted nearly 500 years before the Constitution and before handguns even appeared

in Europe. *Id.* They did not even contemplate carrying firearms, but were directed at wearing armor. *Id.* at 41.[11]

Review of the laws also shows their underlying principles are not like § 930. The first, from 1313, stated:

> Whereas of late, before certain Persons deputed to treat upon sundry debates had between us and certain great men of our realm . . . it was accorded, That, in our next Parliament, after, provision shall be made by us and the common assent of the prelates, earls, and barons, that in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall come without all force and armour, well and peaceably, to the honour of us, and the peace of us and our realm; and now, in our next parliament, at Westminster, after the said treaties, the prelates, earls, barons, and the commonalty of our realm there assembled to take advice of this business, have said, That to us it belongeth, and our part is, through our royal seigniory, straitly to defend force of armour, and all other force against our peace, at all times when it shall please us; and to punish them which shall do contrary, according to our laws and usages of our realm . . . .

7 Edw. 2, 170 (1313). The statute was enacted as part of a power struggle between nobles and King Edward II, which involved nobles appearing at parliament in armor or with armed guards. *See generally* Eben Moglen, *Statutes & Royal Ordinances, Edward II* English Legal History and its Materials (last visited Sept. 3, 2024), https://tinyurl.com/5dmrfa2r; *see also*

---

[11] One of the two statutes is "A statute forbidding Bearing of Armour." *A Statute forbidding Bearing of Armour (1313)*, legislation.gov.uk (last visited Aug. 30, 2024), https://tinyurl.com/3zesjk8r.

Kopel, *supra* p. 36, at 211-13. The statute was directed at a specific problem

that arose in Parliament and was not broadly applicable to all government

buildings or businesses. It therefore is much more limited than the broadly-

applying § 930.

The 1313 statute was soon followed by the 1328 Statute of

Northampton, which stated:

> [N]o man great nor small, of what condition soever he be, except
> the king's servants in his presence, and his ministers in executing
> of the king's precepts, or of their office, and such as be in their
> company assisting them, and also [upon a cry made for arms to
> keep the peace, and the same in such places where such acts
> happen,] **be so hardy to come before the King's justices,
> or other of the King's ministers doing their office, with
> force and arms** . . . .

2 Edw. 3, c. 3 (1328) (emphasis added). The King's Ministers were limited

high-ranking officials. Doc. 57 at 20 (citing 5 Edw. 2, c. 14 (1311) (defining

Ministers to include high-ranking officials such as the Chancellor, Chief

Justice of the King's Bench, and Treasurer). This is clear from another

statute, which stated:

> [T]he King's Justices in their presence, Sheriffs, and other
> Ministers [of the King] in their Bailiwicks, Lords of Franchises,
> and their Bailiffs in the same, and Mayors and Bailiffs of Cities
> and Boroughs, within the same Cities and Boroughs, and
> Borough-Holders, Constables, and Wardens of the Peace within
> their Wards.

2 Edw. 3, c. 3 (1328). "Each of these officials appears to have possessed an adjudicative or law enforcement function, often as the King's representative within a certain area." Doc. 57 at 20. The Statute of Northampton did not forbid going armed in front of any person who worked for the King and was much more limited than § 930. *Id.*

Additionally, the Statute of Northampton created a carveout for servants in the King's presence. 2 Edw. 3, c. 3 (1328). This not only distinguished lower-ranking employees of the sovereign from "Ministers," but also indicated that people who worked for the King were not subject to the same disarmament. To the extent that the Statute of Northampton did not apply to people working for the King while they were on duty, it likewise does not support disarming federal employees, like Mr. Ayala, performing their duties.

The Statute of Northampton is also a poor comparator because it did not refer to weapons carried for self-defense, but was concerned with, at most, weapons such as lances. *Bruen*, 597 U.S. at 41-42; *see also* Richard E. Gardiner, *The True Meaning of "Going Armed" in the Statute of Northampton: A response to Patrick J. Charles*, 71 Clev. St. L. Rev. 947, 955 (2023). The government points "to no evidence suggesting the Statute

applied to the smaller medieval weapons that strike [the Supreme Court] as most analogous to modern handguns." *Bruen*, 597 U.S. at 42.

Based on this analysis—which is exactly the type used in *Heller*, *Bruen*, and *Rahimi*—neither medieval statute the government proposes as an analogue is comparable to § 930. They were not directed at weapons carried for self-defense in any and all government buildings or in front of any and all government officials. Because § 930 burdens the right to bear arms "to an extent beyond what was done" historically, it is unconstitutional. *Rahimi*, 144 S. Ct. at 1898.

### ii.    *Colonial and Founding Era regulations*

The government also relies on regulations dating back to the colonial and founding eras that banned bringing firearms to active legislative sessions, courts, and polling places. These are not analogous because they are much more limited in scope than § 930 and do not stand for the broad proposition that firearms could be regulated in connection with any government business at any government building. As *Rahimi* warned, modern regulations that sweep more broadly than their historic counterparts are unconstitutional. *Id.*

One such law is a 1647 Maryland prohibition of persons "com[ing] into the howse of Assembly (whilst the howse is sett) with any weapon upon perill

45

of such fine or censure as the howse shall thinke fit." 1647 Md. Laws 216.
Another is a 1786 Virginia law that barred all but "the Ministers of Justice in
executing the precepts of the Courts of Justice, or in executing their office,"
as well as those "in their company assisting them," from "com[ing] before the
justices of any court, or either of their Ministers of Justice, doing their office,
with force and arms, on pain, to forfeit their armour to the Commonwealth,
and their bodies to prison, at the pleasure of a Court[.]" 1786 Va. Acts 33,
ch.21. And another is a 1776 Delaware constitutional provision relating to
polling places that stated: "[t]o prevent any violence or force being used at
the said elections, no person shall come armed to any of them . . . ." Del.
Const. art. 28 (1776).

Unlike § 930, these laws regulate specific types of buildings or specific
functions. The 1647 Maryland law did not extend beyond active session and
applied only to the building where legislative assemblies occurred. Likewise,
the 1786 Virginia law applied only to appearing before Ministers of Justice
and those assisting them while performing their duties. And the Delaware
constitutional provision was limited to polling places during elections.

These laws did not ban all firearms from all places of government
business, or even all government buildings. The government does not
suggest, and history does not support, a finding that legislative buildings or

46

courthouses were the only type of government building that historically existed. *Cf.* Office of the Historian, *One of the "Six Buildings," Washington September 1800-May 1801* (last visited Sept. 3, 2024), https://tinyurl.com/54jz44e8 (describing other government buildings in 1800); United States General Services Administration, *A timeline of Architecture and Government* (last visited Sept. 3, 2024), https://tinyurl.com/3wnfy2cv (same).

Thus, none of these statutes stand for the principle that all firearms can be banned at all government buildings at all times. At best, the principle derived from these laws was that location-based firearms regulations were permissible to prevent interference or intimidation in connection with ongoing and high-level government decision-making processes. Doc. 57 at 25. It is not that firearms may be banned from any government building where any day-to-day task that does not involve civic rights or governmental decision-making is accomplished. Post offices fall into the latter category, not the former. Because § 930 sweeps more broadly than these statutes, they cannot be considered "relevantly similar." *Rahimi*, 144 S. Ct. at 1898.

The government also relies on laws that are, quite simply, not sensitive places regulations. One is a New York law that provided "[t]hat all elections shall be free and that no person by force of arms nor by malice or menacing

or otherwise presume to disturb or hinder any citizen of this State to make free election upon pain of fine and imprisonment and treble damages to the party grieved." New York Act of Jan. 26, 1787, ch. 1, cl. 9. Rather than barring firearms possession, the law prohibited using weapons for a certain purpose at those locations. Because § 930 bans possession regardless of intent, the laws are not similar, relevantly or otherwise.

Likewise, the government relies on an 1835 decree from the city of Providence, Rhode Island: "No person shall fire any gun . . . in any street or lane, or on any . . . public lands, within said city, after sunrise and before sunset." The Charter and Ordinances of the City of Providence, *An Ordinance in Relation to the Firing of Guns, Pistols and other Fire-arms*, page 60 (1835). This regulation prohibited discharging a weapon during certain times, not carrying weapons, and bears no similarity to § 930.

The government contends this analysis contradicts *Rahimi*, which cautioned that neither *Heller* nor *Bruen* was "meant to suggest a law trapped in amber." GB at 48 (quoting *Rahimi*, 144 S. Ct. at 1897). Both *Bruen* and *Rahimi* emphasized that a "historical twin" was not required. *Bruen*, 597 U.S. at 30; *Rahimi*, 144 S. Ct. at 1898. Instead of requiring identical laws, courts must distill the principles underlying historic arms-bearing

48

regulations and determine if the modern regulation comports with those principles. *Rahimi*, 144 S. Ct. at 1898-99.

To determine those principles, courts must first examine why historic regulations existed and how the regulations burdened the right to bear arms. *Id.* at 1898. As *Bruen* explained:

> [B]ecause "[e]verything is similar in infinite ways to everything else," one needs "some metric enabling the analogizer to assess which similarities are important and which are not[.]" For instance, a green truck and a green hat are relevantly similar if one's metric is "things that are green." They are not relevantly similar if the applicable metric is "things you can wear."

597 U.S. at 29 (internal citations omitted). For the Second Amendment, the metric is whether the modern regulation and proposed analogue burden the right to armed self-defense in the same way and for the same reasons. To evaluate this, courts must discern the reason for the regulation, the degree of the burden on the Second Amendment right, and the means used to impose that burden. *United States v. Connolly*, --- F.4th ---, 2024 WL 3963874, at *5 (5th Cir. 2024) (applying the "how" and "why" test to determine whether a federal statute disarming unlawful drug users was "relevantly similar" to historic laws disarming the mentally ill); *see also Williams*, 2024 WL 3912894, at *7. It is not enough to say, as the government does, that there

49

were regulations in some government buildings then, so all regulations in government buildings now are ok.

This is demonstrated by the level of analysis in *Rahimi* itself. The Supreme Court did not begin and end its analysis by stating historic laws disarming violent individuals existed, so modern laws doing the same are constitutional. And *Rahimi* did not categorically authorize laws that disarm individuals Congress deemed to pose a risk of violence. *Rahimi*, 144 S. Ct. at 1903 (limiting its holding to the conclusion that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment"). Instead, the Court was clear that the statute under review was constitutional as applied because it was similar in scope, reasoning, and process. It stated:

> While we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse, *see Heller*, 554 U.S., at 626, 123 S. Ct. 2783, we note that Section 922(g)(8) applies only once a court has found that the defendant "represents a credible threat to the physical safety" of another. § 922(g)(8)(C)(i). That matches the surety and going armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon.

*Rahimi*, 144 S. Ct. at 1901-02.

To conclude this, the Court analyzed the process, contours, and reasoning behind surety and going-armed regulations and compared them to the facts of the case. As applied, § 922(g)(8) fit within the "tradition of firearm regulation that allowed the government to disarm individuals who present[ed] a credible threat to the physical safety of others." *Id*. at 1902; *see also id*. at 1896-97. This Court should, like the Supreme Court, ensure that the challenged statute, as applied, fits within the Nation's tradition of firearms regulations by examining how and why § 930 and the proposed analogues burden the Second Amendment right. Such an examination reveals that the government's proposed analogues are not "relevantly similar" to § 930.

This Court should also reject the government's attempt to glaze over historical analysis in favor of bringing back the interest-balancing test rejected by *Bruen*. The government argues that "[i]n post offices—as in legislative assemblies, polling places, and courthouses—firearm restrictions reflect Congress's reasoned judgment that the restriction will help to protect government officials and citizens carrying out or participating in government business within the confines of a government building." GB at 45-46. It asserts that "[f]rom a constitutional perspective, no greater need is necessary to justify firearm prohibitions in post offices or any other government

51

building." *Id.* at 46. But the Second Amendment cannot be limited simply because of a strong governmental interest. *Bruen*, 597 U.S. at 17. Whether there is an important governmental interest is irrelevant to the government's burden to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

For this same reason, the government's reliance on *Bonidy v. United States Postal Service*, 790 F.3d 1121 (10th Cir. 2015), is misplaced. In *Bonidy*, the Tenth Circuit conducted no historical analysis because it relied on *Heller*'s dicta to reach a blanket conclusion that all firearms regulations in government buildings are constitutional under the Second Amendment. *Id.* at 1125. Doing so was error. *See supra* p. 27-35.

*Bonidy* was alternatively decided by employing intermediate scrutiny, which was also error. 790 F.3d at 1126. The circuit court reasoned that the regulation under review was "substantially related to the USPS's important interest in creating a safe environment for its patrons and employees." *Id.* at 1127. That is almost exactly what the government argues here by saying Congress deemed the firearm restriction helpful for protecting people in government buildings. GB at 45-46. Under *Bruen*, that analysis is irrelevant. *Bonidy* should have asked only whether the regulation under review—39 C.F.R. § 232.1(*l*)—burdened the Second Amendment for the same reasons

52

and in the same way as historic regulations. 597 U.S. at 29. *Bonidy* is devoid of such an analysis and provides no guidance here.

For these reasons, the government provides no relevantly similar historical analogues justifying § 930's constitutionality as applied to Mr. Ayala. Because the government failed to meet its burden, this Court should affirm the decision of the district court.

## D. The Property Clause does not permit the government to violate the Second Amendment

The government contends the Constitution's Property Clause authorizes it to violate the Second Amendment. GB at 40-46.[12] However, "federal statutes enacted pursuant to the police power vested in Congress by the Property Clause remain subject to constitutional scrutiny." *United States v. Tolmosoff*, No. 6:23-po-187, 2024 WL 1575071, at *8 (E.D. Cal. Apr. 11, 2024) (citing *Metro Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 253 (1991) ("Nor is there merit to petitioners' contention that the Board should nevertheless be immune from scrutiny from constitutional defects because it was created in the course of

---

[12] The Property Clause states: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State." U.S. Const., art. IV, § 3, cl. 2.

Congress' exercise of its power to dispose of federal property under Article IV, § 3, cl. 2.")). Thus, any regulations enacted under the Property Clause that infringe on the Second Amendment must survive the scrutiny prescribed in *Bruen*. *Cf. United States v. Comstock*, 560 U.S. 126, 134-35 (2010) ("[A] federal statute, in addition to being authorized by Art. I, § 8, must also 'not [be] prohibited' by the Constitution.") (citing *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819)); *see also New York v. United States*, 505 U.S. 144, 156 (1992) ("Congress exercises its conferred powers subject to the limitations contained in the Constitution. Thus, for example, under the Commerce Clause Congress may regulate publishers engaged in interstate commerce, but Congress is constrained in the exercise of that power by the First Amendment.").

None of the cases cited by the government hold otherwise or address how the Property Clause interacts with individual rights secured by the Constitution or Bill of Rights. Instead, they predominantly involve federalism and supremacy concerns arising when there may also be state or local rights to property. *See, e.g.*, *United States v. Brown*, 552 F.2d 817, 819-21 (8th Cir. 1977) (asking "whether the United States ha[d] jurisdiction to enforce regulations controlling activities on waters [belonging to Minnesota] within the boundaries of Voyageurs National Park," and concluding that,

even if the state had jurisdiction over those waters, "federal regulations prohibiting hunting in Voyageurs Park were a constitutional exercise of congressional power under the Property Clause."); *Robbins v. United States*, 284 F. 39, 45 (8th Cir. 1922) (concluding the government could regulate traffic on highways, notwithstanding any rights the state had over the land); *United States v. Matherson*, 367 F. Supp. 779, 781 (E.D.N.Y. 1973) (stating Congress can make rules and regulations on government property even with another governmental unit also has authority over the property).

These cases do not allow the government to violate individuals' constitutional rights by way of the Property Clause.[13] Nor do they provide insight as to the analysis required by *Bruen*. Instead, they are wholly irrelevant to this issue in this case, which is whether § 930, as applied to Mr. Ayala, is consistent with the Nation's tradition of firearm regulation.

## E.    The government cannot impose criminal penalties simply because it acted as an employer

The government cannot argue on appeal that § 930 is constitutional as applied to Mr. Ayala on the basis that he was a government employee because

---

[13] It is not clear whether the government argues that because property owners historically had the right to exclude others from their property, so too can the government by enacting § 930. GB at 42. Such an argument would be flawed. The government does not suggest or support the idea that individuals could criminally prosecute others for entering their property.

it waived this argument below. Although the district court instructed the government to address this potential issue, Doc. 26 at 4, the government's sole discussion of it was stating: "Even if *Bruen* left any doubt about firearm prohibitions in post offices or other government buildings as a general matter (it doesn't), Ayala certainly cannot show that the Second Amendment prevents the government from prohibiting its own employees from bringing guns to work," Doc. 32 at 17-18. The government provided no analysis or legal support for this statement.

The district court correctly concluded that "[t]his throw-away line fails to present the issue or develop any argument," and whether Mr. Ayala could be indicted for violating his condition of employment "would comport with the Second Amendment [was] entirely unbriefed . . . ." Doc. 57 at 39. The district court correctly concluded that the issue was (1) irrelevant because "the criminal prosecution is completely divorced from his status as a postal employee," and (2) not sufficiently preserved. *Id.* at 40; *see also United States v. Lopez*, 805 F. App'x 921, 922 (11th Cir. 2020); *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).

The government attempts to solve this problem by stating it was raised in the government's sensitive places argument. GB at 50 (citing Doc. 32 at 16-17). But that argument did not pertain to why the government could

impose criminal sanctions based on its employer status. Instead, it was part of the government's argument that it could regulate firearm possession when it acted as a proprietor. Doc. 32 at 16-17. The district court was, therefore, correct that the government waived this argument.

Regardless, should the Court address this argument on the merits, the government still fails to justify imposing criminal sanctions based on its status as Mr. Ayala's employer. All the cases cited by the government pertain to adverse employment actions, not criminal penalties. *See, e.g.*, *Gercetti v. Ceballos*, 547 U.S. 410, 413 (2006) (addressing "whether the First Amendment protects a government employee from *discipline* based on speech made pursuant to the employee's official duties") (emphasis added); *Waters v. Churchill*, 511 U.S. 661, 664 (1994) (addressing an application of the test for whether speech by a government employee may, consistent with the First Amendment, serve as a basis for discipling or discharging that employee.).[14] This case is not about an adverse employment action by an employer, it is about a criminal indictment by a sovereign. The government provides no support for the proposition that it can indict its employees solely

---

[14] Two cases do not even concern government employees and their relevance is unclear. *Lyng v. NW Indian Cemetery Protective Ass'n*, 485 U.S. 439, 441-42 (1988); *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114 (1981).

based on their status as employees. Certainly, the cases do not say that employees are subject to criminal prosecution in violation of the Second Amendment where ordinary citizens would not be.

The government has repeatedly failed to identify any legal basis for infringing on the Second Amendment through criminal action because it was the criminal defendant's employer. That is because the sole relevant inquiry for a Second Amendment challenge in a criminal prosecution is whether the regulation is consistent with the Nation's tradition of firearms regulations. For reasons described above, § 930, as applied to Mr. Ayala, is not, and this Court should affirm the district court's dismissal of the charge.

## CONCLUSION

The Second Amendment "is *not* a second-class right." *Bruen*, 597 U.S. at 70. The government must be held to its heavy burden of presenting an analogous historical regulation with a sufficiently similar "how" and "why." It failed to do so in front of either this Court or the district court. As a result, Mr. Ayala respectfully requests that this Court affirm the decision of the district court.

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender
Middle District of Florida

*/s/ Laura Jessica Daines*
Laura Jessica Daines, Esq.
Assistant Federal Defender
Florida Bar No. 105060
400 N. Tampa Street, Ste. 2700
Tampa, Florida 33602
Tel: (813) 228-2715
Fax: (813) 228-2562
E-Mail: laura_daines@fd.org
Counsel for Appellee

59

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

In accordance with Fed. R. App. P. 32(g)(1), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this brief contains 12,950 words according to Microsoft Word's word count, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

*/s/ Laura J. Daines*
Laura J. Daines, Esq.
Assistant Federal Defender

**CERTIFICATE OF SERVICE**

I certify that on September 17, 2024, a true copy of this brief was filed using the Court's CM/ECF system, which will send notification to Sean Siekkinen, Assistant United States Attorney.

*/s/ Laura J. Daines*
Laura J. Daines, Esq.
Assistant Federal Defender