No. 24-10462

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

EMMANUEL AYALA,
*Defendant-Appellee.*

On Appeal from the United States District Court
For the Middle District of Florida
Case No. 8:22-CR-369-KKM-AAS-1
Honorable Kathryn Kimball Mizelle

## BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, MINNESOTA GUN OWNERS CAUCUS, SECOND AMENDMENT LAW CENTER, INC., AND THE SECOND AMENDMENT FOUNDATION IN SUPPORT OF APPELLEE AND AFFIRMANCE

C. D. Michel
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

*Counsel for Amici Curiae*

September 23, 2024

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed entities as described in 11th Cir. R. 26.1.-2(a) have an interest in the outcome of this case.

1. California Rifle & Pistol Association

2. Minnesota Gun Owners Caucus

3. Second Amendment Law Center

4. Second Amendment Foundation

Date: September 23, 2024          **MICHEL & ASSOCIATES, P.C.**

/s/ C.D. Michel
C.D. Michel
*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for amici curiae certify that California Rifle & Pistol Association, Incorporated, Minnesota Gun Owners Caucus, Second Amendment Law Center, Inc., and The Second Amendment Foundation are nonprofit organizations and thus have no parent corporations and no stock.

Date: September 23, 2024                    MICHEL & ASSOCIATES, P.C.

                                            /s/ C.D. Michel
                                            C.D. Michel
                                            *Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons.............................................................i

Corporate Disclosure Statement ..............................................................ii

Table of Contents....................................................................................iii

Table of Authorities ................................................................................v

Interest of Amici Curiae .........................................................................1

Introduction ............................................................................................2

Argument ................................................................................................4

I.      The Proper Application of *Bruen* in the Sensitive Places Context. .......................4

        A.      Historical analysis under the Second Amendment. ....................................4

        B.      Sensitive places are narrowly defined under Bruen. ....................................5

        C.      The government acting as a proprietor does not mean it can opt to eliminate the right to carry in a particular place. ...........................................7

        D.      The government acting as an employer is able to impose job-related restrictions on carry, but that is not what it purports to do Appellee in this instance....................................................................................9

II.     *Rahimi* Further Confirms and Clarifies the Bruen Methodology and Demonstrates the Weaknss in the Government's Claimed Historical Analogues. ...............................................................................................13

        A.      The claimed historical tradition must be anchored in the Founding era, but the Government has presented no Founding-era laws to justify § 930(a). ....................................................................................14

        B.      Modern regulations cannot deviate from the principles underlying historical precursors, as the Government's proffered analogues do .......17

1.      *Rahimi* explains the necessary degree of fit between a modern law and proposed historical analogues........................................................17

2.    History supports restricting carry in places where the business of governing is conducted, but stretching that to encompass regular post offices does not meet the degree of fit Rahimi requires. ............................................................... 19

C.    "Dangerous" is *Rahimi's* North Star when it comes to the standard for disarmament, but the Government has not shown that Mr. Ayala is dangerous ......................................................................................................... 7

Conclusion ............................................................................................................. 24

Certificate of Service ............................................................................................ 25

Certificate of Compliance ..................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*B&L Productions, Inc. v. Bonta,*
  *2023 WL 7132054 (C.D. Cal. Oct. 30, 2023)* ....................................................9

*Bonidy v. United States Postal Serv.,*
  790 F.3d 1121 (10th Cir. 2015) ................................................ 7, 10, 11, 12

*District of Columbia v. Heller.,*
  *554 U.S. 570 (2008)* ..........................................................4, 5, 15, 19,

*Drummond v. Robinson Twp.,*
  *9 F.4th 217 (3d Cir. 2021)* .........................................................................5

*Erlinger v. United States*
  *__, 144 S. Ct. 1840 (2024)* .....................................................................16

*Firearems Policy Coalition, Inc., et al. v. Garland,*
  *4:24-cv-565 (2024)* .................................................................................2

*Hunter v. Cortland Housing Authority,*
  *2024 WL 340775 (N.D.N.Y. Jan. 30, 2024)* .................................................9

*Koons v. Platkin,*
  673 F. Supp. 3d 515 (D.N.J. 2023) ........................................................ 7, 24

*May v. Bonta,*
  No. SACV2301696-CJC(ADSx) 2023
  WL 8946212 (C.D. Cal. Dec. 20, 2023).................................................. 2, 24

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
  597 U.S. 1 (2022)..............................................................................*passim*

*Nguyen v. Bonta*
  *No. 320CV02470WQHMMP, 2024 WL 1057241,*
  *(S.D. Cal. Mar. 11, 2024)* ........................................................................19

*Schoenthal v. Raoul,*
  *No. 3:22-CV-50326, 2024 WL 4007792,*
  *(N.D. Ill. Aug. 30, 2024)*..........................................................................8

*United States v. Ayala,*
   *No. 8:22-CR-369-KKM-AAS, 2024 WL 132624,*
   *(M.D. Fla. Jan. 12, 2024)* ...................................................................*passim*

*United States v. Dorosan*
   *350 Fed. App'x 874 (5th Cir. 2009)* ...............................................10, 11, 12

*United States v. Kokinda,*
   497 U.S. 720 (1990) ......................................................................................8

*United States v. Perez-Garcia,*
   *96 F.4th 1166 (9th Cir. 2024)* ....................................................................19

*United States v. Rahimi,*
   *144 S. Ct. 1889 (2024),* ......................................................................*passim*

*Wolford v. Lopez,*
   *No. 23-16164, 2024 WL 4097462,*
   *(9th Cir. Sept. 6, 2024)* .........................................................................2, 24

## Regulations

37 Fed. Reg. 24346-47 ....................................................................................11

39 C.F.R. § 232.1(*l*) (2024) .............................................................................11

39 C.F.R. § 232.6(*l*) ........................................................................................11

Fla. Stat. § 790.0612(a) (2024 .......................................................................13

## Other Authorities

*BCA Releases 2021 Permit to Carry Annual Report, Data Provided to BCA by Minnesota Law Enforcement Agencies,* Minn. Dep't of Pub. Safety (Mar. 1, 2022),
https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-Releases-2021-
Permit-to-Carry-Annual-Report.aspx (last visited September 15, 2024)...................23

*Department of Justice Concealed Carry Annual Report–175.60(19)–January 1 – December 31, 2022,* at 1-2, Wisc. Dep't of Just.,
https://www.doj.state.wi.us/sites/default/files/dles/ccw/2022%20Annual%20CC
W%20Statistical%20Report.pdf (last visited September 15, 2024). ..........................23

*See Active License/Certified Instructor Counts as of December 31, 2020*, Tex. Dep't of Pub. Safety, https://www.dps.texas.gov/sites/ default/files/documents/rsd/ltc/reports/actlicandinstr/activelicandinstr2020.pdf (last visited September 15, 2024)......................................................................22

*See* An Act to Prevent Pernicious Political Activities (Hatch Act), Pub. L. 76-252, 53 Stat. 424...........................................................................................................13

*See Concealed Weapon or Firearm License Summary Report Oct. 1, 1987- Aug. 31, 2024*, at 1, Fla. Dep't of Agric. & Consumer Servs., Div. of Licensing (June 30, 2023), https://ccmedia.fdacs.gov/content/download/7499/file/cw_monthly.pdf (last visited September 15, 2024). ...............................................................................23

*See Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2020 – 12/31/2020*, at 5, Tex. Dep't of Pub. Safety (Feb. 11, 2021), https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/convic tionratesreport2020.pdf (last visited September 15, 2024 ...........................................23

*See* Heather Shelton, *Throwback Thursday: Postal workers start packing pistols in 1961***,** Times-Standard (Eureka, Cal.) (February 18, 2020), https://www.times-standard.com/2018/09/27/throwback-thursday-postal-workers-start-packing-pistols-in-1961/ (last visited September 15, 2024). .........................................................21

*See Texas: 2020 Census, Texas Added Almost 4 Million People in Last Decade*, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html......................................22

*See* United States Postal Service, *First U.S. Post Offices by State*, (September 2019), https://about.usps.com/who-we-are/postal-history/first-post-offices.pdf (last visited September 13, 2024) ..........................................................................16

*The "Sensitive Places" Doctrine,* 13 Charleston L. Rev. 205, 229-36, 244-47 (2018)). .........................................................6

## INTEREST OF AMICI CURIAE[1]

Founded in 1875, California Rifle and Pistol Association, Incorporated, is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. In service of its mission to preserve the constitutional and statutory rights of gun ownership, California Rifle and Pistol Association regularly participates as a party or amicus in firearm-related litigation.

Minnesota Gun Owners Caucus ("MGOC") is a 501(c)(4) non-profit organization incorporated under the laws of Minnesota with its principal place of business in Shoreview, Minnesota. MGOC seeks to protect and promote the right of citizens to keep and bear arms for all lawful purposes. MGOC serves its members and the public through advocacy, education, elections, legislation, and legal action. MGOC's members reside both within and outside Minnesota.

Second Amendment Law Center, Inc. is a nonprofit corporation headquartered in Henderson, Nevada. Second Amendment Law Center is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States.

The Second Amendment Foundation is a non-profit membership organization founded in 1974 with over 720,000 members and supporters in every state of the union. Its purposes include education, research, publishing, and legal action focusing

---

[1] The parties have given their consent to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

1

on the constitutional right to keep and bear arms. Relevant to this case, The Second Amendment Foundation is a plaintiff in a civil case challenging the ban on carrying in post offices, *Firearms Policy Coalition, Inc., et al. v. Garland*, proceeding in the United States District Court for the Northern District of Texas, case no. 4:24-cv-565.

Together, Amici California Rifle & Pistol Association and the Second Amendment Foundation are also associational plaintiffs in a case challenging California's new "*Bruen* response" law which declared every public place, save for some streets and sidewalks, "sensitive" and thus off-limits to carry, even for those with a concealed handgun license. *See May v. Bonta*, No. SACV2301696-CJC(ADSx), 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023); *see also Wolford v. Lopez*, No. 23-16164, 2024 WL 4097462 (9th Cir. Sept. 6, 2024). Due to their extensive prior litigation and briefing on this topic, Amici's perspective on the application of the sensitive places doctrine may be useful to this Court as it considers this appeal.

## INTRODUCTION

In an era of an expansive federal government that has grown far beyond what the founding generation ever imagined, one agency that would still be familiar to the founders is the United States Postal Service. Congress was expressly authorized by the constitution to create offices, U.S. Const. art. I, § 8, cl. 7, and Congress exercised that power in the Founding era to create the service. Yet not one law was enacted that banned firearm possession in post offices by members of the public until the late-20th century. As to the peaceable carry of firearms for self-defense, that should be the end of the matter under the *Bruen* analysis, as the only relevant historical tradition pertains to banning firearms in places where the *deliberative* business of government is

conducted.

The district court, therefore, got the analysis exactly right and should be affirmed. Since the district court's ruling, however, the Supreme Court has issued its latest Second Amendment ruling, *United States v. Rahimi*. This brief will explain why *Rahimi* does not change the result here. And while the Appellant may attempt to frame the analysis as one of the dire consequence of permitting postal employees to carry firearm at their place of work, that characterization does not save the Appellant. Appellant has provided no evidence of a historical tradition of criminally disarming federal employees in the same manner it has failed to show a tradition of banning arms from postal facilities. As a result, the law, as the district court correctly concluded, is unconstitutional as applied to post offices, regardless of whether Mr. Ayala is an employee or not.

Finally, while *Bruen* forbids interest-balancing analyses, the government has raised the argument of safety to justify its law. Amici will present data demonstrating that those with CCW permits, like Mr. Ayala, are overwhelmingly law-abiding compared to the general population.

3

# ARGUMENT

## I. THE PROPER APPLICATION OF *BRUEN* IN THE SENSITIVE PLACES CONTEXT.

### A. Historical analysis under the Second Amendment.

In 2022, the Supreme Court reaffirmed the "original public meaning test" of *District of Columbia v. Heller*, 554 U.S. 570 (2008), for analyzing Second Amendment challenges. Applying it, the Court found that the Second Amendment protects the right to armed self-defense in public. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 19, 31-33 (2022). *Bruen* reiterated that courts may not engage in any form of "intermediate scrutiny" or "strict scrutiny" in Second Amendment cases. *Id.* at 23. The proper test is:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Bruen*, 597 U.S. at 24. The burden that the Second Amendment imposes is "the *government must demonstrate* that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17 (emphasis added); *see also id.* at 19, 24, 58 n.25, 59 & 70.

Moreover, the government cannot simply proffer just any historical law that references firearms. Rather, when challenged laws regulate conduct or circumstances that already existed at the time of the Founding, the absence of widespread historical laws restricting that same conduct or circumstances suggests that the Founders understood the Second Amendment to preclude such regulation. *Id.* at 27. In contrast,

uniquely modern circumstances that did not exist at the time of the Founding call for an analogical analysis, based on the government's proffered historical record. *Id.* at 28-29.

Outlier statutes do not satisfy the requirement. A law must be a "well-established and representative historical analogue." *Id.* at 30. Courts may not uphold a modern law just because a few similar laws may be found from the past. *Id.* Doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Id.* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)).

For example, in *Bruen*, New York presented three laws from the Colonial Era, three turn-of-the-18th-century laws, three 19th-century laws, and five late-19th-century regulations from the Western Territories. *Bruen*, 597 U.S. at 37-70. The Court found them to be outliers insufficient to uphold New York's law, and emphasized, as it had in *Heller*, that it would not stake its interpretation of the Second Amendment upon historical outliers that contradict the overwhelming weight of other evidence about the right to bear arms in public for self-defense. *Id.* at 65.

### B. Sensitive places are narrowly defined under *Bruen*.

As to whether there are any special locations where the right to bear arms might be restricted without infringing Second Amendment rights, the Court explained that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Bruen*, 597 U.S. at 30. And:

> expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly . . . [and] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*Id.* at 31. "[T]here is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.*

Indeed, sensitive places are intended to be the rare *exception* to the general right to public carry. Using the historical record, the Court acknowledged only three types of places where it suspected firearm carry might presumptively be foreclosed: legislative assemblies, polling places, and courthouses. *Id.* (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018)). Beyond that, the Court identified no other well-represented examples that would obviously and facially meet *Bruen*'s test.

Government-provided security, while not dispositive of whether a place is actually sensitive, at least evidences the government's honest belief that it is. By contrast, when the government declares a place a "gun-free zone" but provides no security of its own, it both effectively admits it does not truly consider that place sensitive but nonetheless removes the effective means of self-defense from law-abiding citizens in that space. As the Kopel & Greenlee article cited approvingly in *Bruen* explains:

> The government's behavior can demonstrate the true importance of the alleged government interest…when a building, such as a courthouse, is protected by metal detectors and guards, the government shows the seriousness of the government's belief that the building is sensitive. . . . Conversely, when the government provides no security at all—such as in a **Post Office or its parking lot**—the government's behavior shows that the location is probably not sensitive. . . .

Kopel & Greenlee, *supra*, at 290 (bold added). So it is with § 930(a). It declares the nation's over 30,000 post offices completely off limits to the right of armed self-

6

defense, but most of those locations have no security to speak of, with anyone being able to enter during business hours.

To be sure, some government facilities may be confirmed to be genuinely sensitive after historical analysis. As one partial dissenting opinion that has been vindicated by *Bruen* explained, "[t]he White House lawn, although not a building, is just as sensitive as the White House itself" but, "[a]t the spectrum's other end[,] we might find a public park associated with no particular sensitive government interests– or a post office parking lot surrounding a run-of-the-mill post office." *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1137 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part). But as Judge Tymkovich implies in that excerpt, there is nothing sensitive about a "run-of-the-mill post office." *Id.*

### C. The government acting as a proprietor does not mean it can opt to eliminate the right to carry in a particular place.

In its brief, the Government argues that it has "more flexibility to regulate when it is acting as a proprietor." Principal Brief of the United States ("US.Br."), at 29. It cites only pre-*Bruen* case law in support. That's because every court to consider the "government as proprietor" argument has rejected it as insufficient on its own to make a place sensitive under *Bruen*.

"While it is certainly true that 'the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers . . . [just] as a private individual' may, the State is not *exempt* from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property." *Koons v. Platkin,* 673 F. Supp. 3d 515, 601 (D.N.J.

7

2023), (citations omitted); *see also United States v. Kokinda*, 497 U.S. 720, 725 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business"). A district court in Hawaii explained the ramifications of what an expansive reading of the "government as proprietor" argument would entail:

> If the government's capacity to act as a proprietor was a determinative factor in the first step of the analysis, then the fundamental right of public carry – as expressed fully in *Bruen* – would be jeopardized. Indeed, under such a theory, an argument could be made that the government possesses the unfettered power to restrict public carrying of firearms in many – if not most – public places because it has a proprietary interest in those areas.

*Wolford*, 686 F. Supp. at 1062, *aff'd in part, rev'd in part*, No. 23-16164, 2024 WL 4097462 (9th Cir. Sept. 6, 2024). Another district court recently agreed, rejecting the "government as proprietor" argument as "breathtaking, jawdropping, and eyepopping" in the context of a ban on carrying firearms on public transportation. *Schoenthal v. Raoul*, No. 3:22-CV-50326, 2024 WL 4007792, at *5 (N.D. Ill. Aug. 30, 2024). "Although the right to exclude—including the right to exclude those bearing arms—may be a fundamental aspect of private property ownership, likely undiminished by the Second Amendment . . . it doesn't necessarily follow that when a *government* like Illinois (through its transit agencies) act as a proprietor, the ban on arms bearing doesn't implicate Plaintiffs' rights under the Second Amendment. The constitutional protection afforded to other individual rights isn't nullified on public property." *Id.* at *6 (citations omitted).

8

As the district court noted correctly, allowing the government to ban firearm carry everywhere it acts as a proprietor would "abridge the right to bear arms by regulating it into practical non-existence." *United States v. Ayala*, No. 8:22-CR-369-KKM-AAS, 2024 WL 132624, at *15 (M.D. Fla. Jan. 12, 2024). Besides the cases already cited above, several others support the district court in this conclusion. *See, e.g., Hunter v. Cortland Housing Authority,* 2024 WL 340775, at *11 (N.D.N.Y. Jan. 30, 2024) (enjoining a New York public housing authority that banned its tenants from keeping handguns in their homes); *B&L Productions, Inc. v. Bonta*, 2023 WL 7132054, at *15 (C.D. Cal. Oct. 30, 2023) (government-operated fairgrounds are not a sensitive place), *reversed on other grounds*, 104 F.4th 108 (9th Cir. 2024). This Court should affirm.

### D. The government acting as an employer is able to impose job-related restrictions on carry, but that is not what it purports to do Appellee in this instance.

The Government also attempts to frame the issue on appeal as "[t]he district court wrongly held that the Second Amendment prevents the government from prohibiting *postal employees from bringing firearms into post offices where they work*." US.Br. 11 (emphasis added). But that's not what the district court decided.

Mr. Ayala was charged with violation of a carry prohibition applicable to anyone in a post office, regardless of their employment status with the Government. *See* 18 U.S.C. § 930(a). The Appellant argues that this fact potentially dooms Mr. Ayala's as-applied challenge, because it argues that 18 U.S.C. § 930(a), as applied to Mr. Ayala the postal worker solely in the context of the Government's role as his employer, does pass muster under the Second Amendment. US.Br. 37. Yet, to be able

to claim that there is a historical tradition of the Government, as an employer, regulating the carry of firearms by federal employees during the relevant analogical period, the Government still has the burden to present a historical tradition of such laws. *See Bruen*, 597 U.S. at 24.

But it has failed to do so. Instead, the Government cites an "administrative *support manual*" of unknown age and provenance prohibiting postal employees from carrying firearms. US.Br. 37-38 (citing *Postal Service Administrative Support Manual*, Section 276.22.). The Government does not explain how such a support manual relates to a historical tradition of regulating federal employee carry from the Founding era, or otherwise to explain to this Court why such a manual isn't anything more than a contractual agreement between an employer and employee – enforceable in a civil court – similar to a private employer's "employee handbook." Even the Government concedes this manual is not remotely sufficient to fulfill its analogical burden. *Id.* at 38.

The Government then relies upon a "not for publication" case, *United States v. Dorosan*, 350 Fed. App'x 874 (5th Cir. 2009) (per curiam)[2], and *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015)[3]. In the unpublished *Dorosan* decision, the Fifth Circuit upheld the criminal conviction of a postal worker based on a 1972 Postal Service regulatory ban against possessing a handgun on Postal Service property. *See id.* Predating *Bruen*, the *Dorosan* ruling had no reason to conduct the now-required

---

[2] *Cert. denied*, 559 U.S. 983.

[3] *Cert. denied*, 136 S. Ct. 1486.

analogical analysis of whether there was a historical tradition of allowing such a ban. *Dorosan*, 350 Fed. App'x at 875-76.

The Fifth Circuit's broad and conclusory analysis did not examine the provenance of the regulation at issue – 39 C.F.R. § 232.1(*l*) (2024) – for had it understood at that time it had an obligation to conduct such an examination, the panel would have discovered that the regulation at issue was no historical tradition at all, but was first enacted at least 100 years after what is now the relevant analogical period for determining whether it was part of historical a tradition. *See Bruen,* 597 U.S. at 27; *and see Rules and Regulations*, U.S. Postal Serv., 37 Fed. Reg. 24346-47 (Nov. 16, 1972 publication notice of a firearms ban on Postal Service property as part of then-39 C.F.R. § 232.6(*l*)). Thus, *Dorosan*, like the Government here, did not identify any other laws or regulations during the Founding era evidencing a tradition of such bans analogous to the Postal Service regulation at issue.[4]

*Bonidy* is no more helpful to the Government's claim. Like *Dorosan*, it is a pre-*Bruen* decision regarding a challenge to a criminal conviction under the same 1972 regulation. *Bonidy*, 790 F.3d at 1125. Thus, like *Dorosan*, *Bonidy* makes no attempt to analyze whether there are any historical laws or analogues supporting the regulation as being part of a Second Amendment tradition of imposing such bans on federal employees generally or postal workers specifically. Straying further from the proper

---

[4] The *Dorosan* holding also relied on the "government as proprietor" argument as an additional reason to uphold the conviction; an argument which, for the reasons cited in Part I.C., *supra*, has not been persuasive in post-*Bruen* decisions and should not be persuasive here.

analysis than *Dorosan*, *Bonidy* also justifies its holding by employing the intermediate scrutiny "means-ends" analysis expressly rejected in *Bruen*. *See Bonidy*, 790 F.3d at 1126; and see *Bruen*, 597 U.S. at 23-24; *see also* Discussion, Part II., *supra* (discussing how *Rahimi* reaffirmed *Bruen*'s one-step analysis).

If the Government had mustered some evidence of a Founding-era tradition of the federal government prohibiting its employees from armed carry, then its attempt to pigeonhole Appellee's case as such a challenge rather than a challenge to a law of general applicability might carry weight. If they existed, some sort of Founding-era regulations prohibiting postal workers from delivering mail on horseback while armed, or laws preventing a customs agent from being armed while in the customs house, should have been presented to the district court. They were not because they do not exist, underscoring that, however the Government attempts to frame the prohibited behavior, it still cannot present the historical evidence it is obligated to provide in order to prevail.

Finally, the Government attempts to argue that a tradition of statutory and case law evidencing a diminished expectation of other constitutional protections for federal employees relieves it of its burden to provide the necessary historical evidence. *See* US.Br. 39-40. Yet, even the Government admits that all but one of its examples of such precedents merely imposed non-criminal workplace consequences on federal employees. *See* US.Br. 40. And the one statute the Government cites imposing criminal liability on a federal employee was enacted in 1939 to address political activity by federal employees, not the Second Amendment rights of federal employees. *See* An

12

Act to Prevent Pernicious Political Activities (Hatch Act), Pub. L. 76-252, 53 Stat. 424.[5]

In presenting a lone statute, enacted in the 20th century, which does not regulate employee firearm carry in any way, the Government essentially concedes there is no tradition of laws from the relevant analogical period evidencing a lessened expectation of Second Amendment protection for federal employees. *Bruen*, 597 U.S. at 24. The government's attempt to claim the statute is valid as to Mr. Ayala the postal worker therefore fails.

## II. *RAHIMI* FURTHER CONFIRMS AND CLARIFIES THE *BRUEN* METHODOLOGY AND DEMONSTRATES THE WEAKNESS IN THE GOVERNMENT'S CLAIMED HISTORICAL ANALOGUES.

With *Rahimi*, the Supreme Court reiterated the one-step historical test that *Bruen* demands: "In *Bruen*, we explained that when a firearm regulation is challenged under the Second Amendment, the Government must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation.' " *United States v. Rahimi,* 144 S. Ct. 1889, 1896 (2024) (citing *Bruen*, 597 U.S. at 24). While government defendants need not hunt for identical historical laws, "why and how the [challenged] regulation burdens the right are central to this inquiry." *Id.* at 1898. Moreover, when

---

[5]  The Appellant also fails to adduce any evidence of a historical tradition of *any* employer – government or private – being able to have their employees arrested for licensed carry at work. In fact, under the Florida state law applicable where Mr. Ayala was arrested, private employers cannot have their employees arrested for licensed carry at work. *See, e.g.*, Fla. Stat. § 790.0612(a) (2024). At most, an employer can demand the armed employee leave the employer's premises and, only if that fails, have them arrested for trespass. *See id.*, § 810.08(c) (2024).  Any other remedy to the employer would be civil or contractual in nature, i.e., workplace discipline or termination from employment.

assessing historical enactments to determine if they substantiate a historical tradition, courts must be vigilant to not give the government the blank check *Bruen* forbade. Indeed, "green trucks" and "green hats" are analogous only when the relevant metric is "things that are green." *Bruen*, 597 U.S. at 29. As Justice Gorsuch put it, "[c]ourts must proceed with care in making comparisons to historic firearms regulations, or else they risk gaming away an individual right the people expressly preserved for themselves in the Constitution's text." *Rahimi*, 144 S. Ct. at 1908 (Gorsuch, J., concurring).

In reaching its ruling in *Rahimi*, the Supreme Court observed several analytical principles relevant to this case that Appellees discuss here in turn.

### A. The claimed historical tradition must be anchored in the Founding era, but the Government has presented no Founding-era laws to justify § 930(a).

In *Rahimi*, the Court declined to explicitly settle the "ongoing scholarly debate" over whether post-Founding historical laws—particularly from the Reconstruction Era—were relevant to the historical analysis. 144 S. Ct. at 1898 n.1 (citing *Bruen*, 597 U.S. at 37). Even so, the majority's analysis, citing and relying on Founding-era laws and later regulations mirroring Founding-era laws, effectively settled the debate. The Court relied on two types of Founding-era laws: sureties and prohibitions on "going armed in terror of the people." *See id.* at 1900-01 (citing a 1795 Massachusetts surety law, laws from four states and colonies prohibiting "going armed" and affrays (in 1741, 1761, 1786, and 1795), the common law, and Blackstone).

Pre-Founding and post-Founding history of similar laws can only confirm a historical tradition that existed in the Founding era. As the Court noted in *Rahimi*, this

additional history resembled Founding-era tradition. *See id.* (noting that, besides the 1795 Massachusetts surety law, nine other jurisdictions enacted the same, including several in the 19th century). But that anchoring to Founding-era laws was critical, as the Court and several concurrences repeatedly suggest:

- "[I]f laws *at the founding* regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* at 1898 (emphasis added).

- "[W]e seek to honor the fact that the Second Amendment 'codified a *pre-existing* right' belonging to the American people, one that carries the same 'scope' today that it was 'understood to have *when the people adopted' it.*" *Id.* at 1907 (Gorsuch, J., concurring) (emphasis added) (quoting *Heller*, 554 U.S. at 592).

- "[P]re-ratification English law and practices may supply background for some constitutional provisions. But the Constitution, including the Bill of Rights, did not purport to take English law or history wholesale and silently download it into the U.S. Constitution." *Id.* at 1915 n.3 (Kavanaugh, J., concurring).

- "[T]he history that matters most is the *history surrounding the ratification of the text*; that backdrop illuminates the meaning of the enacted law. History (or tradition) that long postdates ratification does not serve that function ... evidence of 'tradition' *unmoored from original meaning* is not binding law." *Id.* at 1925 (Barrett, J., concurring) (emphasis added).

15

Contrary to *Rahimi*'s reliance on Founding-era laws,[6] Appellant has presented no laws restricting the peaceable carry of firearms in post offices prior to 1800, or even prior to 1900 for that matter. Post offices certainly existed at the time, with several being established before the founding, and more opening up in the 1790s and the early 19th century. *See* United States Postal Service, *First U.S. Post Offices by State*, (September 2019), https://about.usps.com/who-we-are/postal-history/first-post-offices.pdf (last visited September 13, 2024). To be sure, the Government argues that dedicated postal buildings were much rarer at the time. US.Br. 34. But it's not as if Congress rushed to pass laws restricting carry when post office locations proliferated in the early-to-mid 19th century. No such law would come until the latter part of the 20th century, well after any even remotely relevant time period. *See* Discussion, Part I.D., *supra* (the Appellant has presented only a 1972 postal regulation as evidence of a historical tradition of banning carry at post offices, and no evidence of a historical tradition of banning carry by postal workers or otherwise circumscribing their Second Amendment rights in their role as employees).

Because post offices existed at the Founding without carry being restricted within them, the Government cannot meet its historical burden.

---

[6] In a decision decided on the same day as *Rahimi*, the Supreme Court rejected the argument that procedures employed by a few states "in the early 19th century" could inform the original meaning of the Fifth and Sixth Amendments. *See Erlinger v. United States*, __ U.S. __, 144 S. Ct. 1840, 1857 (2024).

**B.    Modern regulations cannot deviate from the principles underlying historical precursors, as the Government's proffered analogues do.**

**1.    *Rahimi* explains the necessary degree of fit between a modern law and proposed historical analogues.**

In *Rahimi*, the U.S. Supreme Court explained the "level of generality" applicable to comparisons between modern laws and purported historical precursors. 144 S. Ct. at 1926 (Barrett, J., concurring). The Court noted that historical regulations often reflect an overarching "principle" with which modern regulations must comport. *Id.* at 1898. But the Court recognized that the guiding "principles that underpin our regulatory tradition," *id.*, cannot be described so amorphously (*e.g.*, "preventing gun violence") as to countenance disparate modern regulations. In other words, there must be a strong degree of fit between the historical analogues establishing a principle and the modern law implementing it.

For instance, in *Rahimi*, the Court examined the fit between 18 U.S.C. § 922(g)(8)(C)(i) and historical surety laws and restrictions on "going armed in terror of the people." 144 S. Ct. at 1989-1901. Historical surety laws allowed anyone, including abused spouses, to appear before a judge or magistrate and demand the person threatening violence (or who committed violence) pay a bond and, if they were violent again, forfeit that bond. *Id.* If the accused failed to post the bond, they could be jailed for up to six months. *Id.* at 1899-1900. Meanwhile, the "going armed" and affray laws applied to those who carried arms in a way intentionally meant to terrify people, even if no actual violence occurred. *Id.*

Section 922(g)(8)(C)(i) allows the disarmament of alleged domestic abusers, after a hearing, if a court makes a finding of dangerousness. "Like the surety and

17

going armed laws, [it] applies to individuals found to threaten the physical safety of another." *Id.* at 1901. Also important was that neither § 922(g)(8)(C)(i) nor the historical analogues "broadly restrict arms use by the public generally." *Id.* Instead, they applied to specific individuals, and even then, only when there had been a "judicial determination[] of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* The surety bonds were also of limited duration, just like the § 922(g)(8) restriction. *Id.* at 1902. "Finally, the penalty— another relevant aspect of the burden—also fits within the regulatory tradition. The going armed laws provided for imprisonment … and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.*

The surety, going armed, and affray laws cited in *Rahimi* were of the same "genre" of regulation aimed at dealing with armed people, on an individual basis, who have demonstrated their propensity for dangerousness. Indeed, the *Rahimi* majority ignored the government's offer of laws regulating the "unsafe storage of guns or gunpowder" altogether. It declined to suggest that generally applicable regulations on the storage of firearms or powder ("how") to prevent fires or injuries to the public ("why") were analogous to § 922(g)(8) or other laws restricting carry by individuals found to be dangerous ("how") to prevent those individuals from harming others ("why"). *See* Brief for Appellant at 23, *Rahimi*, 144 S. Ct. 1889 (2024) (No. 22-915). The fact that the laws commonly restrict the exercise of the right ("how") to promote a public safety purpose ("why") is too general of a comparison to be sufficiently

analogical. That would have been like comparing "things that are green" as the Court had warned against in *Bruen*, 597 U.S. at 29.

*Rahimi*'s rejection of such a level of generality wasn't just implicit. "Courts must proceed with care in making comparisons to historic firearms regulations, or else they risk gaming away an individual right the people expressly preserved for themselves in the Constitution's text." 144 S. Ct. at 1908 (Gorsuch, J., concurring); *see also Id.* at 1923-24 and 1926 (Justices Kavanaugh and Barrett making similar comments).

> **2.    History supports restricting carry in places where the business of governing is conducted, but stretching that to encompass regular post offices does not meet the degree of fit *Rahimi* requires.**

Lacking any Founding-era history to save § 930(a), the Government instead claims run-of-the-mill post offices are analogues to legislative assemblies, polling places, and courthouses, which the Supreme Court stated in dicta[7] are sensitive places. It also harkens back to earlier history with an English law from 1313 forbidding the carrying of arms into parliament. US.Br. 27. But § 930(a) bears no resemblance to

---

[7] Appellant argues that under this Court's precedent, the "presumptively lawful" list of firearms restrictions in *Heller* are either not dicta, or are entitled to considerable weight if they are dicta. US.Br. 18. It is immaterial. Even if the language were not dicta, "presumptively lawful" does not mean the same thing as "lawful." Presumptions can be rebutted, and the government must still show that its restriction comports with historical tradition. *See Nguyen v. Bonta*, No. 320CV02470WQHMMP, 2024 WL 1057241, at *6 (S.D. Cal. Mar. 11, 2024) (rejecting California's argument that a firearm purchase regulation was "presumptively lawful", because "historical analysis is needed to determine whether any particular regulation…is 'longstanding' under *Bruen*.); *see also United States v. Perez-Garcia,* 96 F.4th 1166, 1175 (9th Cir. 2024) ("the government bears the burden of showing that *any* regulation infringing on Second Amendment rights is consistent with this nation's historical tradition of firearm regulation.").

those restrictions as it is applied here. A post office is not a courthouse, congress, or parliament, and the only thing it has in common with those places is that all are run by the government. Rather, the shared "principle that underpin[s] our regulatory tradition" (*Rahimi,* 144 S. Ct. at 1898) would be a limitation on arms *where the deliberative business of governance is conducted.* That is what legislative assemblies, polling places, and courthouses all have in common under *Rahimi*'s approach, and what regular post offices do not. The district court was thus correct to conclude that these analogues only demonstrate that "governments may restrict firearms possession in places where important and legally definitive governmental decisions are regularly made." *Ayala*, 2024 WL 132624, at *9.

The Government seems to understand this distinction, because it incorrectly claims that no court other than the district court "has held that the government may not restrict firearms in a government building." US.Br. 18. That statement is true only if the definition of "government building" is limited to legislative assemblies, polling places, and courthouses where the *business of governance* happens. If the Appellant's definition properly includes *any* building or property operated by the government, then many courts have rejected the Appellant's argument. *See* Part I.C., *supra* (citing several cases rejecting the notion that the government being a proprietor allows it to ban carry).

Appellant further complains that the district court was "laser focus[ed] on post offices, largely to the exclusion of all other government premises." US.Br. 36. But "[e]ven if the lack of a distinctly similar historical regulation was not dispositive, the United States has offered *no* relevant historical analogues." *Ayala*, 2024 WL 132624, at

*2 (emphasis added). The government failed to present any examples of other similarly mundane government-owned businesses akin to post offices in the 18th or 19th century where carry was banned. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen,* 597 U.S. at 26. Post offices have existed since the Founding, as have people carrying firearms, but the only bans on carry at post offices are recent.

### C.   "Dangerousness" is *Rahimi*'s North Star when it comes to the standard for disarmament, but the Government has not shown that Mr. Ayala is dangerous.

While Amici can only speculate as to Mr. Ayala's specific motivations, he likely chose to carry a firearm because, as a semi-truck driver for the postal service, *Ayala,* 2024 WL 132624, at *1, he frequently found himself alone and vulnerable in remote places. A handgun for self-defense is thus a sensible choice, albeit one that is against the *current* rules of his employment.[8]

---

[8] It was not always this way. In the past the postal service has sporadically issued firearms to its employees as security against robbers, as the district court recognized it did in the 19th century. *Ayala,* 2024 WL 132624, at *5. The same has also occurred more recently. *See* Heather Shelton, *Throwback Thursday: Postal workers start packing pistols in 1961,* Times-Standard (Eureka, Cal.) (February 18, 2020), https://www.times-standard.com/2018/09/27/throwback-thursday-postal-workers-start-packing-pistols-in-1961/ (last visited September 15, 2024) ("With mail robberies and violent hold-ups on the rise, the office of the postmaster general made a bold directive [in 1961]…All U.S. post offices were mandated to hold small-firearms training sessions and key postal personnel throughout the nation were being equipped with loaded .38-caliber Colt revolvers.").

Regardless, as a licensed CCW permit holder, nothing in the record indicates Mr. Ayala is a dangerous person, and that is critical. In *Rahimi*, the U.S. Supreme Court explained that "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." 144 S. Ct. at 1902. This is a significant blow to the Government's arguments because, with § 930(a), it disarms everyone in post offices by default without any finding that they pose a credible threat. The Government states that the law is "designed to maintain safety and order on government property," US.Br. 28, but never claims Ayala is a dangerous person.

That is probably because it would fail. Mr. Ayala has gone through the trouble of getting a concealed weapon license ("CCW permit") from Florida, *Ayala*, 2024 WL 132624, at *1, indicating he is someone who is otherwise predisposed to following the law. The data overwhelmingly show that Americans with CCW permits are extraordinarily law-abiding. For example, in 2020, Texas had 1,626,242 active carry permit holders.[9] Carry permit holders thus made up about 5.6 percent of the state population of 29,145,505 in 2020.[10] But permit holders made up just 114 of the state's 26,304 criminal convictions.[11] That is just slightly more than four-tenths of one

---

[9] *See Active License/Certified Instructor Counts as of December 31, 2020*, Tex. Dep't of Pub. Safety, https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/actlicandinstr/activelicandinstr2020.pdf (last visited September 15, 2024).

[10] *See Texas: 2020 Census, Texas Added Almost 4 Million People in Last Decade*, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html.

[11] *See Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2020 – 12/31/2020*, at 5, Tex. Dep't of Pub. Safety (Feb. 11, 2021), https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/convictio

percent of the state's serious crimes. Even among those few convictions, most involved no gun. Of those that did, permit holders were responsible for an even smaller percentage. *See id.* For example, there were 1,441 convictions for aggravated assault with a deadly weapon in 2020, but people with a valid carry permit committed just four of those—less than three-tenths of one percent of the total. *See id.*

Other states evidence this trend too, including the one where the facts of this case occurred. As of August 2024, Florida had issued 6,144,365 concealed weapon permits since October 1, 1987. Of those, 2,449,492 are still active today.[12] In that 37-year period, only 20,621 permits have been revoked without being reinstated, or roughly three-tenths of one percent of the total issued. *See id.*

Similar data exist in Wisconsin,[13] Minnesota,[14] and many other states, and data to the contrary are nonexistent. As a result, several courts have recognized the lack of evidence supporting efforts to tie criminality to those lawfully carrying for self-defense. "[D]espite ample opportunity for an evidentiary hearing, the State has failed to offer any evidence that law-abiding responsible citizens who carry firearms in

---

nratesreport2020.pdf (last visited September 15, 2024).

[12] *See Concealed Weapon or Firearm License Summary Report Oct. 1, 1987- Aug. 31, 2024*, at 1, Fla. Dep't of Agric. & Consumer Servs., Div. of Licensing (June 30, 2023), https://ccmedia.fdacs.gov/content/download/7499/file/cw_monthly.pdf (last visited September 15, 2024).

[13] *Department of Justice Concealed Carry Annual Report–175.60(19)–January 1 – December 31, 2022*, at 1-2, Wisc. Dep't of Just., https://www.doj.state.wi.us/sites/default/files/dles/ccw/2022%20Annual%20CCW%20Statistical%20Report.pdf (last visited September 15, 2024).

[14] *BCA Releases 2021 Permit to Carry Annual Report, Data Provided to BCA by Minnesota Law Enforcement Agencies*, Minn. Dep't of Pub. Safety (Mar. 1, 2022), https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-Releases-2021-Permit-to-Carry-Annual-Report.aspx (last visited September 15, 2024).

public for self-defense are responsible for an increase in gun violence." *Koons v. Platkin*, 673 F. Supp. 3d 515, 577 (D.N.J. 2023). "Simply put, CCW permitholders are not the gun wielders legislators should fear." *May v. Bonta*, No. 23-cv-01696, 2023 WL 8946212, at *19 (C.D. Cal. Dec. 20, 2023). "[T]he vast majority of conceal carry permit holders are law abiding." *Wolford v. Lopez*, 686 F. Supp. 3d 1034, 1076 (D. Haw. 2023).

## CONCLUSION

For these reasons, Amici urge this Court to affirm the district court and rule that § 930(a) is unconstitutional as applied to post offices.

Dated: September 23, 2024

Respectfully submitted,

**MICHEL & ASSOCIATES, P.C.**

/s/ C.D. Michel
C.D. Michel
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Email: cmichel@michellawyers.com
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of Amici Curiae with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit on September 23, 2024, using the Appellate Electronic Filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: September 23, 2024          **MICHEL & ASSOCIATES, P.C.**

/s/ C.D. Michel
C.D. Michel
*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.       This brief complies with: (1) type-volume limitation of Federal Rules of Appellate Procedure 29)a)(5), 32 (a)(7)(B)(i), and 11 Cir. R. 32-4 because it contains 6487 words, excluding the parts of the brief exempted by Rule 32(f).

2.       This brief complies with the typeface requirements of Fed. R. App. P. Rule 32(a)(5) and the type style requirements of Fedl R. App. P. 32(A)(6) and 11 Cir. R. 32-3 because it has been prepared in a proportionally spaced typeface using Microsoft Word (14-point Garamond and is double spaced).

Dated: September 23, 2024                    Respectfully submitted,

                                            **MICHEL & ASSOCIATES, P.C.**

                                            /s/ C.D. Michel
                                            C.D. Michel
                                            *Counsel for Amici Curiae*