No. 24-10462-DD

In the
United States Court of Appeals
for the Eleventh Circuit

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

EMMANUEL AYALA,

*Defendant-Appellee*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 8:22-CR-369-KKM-AAS-1

---

**REPLY BRIEF OF THE UNITED STATES**

---

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

SEAN SIEKKINEN
Assistant United States Attorney
Appellate Division
USA No. 192
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

December 9, 2024

*United States v. Emmanuel Ayala*
No. 24-10462-DD

## Certificate of Interested Persons and Corporate Disclosure Statement

The initial certificate of interested persons and corporate disclosure statement filed by the United States is complete.

No publicly traded company or corporation has an interest in the outcome of this appeal.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement......... C-1

Table of Contents ........................................................................i

Table of Citations..........................................................................

Argument and Citations of Authority ..............................................1

    I.    *Heller*'s and *Bruen*'s explicit acceptance of firearm prohibitions at schools and government buildings should resolve this appeal ......................................................1

    II.    Regardless, the historical record sufficiently demonstrates a contemporaneous understanding of the government's authority to restrict firearms in government buildings ...............10

    III.    Combined with the historical regulations above, the Property Clause further reflects a historical understanding of the government's authority to prohibit firearms in government buildings................................................................13

    IV.    Recent cases further support the constitutionality of firearm prohibitions in schools and government buildings.....................14

Conclusion.................................................................................16

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

i

# Table of Citations

## Cases

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) ............................................................. 14, 15

*Bonidy v. U.S. Postal Serv.,*
    790 F.3d 1121 (10th Cir. 2015) ...................................................................9

*Bruen,*
    597 U.S. n.4 ....................................................... 1, 2, 5–7, 9, 10, 12, 14, 15

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .................................................................. 1–10, 12, 15

*Faheem-El v. Klincar,*
    841 F.2d 712 (7th Cir. 1988) .......................................................................5

*Garcia v. United States,*
    469 U.S. 70 (1984) ....................................................................................12

*Peterson v. BMI Refractories,*
    124 F.3d 1386 (11th Cir. 1997) ...................................................................8

*Rahimi,*
    602 U.S. ..........................................................................................5, 6, 10–12

*Rocky Mountain Gun Owners v. Polis,*
    121 F.4th 96 (10th Cir. 2024) .....................................................................9

*United States v. Class,*
    930 F.3d 460 (D.C. Cir. 2019) ....................................................................7

*United States v. Dubois,*
    94 F.4th 1284 (11th Cir. 2024) ...........................................................1, 2, 8

*United States v. Focia,*
    869 F.3d 1269 (11th Cir. 2017) ...................................................................8

*United States v. Rozier,*
    598 F.3d 768 (11th Cir. 2010) ................................................................1–8

*Wolford v. Lopez*,
   116 F.4th 959 (9th Cir. 2024) .........................................................11, 13, 14

## Statutes

18 U.S.C. § 922(a)(5) ...........................................................................8

18 U.S.C. § 922(g) ...............................................................................8

18 U.S.C. § 922(g)(1) ...........................................................................8

18 U.S.C. § 930 .......................................................................... 1, 14, 16

## Other Authorities

Act of Feb. 20, 1792, ch. 7, § 17, 1 Stat. 237................................................12

https://en.wikipedia.org/wiki/ Old_Post_Office_(Washington,_D.C.),
   *last visited* Dec. 3, 2024................................................................11

The "Sensitive Places" Doctrine,
   13 Charleston L. Rev. 205 (2018).............................................................7

## Argument and Citations of Authority

The district court erred in dismissing count one of the indictment, as we explain in our principal brief. That charged offense, a violation of 18 U.S.C. § 930, does not violate the Second Amendment. The Supreme Court and this Court have decided that firearm restrictions in schools and government buildings are the sort of longstanding restrictions that comport with the Second Amendment. And even if that were not the case, the historical record here shows that this restriction satisfies *Bruen*, and that's especially so as refined by *Rahimi*.

**I.    *Heller*'s and *Bruen*'s explicit acceptance of firearm prohibitions at schools and government buildings should resolve this appeal.**

Ayala argues that the Supreme Court's repeated assurances that its opinions in *Heller* and *Bruen* cast no doubt on presumptively lawful firearm prohibitions in schools and government buildings do not govern this case, as they are non-binding dicta. *See* Ayala's brief at 25–38.[1] This Court, though, has already rejected that argument, recognizing in both *United States v. Rozier,* 598 F.3d 768, 771 n.6 (11th Cir. 2010), and *United States v. Dubois*, 94 F.4th 1284, 1292 (11th Cir. 2024), that the Supreme Court's treatment of those sorts

---

[1]We use the parties' pagination, rather than the clerk's, when citing the parties' briefs.

of prohibitions is binding (and would be entitled to substantial deference—controlling deference here—regardless). *See* United States' principal brief at 22–24.

In *Rozier*, 598 F.3d at 771 n.6, this Court addressed one portion of that assurance in *Heller*—firearm prohibitions for convicted felons—quoting that part of the Supreme Court's list of lawful firearm restrictions: "'[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by *felons* … .'" *Id.* at 771 (emphasis ours, ellipsis this Court's) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). This Court explained that "to the extent that [this language] limits [*Heller*'s protections] to possession of firearms by *law-abiding* and *qualified individuals*, it is not dicta." *Rozier,* 598 F.3d at 771 n.6 (emphasis in original). After *Bruen*, this Court quoted *Rozier* and confirmed that *Heller*'s now-repeated assurances remain binding. *See Dubois*, 94 F.4th at 1292.

Recall, the Supreme Court's full statement in *Heller* was that the opinion should cast no doubt on firearm prohibitions for felons *or* for the mentally ill *or* "in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626. Ayala argues that the category quoted in *Rozier* and *Dubois*—felons—was necessary to the decision in *Heller,* but the others were not, because "*Heller* repeatedly identified law-abiding citizens as those protected by

2

the Second Amendment." Ayala's brief at 30–31.

But the issue in *Heller* was not whether felons or any other group could possess firearms. The issue was whether the District of Columbia could prohibit firearms in the home. *See Heller*, 554 U.S. at 635. The point of each enumerated category was the same: Although the Second Amendment guarantees the right to possess lawful firearms in the home for self-defense, that does not open the door to attack certain other firearm regulations—not laws prohibiting felons from possessing firearms, not laws prohibiting the mentally ill from possessing firearms, and not laws prohibiting firearms in schools or government buildings. Although footnote 6 in *Rozier* mentions only the government's authority to prohibit felons from possessing firearms, the footnote does not distinguish the other categories of presumptively lawful firearm regulations that *Heller* identified. *Heller* equated the government's authority to prohibit felons or the mentally ill from possessing firearms with its authority to prohibit firearms in schools and government buildings. Then, in *Rozier*, this Court acknowledged that the Supreme Court's statement was not dicta to the extent that it limits *Heller*'s protections "to possession of firearms by *law-abiding* and *qualified individuals*." *Rozier*, 598 F.3d at 771 n.6 (emphasis this Court's). This Court's observation in *Rozier* does not suggest that *Heller*'s recognition of presumptively lawful firearm prohibitions in schools and

3

government buildings (which were not at issue in *Rozier*) was any less necessary to *Heller* or should be entitled to less weight than *Heller*'s simultaneous recognition of presumptively lawful prohibitions against felons possessing firearms.

And, although Ayala suggests that *Heller* acknowledged that its statement was not a holding, Ayala's brief at 31–33, the Court did not say that. The Court stated that those "exceptions" to the Second Amendment had "historical justifications," which the Court would have "time enough to expound upon" "if and when those exceptions come before" it. 554 U.S. at 635. The Court did not say that the exceptions were up to debate.

To be sure, *Heller* emphasized that a person "disqualified from the exercise of Second Amendment rights" has no right to possess a firearm at home, 554 U.S. at 635, but that clarification does not make the restriction for felons "more" necessary to the Court's opinion, or make the limits as to mentally ill persons or schools and government buildings "less" necessary. Each limit was necessary, in the Court's view, for the reason we have explained. They collectively establish outer bounds for the framework that the Court prescribed, as this Court observed in footnote 6 in *Rozier*. This Court's statement that the above-quoted language "is not dicta ... to the extent that [it] limits the [*Heller*] opinion to possession of firearms by *law-abiding* and *qualified*

4

*individuals,*" *Rozier,* 598 F.3d at 771 n.6 (emphasis in original), does not imply that the quoted limit (as to felons) was more necessary than the limits that this Court skipped over with an ellipsis (including presumptively lawful firearm restrictions in schools and government buildings).

Like any "comprehensive decision" of the Supreme Court, "almost all of the opinion *could* be labeled dicta," in the same way that Ayala characterizes the limits in *Heller* and *Bruen*. *See Faheem-El v. Klincar*, 841 F.2d 712, 730 (7th Cir. 1988) (Easterbrook, J., concurring) (emphasis added). The safeguards that the Supreme Court famously decreed in *Miranda v. Arizona* are one example. Those "details of *Miranda* ... could be disregarded," in theory, "on the ground that Ernesto Miranda had not been given any warning, so the Court could not pronounce on the consequence of giving three but not four of the warnings on its list." *Id*. But the Supreme Court "has rebuffed arguments of this sort." *Id*. (collecting cases affirming *Miranda* and other "comprehensive" decisions). This Court should likewise rebuff Ayala's attempt to cast aside the parts of *Heller* and *Bruen* that he doesn't like.

Nor does *United States v. Rahimi*, 602 U.S. 680 (2024), suggest that the assurances were "not part of *Heller*'s holding" (or otherwise not entitled to deference), as Ayala argues. Ayala's brief at 34. To the contrary, the part of *Rahimi* that Ayala cites provides guidance for future cases in much the same

way as *Heller* and *Bruen*. After holding that the challenged statute did not violate the Second Amendment, the Court went a step further and rejected the United States' alternative argument that "Rahimi may be disarmed simply because he is not 'responsible.'" *Rahimi*, 602 U.S. at 701–02 (explaining that "'[r]esponsible' is a vague term" and "[i]t is unclear what such a rule would entail"). And then, far from undermining those assurances, *Rahimi* repeated them yet again: "But *Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Rahimi*, 602 U.S. at 699 (quoting *Heller*, 554 U.S. at 626–27).

Likewise unpersuasive is Ayala's reliance on the Supreme Court's use of the term "presumptively." *See* Ayala's brief at 29–33. For one thing, this Court has already said that "[t]his language suggests that statutes disqualifying felons from possessing a firearm *under any and all circumstances* do not offend the Second Amendment." *Rozier*, 598 F.3d at 771 (emphasis added). This is not the language of something that's "thought to be true because it is highly probable," as Ayala describes it. Ayala's brief at 29. Rather, this Court explained, the Supreme Court used the language it did to recognize "a constitutional avenue to restrict the Second Amendment right of certain classes

6

of people." *Rozier*, 598 F.3d at 771. As discussed above, the Supreme Court applied that same language to schools and government buildings, and the same constitutional avenue permits the firearm restriction at issue here.

Similarly unavailing is Ayala's reliance on a supposed ambiguity created by the Supreme Court's use of the term "longstanding." *See* Ayala's brief at 28. The Supreme Court has said that these specified restrictions—including on the possession of firearms by felons and the mentally ill, and on the carrying of firearms in sensitive places such as school and government buildings—are longstanding, and the Court categorized them as lawful. The Court did not say that each variation among these categories must be independently evaluated for its longstandingness. *See United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) ("'schools' and 'government buildings' [are] the paradigmatic 'sensitive places' identified in *Heller*"), abrogated on other grounds by *Bruen*, 597 U.S. at 19 n.4.[2]

---

[2]Although FPC states in its amicus brief that *Bruen* identifies only three examples of government sensitive spaces, FPC brief at 8 n.4, that's incorrect. The Court recognized the "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'" and invited the courts to analogize from them "to determine whether modern regulations are constitutionally permissible." *Bruen*, 597 U.S. at 31. Indeed, the Court cited for that proposition a law review article that put it this way: "Where may the government prohibit the bearing of arms? In *District of Columbia v. Heller,* the U.S. Supreme Court offered a short answer: 'in sensitive places such as schools and government buildings.'" D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247

This Court, too, has made this clear. In *United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017), for example, this Court upheld 18 U.S.C. § 922(a)(5) because it fit within that presumptively lawful group as a restriction that "merely 'impos[es] conditions and qualifications on the commercial sale of arms.'" *Id.* at 1286.[3]  This Court did so not because it deemed that particular restriction to be longstanding; it did so because the restriction "qualifies as the kind of 'presumptively lawful regulatory measure[ ]' described in *Heller*." *Id.* And this Court did the same thing in *Rozier* and *Dubois*. In neither case did this Court analyze section 922(g) to determine whether its prohibition was a longstanding one. This Court instead held that, under *Heller*, section 922(g)(1)—in restricting firearm possession by felons—is "a presumptively lawful longstanding prohibition." *Rozier*, 598 F.3d at 771. The same is true here.

In any event, this Court has explained that the Supreme Court's assurances are entitled to "considerable weight" even if they are dicta. *Rozier*, 598 F.3d at 771 n.6. "[D]icta from the Supreme Court is not something to be lightly cast aside." *Peterson v. BMI Refractories,* 124 F.3d 1386, 1392 n.4 (11th

_____

(2018).

---

[3] *Heller*'s accepted measures include this category, in addition to the felon, mentally-ill, and sensitive-places restrictions. *Heller*, 544 U.S. at 626–27.

8

Cir. 1997). And the Supreme Court has repeated this assurance three times now. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 119 (10th Cir. 2024) ("So, when it came to the statement and restatement that there are presumptively lawful firearm regulations under the Second Amendment, from *Heller* – to *McDonald* – to *Bruen*, our High Court went three-for-three.").

As the Tenth Circuit explained in "conclud[ing] that the Second Amendment right to carry firearms does not apply to federal buildings, such as post offices," "[W]e are bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015). The Court added that, "this dicta squarely relates to the holdings itself, and therefore is assuredly not gratuitous" and "was subsequently repeated largely verbatim and reendorsed by the Court several years later in *McDonald*." *Id.*[4]

In sum, Ayala provides no good reason for this Court to ignore *Heller* and *Bruen*, specifically the Supreme Court's repeated assurances that those cases cast no doubt on laws prohibiting firearms in schools or government

---

[4]Although the NRA states that *Bonidy* upheld the restriction based on now-discredited intermediate scrutiny, NRA Amicus brief at 24, that is incorrect. The Court applied that standard only as an alternative basis for its holding, and only as to the post office's parking lot. *See Bonidy*, 790 F.3d at 1123.

buildings.

## II. Regardless, the historical record sufficiently demonstrates a contemporaneous understanding of the government's authority to restrict firearms in government buildings.

As for *Bruen*'s historical-tradition test, Ayala argues that the historical analogues cited in *Heller*, *Bruen*, and our principal brief do not suffice because none involved firearm restrictions in post offices. *See* Ayala's brief at 38–53. We have already explained that such granularity is excessive, especially after *Rahimi* emphatically rejected the Fifth Circuit's insistence on such one-to-one "twins." *See* United States' principal brief at 32–36 (discussing *Rahimi*, 602 U.S. at 690–92). Yet Ayala relies on the Supreme Court's statement that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Ayala's brief at 40 (quoting *Bruen*, 597 U.S. at 26). Ayala frames the relevant problem here as "potential interference with postal services at a postal building" and claims that it "lacks a distinctly similar historical regulation." *Id*. But interference with postal services at dedicated government buildings like modern post offices was not a problem in the 18th century, or even for most of the 19th century,

10

because such buildings did not exist until much later, as we have explained. *See* United States' principal brief at 34–35 and Exhibits A–D. The "post offices" of the 18th and early 19th centuries were generally taverns, coffee shops, or private residences. *Id*. We have found no record of any building owned or leased by the government exclusively for postal use prior to the late 19th century. Ayala's own evidence supports this. He cites recent reports from the State Department and the General Services Administration for the proposition that "legislative buildings or courthouses were [not] the only type of government buildings that historically existed." Ayala's brief at 46–47. We don't see how that's relevant (no one disputes it), but regardless, the earliest dedicated post office mentioned in either report is The Old Post Office in Washington, DC. *See* GSA report. The Old Post Office was built between 1892 and 1899. *See* https://en.wikipedia.org/wiki/ Old_Post_Office_(Washington,_D.C.), *last visited* Dec. 3, 2024. It would make no sense to measure the constitutionality of firearm restrictions in dedicated post offices (or any other modern building) against historical restrictions in buildings that did not exist at that time. *See Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024) ("[I]t is illogical to expect a government to regulate a place before it existed in modern form."). That would create "a law trapped in amber," contrary to the Supreme Court's instructions in *Rahimi*, 602 U.S. at

11

691. "[T]he reach of the Second Amendment is not limited only to those arms that were in existence at the founding," and, by the same logic, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 691–92. *Heller*, *Bruen*, and the evidence cited in our principal brief demonstrate that the regulation challenged here is "analogous enough to pass constitutional muster" when compared to historical firearm restrictions in government buildings that existed at the time of the founding. *See Rahimi*, 602 U.S. at 692. Those examples need not be voluminous, given the absence of historical "disputes regarding the lawfulness of such prohibitions." *Bruen*, 597 U.S. at 30.[5]

---

[5]Congress has recognized the sensitivity of the mail since the Founding. Founding era law did not address post office buildings because they were not yet in common existence. Instead, it protected "the delivery of the mails" by federalizing and severely penalizing armed assaults against lawful custodians and carriers of the mail. *See Garcia v. United States,* 469 U.S. 70, 80–82 (1984) (Stevens, J., dissenting) (surveying postal laws from 1792 through 1909 that made "it clear that a crime upon such a person was an unusually serious matter, not only because it was a federal offense, but also because of the severity of the mandated penalty"); *see also* Act of Feb. 20, 1792, ch. 7, § 17, 1 Stat. 237 ("That if any person or persons shall rob any carrier of the mail of the United States, of such mail, or if any person shall rob the mail, in which letters are sent to be conveyed by post, of any letter or packet, or shall steal such mail, or shall steal and take from or out of the same, or from or out of any post-office, any letter or packet, such offender or offenders shall, on conviction thereof, suffer death"). There is no evidence that prohibiting firearms in founding-era post offices—had they existed at the time—would have been contrary to then-prevailing traditions and understandings. To the contrary, it is abundantly clear that, even prior to the common existence of freestanding post offices, Congress was finely attuned to the extremely sensitive nature of the

### III. Combined with the historical regulations above, the Property Clause further reflects a historical understanding of the government's authority to prohibit firearms in government buildings.

Ayala argues that "federal statutes enacted pursuant to the police power vested in Congress by the Property Clause remain subject to constitutional scrutiny." Ayala's brief at 53 (quoting a district-court case from the Eastern District of California). We have not argued otherwise. The Property Clause is relevant here because, when taken together with the historical firearm regulations mentioned in our principal brief, the government's long recognized authority over its own property further suggests that our framers likely would have understood that it was within the government's power to restrict firearms in federally owned and operated buildings dedicated to the postal services, had such buildings existed at the time of the framing. *See* United States' principal brief at 28–32. As the Ninth Circuit recently observed along similar lines, even if the Second Amendment bars the government from prohibiting firearms in, for example, a privately owned bank, the bank itself could "prohibit firearms as a matter of the ordinary property-law right to exclude," and "if a state operates a bank, the state, too, may exercise its proprietary right to exclude, just as a

_____

mail and sought to protect it.

private property owner may." *Wolford*, 116 F.4th at 970–71.[6]

## IV.  Recent cases further support the constitutionality of firearm prohibitions in schools and government buildings.

No appellate court has yet addressed the constitutionality of 18 U.S.C. § 930 as to post offices, but two recent opinions recognize the government's authority to prohibit firearms in schools or related places following *Bruen*. In *Wolford v. Lopez*, the Ninth Circuit held that Hawaii and California laws banning firearms at playgrounds, youth centers, athletic areas, athletic facilities, and most real property controlled by the Department of Parks and Recreation or the Department of Fish and Wildlife, were likely valid. 116 F.4th 959 (9th Cir. 2024). The court noted that "playgrounds did not exist in modern form at the time of the Founding" but are "found primarily at schools and parks," which "qualify as 'sensitive places' that have a historical tradition of firearm bans." *Id.* at 985. And in *Antonyuk v. James*, the Second Circuit held that New York City laws banning the concealed carrying of handguns in parks and zoos were not facially unconstitutional. 120 F.4th 941 (2d Cir. 2024). The court found that "prohibiting firearms at zoos is consistent with the country's

---

[6]Amicus NRA has ended its quotation from *Wolford* right before this portion, *see* NRA brief at 12, but this portion supports firearm bans on government property when the government is acting in a proprietary capacity.

14

tradition of regulating firearms in places of educational and scientific opportunity, places heavily trafficked by children, and places that are densely crowded," *id.* at 1027, and that prohibiting firearms in urban parks fell "within a national tradition of regulating firearms in often-crowded public squares, including, specifically, city parks," *id.* at 1026. The notion that the Second Amendment prevents the government from prohibiting firearms in post offices or any other government building, contrary to the Supreme Court's assurances in *Heller* and *Bruen*, is difficult to reconcile with these recent opinions, which correctly recognize the binding force of the doctrinal limits in those cases.

## Conclusion

This Court should reverse the district court's ruling that 18 U.S.C. § 930 is unconstitutional as applied to Ayala, vacate the order dismissing that count, and remand for further proceedings.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

DAVID P. RHODES
Assistant United States Attorney
Chief, Appellate Division

By:    *s/ Sean Siekkinen*
SEAN SIEKKINEN
Assistant United States Attorney
Appellate Division
USA No. 192
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000
sean.siekkinen@usdoj.gov

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 3,526 countable words under 11th Cir. R. 32-4, complies with Fed. R. App. P. 32(a)(7)(B).

# Certificate of Service

I certify that a copy of this reply brief and the notice of electronic filing was sent by CM/ECF on December 9, 2024, to:

LAURA J. DAINES
Federal Public Defender's Office

*Counsel for Emmanuel Ayala*

*s/ Sean Siekkinen*
SEAN SIEKKINEN
Assistant United States Attorney