No. 24-10462

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

EMMANUEL AYALA,

*Defendant-Appellee.*

————————————————

On Appeal from the United States District Court
for the Middle District of Florida (No. 8:22-cr-00369)
(Hon. Kathryn Kimball Mizelle)

————————————————

**BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFF-APPELLANT THE UNITED STATES OF
AMERICA AND REVERSAL**

————————————————

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org

July 3, 2024

No. 24-10462

*United States v. Emmanuel Ayala*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT**

Everytown for Gun Safety (formally, Everytown for Gun Safety Action
Fund) has no parent corporations. It has no stock and hence no publicly held
company owns 10% or more of its stock.

Pursuant to 11th Cir. R. 26.1-1 – 26.1-4, Everytown for Gun Safety states
that, in addition to the persons listed in the Certificate of Interested Persons
contained in the brief of Appellant the United States of America filed on June 28,
2024, the following persons and entities have an interest in the outcome of this
case:

1.    Carter, Janet, *Counsel for amicus curiae Everytown for Gun Safety*

2.    Everytown for Gun Safety (formally, Everytown for Gun Safety
       Action Fund), a 501(c)(4) organization, *amicus curiae*

3.    Everytown Law, *Counsel for amicus curiae Everytown for Gun Safety*

4.    Taylor, William J., Jr., *Counsel for amicus curiae Everytown for Gun Safety*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ..........................................................................C-1

STATEMENT OF INTEREST ............................................................................1

STATEMENT OF THE ISSUE.............................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT .........................................................................................................2

I.    Litigants in Similar Cases Have Argued that Comprehensive, Government-Provided Security Is a Precondition to Location-Based Firearms Prohibitions.......................................................................................2

II.   Comprehensive, Government-Provided Security Is Not a Precondition to Location-Based Firearms Prohibitions.............................................................4

CONCLUSION.....................................................................................................11

# TABLE OF CITATIONS

## Cases

*Bonidy v. U.S. Postal Service*,
　790 F.3d 1121 (10th Cir. 2015)..............................................................6

*Burson v. Freeman*,
　504 U.S. 191 (1992) ...............................................................................7

*District of Columbia v. Heller*,
　554 U.S. 570 (2008) ...........................................................................3, 5

*Kipke v. Moore*,
　Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503 (D. Md. Sept.
　29, 2023) ................................................................................................6

*McDonald v. City of Chicago*,
　561 U.S. 742 (2010) ...............................................................................5

*New York State Rifle & Pistol Ass'n v. Bruen*,
　597 U.S. 1 (2022) ...........................................................................2, 3, 5

*United States v. Class*,
　930 F.3d 460 (D.C. Cir. 2019) ...............................................................6

*United States v. Rahimi*,
　No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024) ........................2, 5

## Statutes

1 *Laws of the State of New York* (Charles R. & George Webster eds., 1802)................8

10 *The Statutes at Large of Pennsylvania from 1682 to 1801* (William Stanley Ray ed.,
　1904) ......................................................................................................9

18 U.S.C. § 930(a) ............................................................................1, 3, 11

2 *Laws of Delaware* (Samuel Adams & John Adams eds., 1797)..................9

39 C.F.R. § 232.1(l) ...................................................................................3

*A Compilation of the Laws of the State of Georgia* (Augustine Smith Clayton ed., Augusta,
　Adams & Duyckinck 1812) ....................................................................9

*Extracts from the Journal of the Votes & Proceedings of the Provincial Congress of New Jersey* (1835)...................................................................................................................9

*Journal of the House of Delegates of the Commonwealth of Virginia* (Thomas W. White ed., 1828) .................................................................................................................................8

*The Laws of the State of Vermont* (Sereno Wright ed., 1808)..........................................9

*The Public Laws of Rhode Island and Providence Plantations* (Carter & Wilkinson eds., 1798) .................................................................................................................................8

*The Public Laws of the State of South-Carolina* (R. Aitken & Son ed., 1790) ...................9

## Other Authorities

Del. Const. of 1776, art. 28, *reprinted in Constitutions of the Several Independent States of America* (1786) ......................................................................................................................7

*Guarding the White House*, White House Hist. Ass'n, https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house ........................................................................................................................10

J. William Harris, *Portrait of a Small Slaveholder: The Journal of Benton Miller*, 74 Georgia Historical Quarterly 1 (1990)................................................................................10

Katie Zezima, *People Used to Be Able to Walk into the White House. Legally*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND...........................................................10

Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe ......................................................................7

United States Capitol Police, *Our History*, https://www.uscp.gov/the-department/our-history ......................................................................................................10

## STATEMENT OF INTEREST

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## STATEMENT OF THE ISSUE

Whether prohibiting an employee of the U.S. Postal Service from carrying a firearm in a post office under 18 U.S.C. § 930(a) is constitutional under the Second Amendment.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Federal law generally prohibits possessing a firearm in a federal facility. *See* 18 U.S.C. § 930(a). Applying § 930(a) to Appellee—a U.S. Postal Service employee

---

[1] No party's counsel authored this brief in whole or part, and, apart from Everytown, no person contributed money to fund its preparation or submission.

who possessed a firearm in a post office—is constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, No. 22-915, 2024 WL 3074728 (U.S. June 21, 2024), for the reasons stated in the government's opening brief, Dkt. 13-1 ("U.S. Br."). Everytown submits this amicus brief to address an issue that Appellee or amicus briefs supporting him might raise in response. Specifically, Everytown's brief demonstrates that, contrary to arguments challengers have raised in other, similar cases, a location does not need to be protected by comprehensive, government-provided security for a prohibition on guns in that location to be constitutional.

## ARGUMENT

### I.    Litigants in Similar Cases Have Argued that Comprehensive, Government-Provided Security Is a Precondition to Location-Based Firearms Prohibitions

Litigants challenging gun laws under the Second Amendment have argued in several cases that the only places where a government may constitutionally prohibit guns are those protected by comprehensive, government-provided security. This includes plaintiffs in two recently filed civil actions who, like Appellee in this case, assert that the federal law prohibiting guns in post offices is unconstitutional.

2

Most recently, the Firearms Policy Coalition, the Second Amendment Foundation, and other plaintiffs filed a Second Amendment challenge in the Northern District of Texas to (a) the application of 18 U.S.C. § 930(a) to post offices and (b) 39 C.F.R. § 232.1(l), a regulation that prohibits carrying and storing firearms on U.S. Postal Service property. *See* Complaint, *Firearms Pol'y Coal., Inc. v. Garland*, No. 4:24-cv-00565 (N.D. Tex. filed June 18, 2024), Dkt. 1 ("FPC Complaint"). The FPC Complaint relies on the decision below. *See id.* ¶¶ 27-28. It claims that the Supreme Court "has identified only three" locations as sensitive places—legislative assemblies, polling places, and courthouses, *id.* ¶ 26—despite *Heller*'s identification of "schools and government buildings" as "sensitive places" and *Bruen*'s reiteration of that point, *see District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *Bruen*, 597 U.S. at 30. It then asserts:

> The unifying principle allowing arms to be restricted in these locations at the Founding was comprehensive government-provided security. The federal government does not comprehensively secure post offices, so it cannot ban carry there.

FPC Complaint ¶ 26 (citations omitted).

In addition, We the Patriots USA, Inc. and an individual plaintiff have filed a similar challenge in the District of Connecticut, alleging that 18 U.S.C. § 930(a)'s prohibition on firearms in post offices violates the Second Amendment. Complaint, *Nastri v. Garland*, No. 3:24-cv-00222 (D. Conn. Filed Feb. 20, 2024), Dkt. 1 ("Nastri Complaint"), at 12. Like the FPC Complaint, the Nastri Complaint contends that

3

the "lack of ... security measures" like "airport-style screening" at post offices means "the federal government may not ban the carrying of firearms" there. *Id.* ¶¶ 39-40. It also cites to the district court proceedings below. *See id.* ¶ 14.[2]

Because the FPC Complaint and the Nastri Complaint specifically focused on this case, and because challengers have made the ahistorical comprehensive-security argument in those and other location-restriction cases, we anticipate that the argument will be presented to this Court either by Appellee or potential amici curiae supporting him. Accordingly, this brief explains why that argument is wrong.

## II. Comprehensive, Government-Provided Security Is Not a Precondition to Location-Based Firearms Prohibitions

Any argument that the Second Amendment forbids prohibiting guns in the absence of comprehensive, government-provided security is mistaken. The two most obvious reasons for that are as follows. *First*, it is impossible to reconcile that

---

[2] The Firearms Policy Coalition, Second Amendment Foundation, and We the Patriots USA, Inc. have made similar assertions in other cases, as have other individuals and organizations challenging location-based gun restrictions. Notably, however, in at least one instance those three organizations appear not to have been able to convince *even other plaintiffs* that their security-based argument is tenable. *See* Corrected Consol. Opening Br. of Pls.-Appellants, *We the Patriots USA, Inc. v. Lujan Grisham*, Nos. 23-2166, 23-2167, 23-2185 (consol.), Doc. 010110993058, at 24 n.7 (10th Cir. filed Jan. 31, 2024) ("We the Patriots Br.") (stating that one individual and two organizational plaintiffs in consolidated appeal "do not join this and the following five paragraphs," which argued that comprehensive, government-provided security is a precondition to prohibiting guns in a location).

argument with *Heller* and *Bruen*'s recognition that guns may be prohibited in schools and government buildings. *Second*, the argument is also irreconcilable with *Bruen*'s confirmation that prohibitions in legislative buildings, polling places, and courthouses are also constitutional.

    **A.**    **Schools and government buildings**. As the government's brief explains, *Heller* recognized that guns may be prohibited in schools and government buildings, and *Bruen* reiterated *Heller*'s statement. *See* U.S. Br. 10-25; *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 30; *see also id.* at 81 (Kavanaugh, J., concurring) (reproducing *Heller* passage verbatim); *Rahimi*, 2024 WL 3074728, at *28 (Kavanaugh, J., concurring) (explaining that *Heller* "recognized a few categories of traditional exceptions to the [Second Amendment] right," including "'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'" (quoting *Heller*, 554 U.S. at 626)); *McDonald v. City of Chicago*, 561 U.S. 742, 787 (2010) (plurality op.) ("repeat[ing]" *Heller*'s "assurance[]" that the Court cast no doubt on firearms prohibitions in schools and government buildings).

    The constitutionality of these prohibitions alone is sufficient to defeat the comprehensive-security argument. Schools—which typically include not only buildings but yards, play areas, and athletic fields—routinely lack comprehensive, government-provided security. *See, e.g.*, *United States v. Class*, 930 F.3d 460, 465

(D.C. Cir. 2019) (explaining that "many schools and government buildings—the paradigmatic 'sensitive places' identified in [*Heller*]—are open to the public, without any form of special security or screening" (cleaned up)). Accordingly, "because *Bruen* conclusively named schools … [as] sensitive places, … [the] argument that sensitive places are limited to buildings with comprehensive, state-provided security is baseless." *Kipke v. Moore*, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023).

The same is true of government buildings. Any number of government buildings lack comprehensive security, such as public libraries, community recreation centers, and, of course, post offices. *See, e.g.*, *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1123 (10th Cir. 2015) (stating, in rejecting Second Amendment challenge to prohibition on firearms in post offices, that specific post office at issue "d[id] not regularly employ any security officers"); *id.* at 1133 (Tymkovich, J., concurring in part and dissenting in part) (stating that post office did not have "security … devices"); *see also Class*, 930 F.3d at 465 (referring to "a post office" as example of "an unsecured public building"). In essence, the comprehensive-security argument first ignores *Heller* and *Bruen*'s endorsement of firearms prohibitions in schools and government buildings, then invents a principle purportedly (but incorrectly, *see infra* Part II.B) based on the other location restrictions *Bruen* approves, and then tries to deploy that principle as a reason to

6

ignore *Heller* and *Bruen*'s endorsement of prohibitions in schools and government buildings. That is hopelessly circular.

**B.    Legislative buildings, polling places, and courthouses**. Even if proponents of the comprehensive-security argument were correct to ignore the constitutionality of firearms restrictions in schools and government buildings (and they are not), their argument fails on its own terms, because they have failed to establish that the three additional locations *Bruen* named—legislative assemblies, polling places, and courthouses—all feature comprehensive security. Polling places, for example, routinely lack such security. Indeed, law enforcement officers are often "barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process." *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality op.) (describing Tennessee law); *see also*, e.g., Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe (quoting Minnesota Secretary of State explaining that "you can't preemptively station or assign [police officers] to a polling place. You just can't do it. It's unlawful."). The same was true historically. *See* Del. Const. of 1776, art. 28, *reprinted in The Constitutions of the Several Independent States of America* 143-44 (1786) (mandating that "*no persons* shall come armed" to any election and that no "battalion or company, in the pay of the continent, or of this or any other State"

shall come within one mile of any election-place for twenty-four hours before or after an election (emphasis added)).

Furthermore, efforts litigants have made to show that legislative buildings, polling places, and courthouses all had comprehensive, government-provided security historically fall short. For example, plaintiffs in *We the Patriots* argued that legislative buildings had such security, but none of the nine statutes they cited came close to establishing their claim. *See* We the Patriots Br. 25-26.[3] Two of their citations had nothing to do with legislative buildings, let alone security in those buildings. *See id.* at 26 (citing 1 *Laws of the State of New York* 532 (Charles R. & George Webster eds., 1802), which concerns militia regulations); *id.* (citing *Journal of the House of Delegates of the Commonwealth of Virginia* 77 (Thomas W. White ed., 1828), which contains no mention of legislative buildings). Two allowed for a payment to sheriffs, constables, or similar officers *if* they attended the general assembly, but did not set out any conditions or requirements regarding when they should attend, how many should attend, or what their duties would be if they did so. *See id.* at 25 (citing *The Public Laws of Rhode Island and Providence Plantations* 220, 222 (Carter & Wilkinson eds., 1798)); *id.* at 26 (citing *The Laws of the State of Vermont* 382, 387 (Sereno Wright

---

[3] The *We the Patriots* plaintiffs included copies of these statutes in Attachment B to their originally-filed opening brief. *See* Consol. Opening Br. of Pls.-Appellants, *We the Patriots USA, Inc. v. Lujan Grisham*, Nos. 23-2166, 23-2167, 23-2185 (consol.), Attachment B, Doc. 010110991418 (10th Cir. filed Jan. 29, 2024).

ed., 1808)). The remaining five statutes each allowed for daily or annual payments to a single "door-keeper" or to one door-keeper for each legislative house (and in one instance, to an additional sergeant-at-arms). *See id.* at 25 (citing 2 *Laws of Delaware* 1100, 1118 (Samuel Adams & John Adams eds., 1797), which allows for a fee to "the Door-keepers of the respective Houses" of one dollar for "every day's attendance"); *id.* (citing 10 *The Statutes at Large of Pennsylvania from 1682 to 1801* 378 (William Stanley Ray ed., 1904), which allows for payment of ten shillings for "every day's attendance" to each of "[t]he sergeant-at-arms," "[t]he door-keeper of the council[,] and the door-keeper of the house of assembly"); *id.* at 25-26 (citing *The Public Laws of the State of South-Carolina* 426-27 (R. Aitken & Son eds., 1790), which provides for an annual salary for "[t]wo Door-keepers"); *id.* at 26 (citing *A Compilation of the Laws of the State of Georgia* 372-73 (Augustine Smith Clayton ed., Augusta, Adams & Duyckinck 1812), which allows for payment of three dollars per day to two individuals in dual role of "messenger and door-keeper," one for each chamber); *id.* (citing *Extracts from the Journal of the Votes & Proceedings of the Provincial Congress of New Jersey* 240 (1835), which provides for payment of five shillings per day to "the door keeper, … for each day that he hath or shall attend this Congress"). But none of these statutes mandated how often these door-keepers attended the legislative buildings, explained their duties when they did so, or ensured that these positions were constantly (or ever) filled. And, in any event, one

or two individuals for an entire legislative house does not amount to meaningful, let alone "comprehensive," security. *Cf.* J. William Harris, *Portrait of a Small Slaveholder: The Journal of Benton Miller*, 74 Georgia Historical Quarterly 1, 14 (1990) (explaining that Benton Miller, who served as door-keeper in Georgia House from 1873 to 1888, had lost "more than four inches of his left leg" in the Civil War and walked with crutch and cane).

Indeed, even such indisputably sensitive places as the U.S. Capitol and the White House lacked serious security for decades. *See* United States Capitol Police, *Our History*, https://www.uscp.gov/the-department/our-history (explaining that when Congress moved to Washington, DC in 1800, a "lone watchman, John Golding, was hired to protect the Capitol Building," and that the watch remained one person until 1828, when it was expanded to four); Katie Zezima, *People Used to Be Able to Walk into the White House. Legally*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND ("Despite being open to the public, there was very little security at the White House until a drunk man threw rocks at President John Tyler…. Abraham Lincoln … stationed guards at the White House. After the Civil War, however, security measures dropped off."); *Guarding the White House*, White House Hist. Ass'n, https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house (last visited June 20, 2024) (timeline describing no guards at White House before 1830, other than militia presence on White

10

House grounds during War of 1812, and no permanent security force until a four-man guard was established in 1842).

## CONCLUSION

This Court should reject any argument that the government may only prohibit firearms in locations with comprehensive, government-provided security and should reverse the district court's decision that 18 U.S.C. § 930(a) is unconstitutional as applied to Appellee.

Respectfully submitted,

Dated:  July 3, 2024                Janet Carter

Janet Carter
William J. Taylor, Jr.
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8174
jcarter@everytown.org
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

11

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App. P. 29(a)(5) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 2,412 words.

2.      This document also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.


Dated:  July 3, 2024                    Janet Carter

                                        Janet Carter
                                        William J. Taylor, Jr.
                                        Everytown Law
                                        450 Lexington Avenue, P.O. Box 4184
                                        New York, NY 10163
                                        (646) 324-8174
                                        jcarter@everytown.org
                                        *Counsel for Amicus Curiae*
                                        *Everytown for Gun Safety*